**BEFORE THE ARBITRATION COMMITTEE ESTABLISHED UNDER SECTION 1(e)**

**OF THE MERGER PROTECTION AGREEMENT OF NOVEMBER 16, 1994**

| | |
|---|---|
| MICHAEL J. KNAPIK, et al., | Case No. 69-722 |
|     Claimants, | |
|        v. | |
| PENN CENTRAL, | |
|     Carrier. | |

| | |
|---|---|
| ROBERT WATJEN, et al., | Case No. 69-675 |
|     Claimants, | |
|        v. | |
| PENN CENTRAL, | |
|     Carrier. | |

| | |
|---|---|
| DAVID C. BUNDY, et al., | Case No. 69-947 |
|     Claimants, | |
|        v. | |
| PENN CENTRAL, | |
|     Carrier. | |

| | |
|---|---|
| G.V. SOPHNER, et al., | Case No. 74-914 |
|     Claimants, | |
|        v. | |
|     PENN CENTRAL, | |
|     Carrier. | |

## ARBITRATION AWARD
## MAJORITY & DISSENTING OPINIONS

**Members of the Arbitration Committee:**
Steven H. Steinglass, Chairman/Neutral Arbitrator
Dennis R. Lansdowne, Party-Appointed Arbitrator
Joseph P. Tomain, Party-Appointed Arbitrator, Dissenting

**Appearances**

| **For the Claimants** | **For Penn Central** |
|---|---|
| Carla M. Tricarichi | Michael L. Cioffi |
| Randy J. Hart | Michael A. Cioffi |
| Mark Griffin | Thomas H. Stewart |
| Bernard S. Goldfarb | Jason D. Groppe |

# Table of Contents

I.      Introduction ………………………………..……………………………  1
II.     Principal Issues……………………………………………………..……  5
III.    Background…………………………………………………………..........  6
        A.      Post-World War II Decline in Railroad Passenger Traffic……………….  6
        B.      The Penn Central Merger and its Aftermath…………………………….  8
IV.     The Parties………………………………………………………… 12
        A.      Claimants…………………………………………………………... 12
                1.      Knapik Claimants………………………………………………. 12
                2.      Sophner Claimants …………………………………………. 15
                3.      Watjen and Bundy Claimants…………………………………. 16
        B.      The Carrier…………………………………………………………18
V.      Procedural History ……………………………………………………….... 23
        A.      Knapik v. Penn Central Company--1976 Decision…………………………23
        B.      Consolidated Case--1979 Memorandum Opinion and Order …………….. 24
        C.      Blackwell Arbitration Decision ……………………………….…... 26
        D.      Surface Transportation Board Decision ……………………….......... 28
        E.      Sixth Circuit Review …………………………………………… 32
        F.      Subsequent District Court Proceedings--Renewed Efforts to Arbitrate …... 35
        G.      Pre-Hearing Proceedings ……………………………………… 35
        H.      Interim Decision ……………………………………………… 36
        I.      The Hearing ………………………………………………… 38
VI.     Preliminary Issues ………………………………………………….............39
        A.      Delay ……………………………………………………………40
        B.      Spoliation ……………………………………………………… 46
        C.      Burdens of Proof ………………………………………………. 51
        D.      Evidentiary Issues ……………………………………………. 55
VII.    The Causation Issue …………………………………………………59
        A.      Knapik Claimant …………………………………………………68
        B.      Sophner Claimants ………………………………………….....69
        C.      Watjen and Bundy Claimants ………………………………… 70
VIII.   The Work-Related Eligibility Issues ……………………………………70
        A.      Knapik Claimants ……………………………………………….75
        B.      Sophner Claimants ………………………………………….……79
        C.      Watjen and Bundy Claimants ……………………………………… 81
IX.     The Compensation Loss Issues ………………………………………86
        A.      Expert Testimony--Proof of Compensation Loss …………………….... 91
                1.      Knapik Claimants …………………………………………….91
                2.      Sophner Claimants ……………………………………… 93
                3.      Watjen and Bundy Claimants ………………………….………. 95
        B.      Penn Central's Arguments—Compensation Loss …………………….…. 97
                1.      Failure to follow § 6(c) of the WJPA ……………………………. 98
                2.      Failure of Proof--Wage Guarantees/Base Period Earnings ……….. 98
                3.      Failure of Proof—Post-Merger Earnings …………………… 101
                4.      Use of Annual Earnings ………………………….…………...102

ii

|  |  | 5. | Denial of Benefits to Those without Any Income …………….……103 |
|  |  | 6. | Forecasting of Future Wages …………………………………….... 105 |
|  |  | 7. | Offsets for Voluntary Absences …………………………………... 106 |
|  | C. | Proof of Compensation Loss …………………………………………. 106 |
| X. | | The Enhancement Issues ……………………………………………………107 |
|  | A. | Prejudgment interest ……………………………………………………. 108 |
|  |  | 1. | Availability ……………………………………………..…………. 108 |
|  |  | 2. | Interest Rate and Compounding …………………………………. 117 |
|  | B. | Punitive Damages ………………………………………………............ 121 |
|  | C. | Attorney Fees and Costs ………………………………………………. 123 |
| XI. | | The Reorganization Issues ……………………………………………………. 125 |
| XII. | | Findings of Fact and Conclusions of Law …………………………………… 127 |
|  | A. | Knapik Claimants …………………………………………………....……128 |
|  |  | 1. | Causation & Work Requirements ………………………………… 128 |
|  |  | 2. | Compensation Loss ……………………………………..…………. 132 |
|  |  | 3. | Individual Findings ……………………………………………… 136 |
|  | B. | Sophner Claimants ……………………………………………………… 147 |
|  |  | 1. | Causation & Work Requirements ………………………………… 147 |
|  |  | 2. | Compensation Loss ……………………………………..…………. 149 |
|  |  | 3. | Individual Claimants ……………………………………..……...... 152 |
|  | C. | Watjen and Bundy Claimants ………………………………………… 168 |
|  |  | 1. | Causation & Work Requirements …………………….……....….... 168 |
|  |  | 2. | Compensation Loss ……………………………………..…………. 171 |
|  |  | 3. | Individual Findings ……………………………….……………… 173 |
| XIII. | | Relief ……………………………………………………………………176 |
|  |  | Schedule of Awards ……………………………………………………………................ 180 |
|  |  | Dissent ……………………………………………………………………………….. 1 |

iii

## I.      Introduction

On February 1, 1968, more than four decades ago, the Pennsylvania Railroad Company ("Pennsylvania Railroad") and the New York Central Railroad Company ("New York Central") merged into the Pennsylvania-New York Central Transportation Company ("Penn Central").[1]

In these consolidated arbitration proceedings, thirty-two former Penn Central employees seek compensation and related benefits (generically referred to as merger protection benefits) under a Merger Protection Agreement ("MPA")[2] negotiated in anticipation of the merger by the two railroads and the unions representing their employees. The MPA sought to protect the compensation and related benefits of railroad employees in the event the Interstate Commerce Commission ("ICC") approved the proposed merger.

The ICC approved the merger on April 6, 1966, but the merger did not produce the results its proponents had hoped for, and on June 21, 1970, Penn Central filed a petition for reorganization.  Notwithstanding the bankruptcy filing and the subsequent emergence of Penn Central from the reorganization, this dispute remains unresolved.

Since the merger, Penn Central and the claimants, Penn Central employees who had worked for the New York Central or its passenger subsidiary, the Central Union Terminals Company ("CUT"), have been contesting whether these former employees (or their survivors or other personal representatives) were entitled to merger protection benefits.

---

[1] Despite the changes in name and changes in corporate organization, we will generally refer to the carrier as "Penn Central," as it has been known throughout these proceedings.  For a discussion of the changes in name and corporate structure, see *infra* III.B. & IV.B.

[2] The Merger Protection Agreement was formally known as the Agreement for Protection of Employees in the Event of Merger of Pennsylvania and New York Central Railroads. Claimants' Ex. 1. The agreement contains an execution date of November 16, 1964, *see id* at 6, but its effective date was January 1, 1964.  *See* MPA, §5.

1

This "regrettably protracted dispute," *see Augustus v. Surface Transportation Board*, 238 F.3d 419, 2000 U.S. App. Lexis 33966, *1 (6th Cir. Dec. 12, 2000), *cert. denied*, 533 U.S. 949 (2001) (Penn Central Ex. 93), is being resolved through arbitration, as contemplated by §1(e) of the MPA and as a direct result of an order issued on November 29, 1979, by Judge Thomas D. Lambros of the United States District Court for the Northern District of Ohio in response to a motion by Penn Central.  *See* Memorandum Opinion and Order, Claimants' Ex. 6.

In his 1979 Memorandum Opinion and Order, Judge Lambros ordered the parties in the four above-captioned actions to arbitrate the claims for merger protection benefits.  Recognizing the right of the parties to structure their own arbitration proceeding, Judge Lambros nonetheless stated his belief that "the most efficient and equitable approach would be to have the same panel hear each case in order of complexity and the extent to which the issues have been previously defined and are related." *Id*. at 7. He then suggested an order for proceeding and concluded by expressing his hope that the "spirit" of "agreement and conciliation [that] is the foundation" of arbitration "will infect the parties and help them solve any procedural difficulties so that the substance of these long-suffered disputes can be reached and resolved." *Id*.

Judge Lambros's hopes have not been realized.  Although the parties negotiated an Agreement for Arbitration in 1980, *see* Claimants' Ex. 24, that provided, in relevant part, for the four cases to be heard serially before the same three-person arbitration panel, no arbitration proceedings were ever commenced (until now) in three of the four cases.  The fourth case, on the other hand, *Knapik v. Penn Central Company*, (No. C-69-772)(U.S. Dist. Ct. N.D. Ohio), the case that Judge Lambros hoped would provide guidance for resolution of the others, has been the subject of extensive judicial and administrative proceedings, including, an arbitration decision

2

that was vacated by Judge Lambros (1985), a completed arbitration proceeding (1992), an administrative review by the Surface Transportation Board ("STB")(1998),[3] judicial review in the Sixth Circuit (2000), and an unsuccessful petition for certiorari to the United States Supreme Court (2001).

The claimants in the present consolidated arbitration proceedings are ten of the original seventeen brakemen who were plaintiffs in the *Knapik* case, the sixteen carmen who were plaintiffs in *Sophner v. Penn Central Company*, (No. C-74-914)(U.S. Dist. Ct. N.D. Ohio), the two rate clerks who were plaintiffs in *Bundy v. Penn Central Company,* (No. C-69-947)(U.S. Dist. Ct. N.D. Ohio), and the four rate clerks who were plaintiffs in *Watjen v. Penn Central Company,* (No. C-69-975)(U.S. Dist. Ct. N.D. Ohio).

Subsequent to the 1998 decision of the STB in *Pennsylvania Railroad Company—Merger—New York Central Railroad Company*, STB Finance Docket 21989 (Dec. 2, 1998) (Claimants' Ex. 7), reversing, in part, the 1992 arbitration decision that had denied all claims in the *Knapik* case, the parties were not able to reach agreement concerning the resumption of arbitration.  Thus, in late 2004, the claimants notified the district court of their intention to pursue an earlier-filed motion that the court re-assert jurisdiction and order a return to arbitration. *See* Order, Claimants' Ex. 25, at 1-2.

On February 18, 2005, the United States District Court for the Northern District of Ohio, the Honorable Solomon Oliver, Jr. presiding,[4] granted the claimants' motion and ordered the

---

[3] The Surface Transportation Board is the successor to the ICC.

[4] Judge Lambros retired from the federal bench in 1995, and the four cases were eventually re-assigned to Judge Solomon Oliver, Jr.

parties to resume arbitration, a decision the court reaffirmed in its April 28, 2005, decision on Penn Central's motion for reconsideration. Claimants' Ex. 25.

Ultimately, this arbitration panel was appointed, *see* Order (June 23, 2006) (Claimants' Ex. 25), and on December 10-13, 2007, the panel held four days of hearings in Cleveland at the Carl B. Stokes United States Court House. Counsel have filed extensive post-hearing briefs, including proposed findings of fact and conclusions of law.

For the reasons described more fully in this opinion, we conclude that the thirty-two claimants (or their survivors or other personal representatives) are entitled to merger protection benefits. We further conclude that they are entitled to prejudgment interest to compensate them for the loss of the use of the disputed funds, but we reject their claims for punitive damages, attorney fees, and costs.

We reach these conclusions fully aware that time has taken its inevitable toll on the claimants. At the time of the hearing, only five of the original thirty-two claimants were alive with the remainder represented by duly appointed personal representatives. *See* Updated List of Plaintiffs and Notice of Substitution (August 1, 2007). Nonetheless, merger protection benefits are contractual benefits the entitlement to which survives the deaths of the employees, and we see no legal, equitable or other reason to not award the survivors or other personal representatives the benefits, including prejudgment interest, to which the deceased Penn Central employees were entitled.

In reaching our conclusions, we are also aware that the underlying litigation and the resulting arbitration proceedings have gone forward with the approval of the United States District Court for the Eastern District of Pennsylvania, which has continuing jurisdiction over the

4

Penn Central bankruptcy proceedings.  We recognize, as do the parties, that issues involving the enforcement of any award of prejudgment interest are not before this panel.  Nonetheless, the judge who has long presided over the Penn Central bankruptcy proceeding has made clear that the claimants were free to make a record on prejudgment interest, punitive damages, and attorney fees, *see In re Penn Central Transportation Company*, No. 70-bk-00347-JF, Order, para. 3 (January 9, 2008), and it is appropriate (and indeed our obligation) to address fully their claims for these items independent of any limitations that may flow from the reorganization.  And we conclude that the claimants have established their entitlement not only to merger protection benefits but also to prejudgment interest.  We express no view on whether principles of bankruptcy law preclude or otherwise make inappropriate either the award of merger protection benefits or the award of prejudgment interest.

Because the history of these proceedings strongly suggests that our decision will not be the final stop in this legal odyssey, we will provide a full history of this dispute as well as a full explanation of the basis for our award.

II.     **Principal Issues**

These arbitration proceedings seek to determine the eligibility of thirty-two former Penn Central employees to merger protection benefits under the MPA.  At the outset, we briefly identify the principal legal issues before us.

(a) **The Causation Issue**. Eligibility for merger protection benefits is governed by the MPA, and but for the merger and the resulting coordinations the claimants would not have viable claims for benefits.  Penn Central argues, however, that the MPA conditions benefits upon the claimants' showing that the merger was the "proximate cause" of any adverse effect on them, and that the decline in intercity railroad passenger service in the

decades preceding the merger, as contrasted to the merger, caused their losses of employment.  The claimants, on the other hand, argue that the MPA provides "attrition benefits" to protect the compensation and related benefits of otherwise eligible employees in the event of a merger and to insure that the merger did not deprive them of employment or place them in a worse position. The issue, then, is whether the MPA requires the claimants to prove that the merger was the proximate cause of their loss of employment?  And if there is a "causation" requirement of any kind, did the claimants satisfy it?

(b) **The Work-Related Eligibility Issues**.  Assuming there is no causation requirement in the MPA (or that the claimants met any causation requirement), did the claimants meet all other (*i.e.*, non-causation) eligibility requirements for merger protection benefits under the MPA, particularly eligibility requirements relating to the obligation to report to work and to exercise seniority rights?

(c) **The Compensation Loss Issues**.  Assuming the claimants are eligible for merger protection benefits under the MPA, did they establish the amount of damages (or compensation loss) to which they were entitled and, if so, what are those amounts?

(d) **The Enhancement Issues**.  Should any awards of merger protection benefits be enhanced by an award of prejudgment interest, punitive damages, attorney fees, or costs, and, if so, what should be the amount of any such enhancements?

(e) **The Reorganization Issues**.  What is the impact, if any, of the reorganization proceeding for Penn Central on these arbitration proceedings and on any relief to which the claimants may otherwise be entitled?

## III.    Background

## A.    Post-World War II Decline in Railroad Passenger Traffic

In the years following World War II, there was a precipitous decline in intercity railroad passenger traffic in the United States.  There were multiple causes for this decline, including the construction of the interstate highway system and the concomitant increase in the use of private automobiles, the introduction of jet aircraft for passenger use, the reduction of mail and express shipments on passenger trains (as a result of the fall of the Railway Express Agency and decisions by the United States Post Office), and the growth of suburbs at the expense of central

6

cities and their business districts.[5]  The decline in intercity railroad passenger service had a particularly harsh impact in Cleveland.  For example, the Pennsylvania Railroad ended all passenger service to Cleveland in approximately 1965, *see* Tr. 538, and the number of passenger trains using the CUT subsidiary each day fell from thirty-five in 1961 to eleven per day in 1972.[6]  And employment at CUT decreased from more than 550 employees in 1961 to roughly sixty employees in 1971.[7]

One of the ways in which the railroad industry attempted to address the economic issues confronting it was through mergers.  Interstate railroads in this country, however, were heavily regulated and extensively organized, and the merger of interstate railroads could only be consummated with the approval of the ICC.  One of the statutory requirements with which the ICC had to comply concerned the interests of railroad workers, and §5(2)(f) of the Commerce

---

[5] The decline in intercity railroad passenger service is described in great detail in the report of Penn Central's expert witness, Michael R. Weinman, *see* Penn Central Ex. 1, and in his testimony. *See* Tr. 505-575; *see also* Affidavit of Michael R. Weinman, Penn Central Ex. 2, Para. 2 (concluding that "the decline in railroad passenger service at the Cleveland Union Terminal, occurred in the natural course of the New York Central Railroad's business, and was not as a result of the merger").

Mr. Weinman's report and testimony provide a cogent explanation for the long-term decline in intercity railroad passenger service through Cleveland, but neither his testimony nor his report address the overall business decline experienced by the merged railroad. *See* Weinman Affidavit, *id*. at Para 2(a)-(n) (summarizing the factors contributing to the decline in intercity railroad passenger service at CUT and not addressing either the overall business decline in railroad service or the decline in freight service); *see also* Tr. 546 (making clear that his testimony did not address the issue of overall business decline).

More importantly, Mr. Weinman's conclusion that the decline in intercity railroad passenger service was not the result of the merger sheds little light on the issues in these proceedings.  We do not understand the claimants to be arguing that the merger caused the decline in railroad passenger service.  Rather, they acknowledge that the decline in business led to the merger, which, in turn, led to the losses of employment, but they contend that the MPA was designed to protect employees from such anticipated post-merger employment losses.  Thus, as we make explicit in our discussion of causation, *see infra* at VI., despite Mr. Weinman's cogent explanation for the causes of the post-World War II decline in intercity railroad passenger service, the claimants have established that the merger was the cause of their employment losses within the meaning of the MPA.

[6] *See* Weinman Affidavit, *id*. at Para 2(i).

[7] *Id. See also* STB Decision, at *7 n.14.

Act ("ICA"), 49 U.S.C. §5(2)(f)(1973),[8] expressly conditioned ICC approval of railroad mergers on the ICC "requir[ing] a fair and equitable arrangement to protect the interests of the railroad employes affected."  *Id*.  More specifically, the ICA required the ICC to include in any order of approval a provision guaranteeing that employees would not be placed "in a worse position with respect to their employment" during the four-year period after the effective date of the merger. *Id*.  The ICA also permitted merging carriers and duly authorized employee representatives to make agreements further protecting the interests of railroad employees.  *Id.*

### B.      The Penn Central Merger and its Aftermath

In 1962, the Pennsylvania Railroad and the New York Central filed a joint application with the ICC for authority to merge their properties and franchises.  *See* MPA, Whereas Clause, Para. [1].[9]  This application was based on a Joint Agreement of Merger, dated January 12, 1962, which identified the surviving corporation as Penn Central and which obligated Penn Central to

---

[8] The Transportation Act of 1940, ch. 722, §7, 54 Stat. 899, 906 (1940), brought §5(2)(f) into the Interstate Commerce Act.  *See Railway Labor Executives' Ass'n v. U. S.*, 339 U.S. 142, 146 (1950).  Section 5(2)(f) of the ICA, 49 U.S.C. §5(2)(f) , as amended by the Transportation Act of 1940, provided as follows:

As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

[9] The Whereas Clauses are not numbered, but this opinion uses bracketed numbers to identify unnumbered paragraphs of the MPA and other documents.

assume and be bound by the collectively-bargained labor agreements of both carriers.  *See* MPA, Whereas Clause, Para. [2].

The Penn Central merger represented an effort by the merging railroads to survive and prosper.  The Pennsylvania Railroad and the New York Central were major passenger and freight carriers in the northeastern United States, and they both had suffered mightily as intercity railroad traffic, especially passenger traffic, fell in the years following World War II.  *See generally* Weinman Report (Penn Central Ex. 1) and Weinman Affidavit (Penn Central Ex. 2).

Prior to obtaining ICC approval, the merging railroads made clear their "intent and purpose . . . to effectuate the merger through the unification, coordination, and consolidation of their separate facilities, all of which will or may have adverse effect upon employes represented by the labor organizations parties hereto. . . ."  MPA, Whereas Clause, Para. [3].

To strengthen their pending application for ICC approval of the merger, the railroads negotiated a "merger protection agreement" with the unions representing their employees.[10]  This agreement, the MPA, addressed employee protection and other issues unique to the Penn Central merger.  The unions representing the railroad employees had opposed the merger, but they hedged their bets by negotiating the MPA in anticipation of the ultimate approval of the merger by the ICC and the consummation of the merger.  *See* MPA, §3.

In approving the merger on April 6, 1966, the ICC noted that the merging railroads "have agreed to certain benefits greater than we have heretofore required of any . . . [merger

---

[10] In approving the merger, the ICC noted that the MPA was entered into by the merging railroads and 23 unions representing about 75% of the employees of the merging railroads. *See Pennsylvania Railroad Company— Merger—New York Central Railroad Company*, 327 I.C.C. 475, 543 (1966) (Claimants' Ex. 5).

applicants]."  *Pennsylvania Railroad Company—Merger-- New York Central Railroad Company*, 327 ICC 475, 545 (1966) (Claimants' Ex. 5).

On February 1, 1968, the Pennsylvania Railroad and the New York Central merged into Penn Central, and, as expected, Penn Central began taking steps to effectuate the merger through the unification, coordination, and consolidation of their separate facilities.[11]  For example, on February 21, 1968, Penn Central notified twenty-nine employees who worked at the CUT that they were being furloughed, effective February 25, 1968, *see* Claimants' Ex. 15 (*Knapik* claimants), and on January 10, 1969, it notified the *Watjen* and *Bundy* claimants that their positions were being abolished and that their work was being transferred to other offices.  *See* Claimants' Ex. 20.

Despite the high hopes that the merger would provide a bright future for railroad service,[12] this did not happen.[13]  And on June 21, 1970, Penn Central filed for reorganization in the United States District Court for the Eastern of Pennsylvania under §77 of the Bankruptcy Act of 1898, as amended, *see Pennsylvania Railroad Company—Merger--New York Central Railroad Company*, 347 I.C.C. 536, 537 (1974), in what, at the time, was the largest bankruptcy proceeding in the nation's history. *See* Tr. 47. After Penn Central filed for reorganization, Congress enacted the Rail Passenger Service Act of 1970, 45 U.S.C. §§501 *et seq*., which

---

[11] The February 1, 1968, letter of Stuart T. Saunders, Chairman of the Board, and Alfred E. Pearlman, President, to all Penn Central employees announced the merger and noted that the merger "will come about within the framework of established personnel policies and agreements which contain unprecedented protective provisions and security for Penn Central employees." Claimants' Ex. 10.

[12] *See id*. ("The Penn Central merger was approved because of its vast potential to improve service to the millions of of people, industries and communities on its lines.").

[13] *See generally* JOSEPH R. DAUGHEN & PETER BINZEN, THE WRECK OF THE PENN CENTRAL (Little Brown & Co. 1971).  We cite this book only for background and not for its interpretation of any documents or events in these proceeding.  We note that Penn Central's expert similarly relied on this book.  *See* Penn Central Ex. 1; *see also* Tr. 563.

10

created Amtrak (formally the National Railroad Passenger Corporation), a government-owned corporation organized to provide railroad passenger service.  Pursuant to the Rail Passenger Service Act, Penn Central entered into an agreement with Amtrak, effective May 1, 1971, under which Amtrak assumed responsibility for Penn Central's intercity passenger services and used Penn Central's physical plants, equipment, and personnel.  Subsequently, the Regional Rail Reorganization Act of 1973, 87 Stat. 985 (codified, as amended, at 45 U.S.C. §§701 *et seq.*), provided for the transfer from Penn Central to the Consolidated Rail Corporation ("Conrail") of the facilities and equipment required by Contrail and Amtrak and included provisions under which Amtrak could acquire ownership or leasehold interests in the Northeast corridor for intercity passenger service.  Finally, in the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94-210, 90 Stat. 54 (1976), 49 U.S.C. §11501 *et seq.*, Congress conveyed Penn Central's remaining railroad assets to Conrail, which, in turn, transferred the passenger service railroad assets to Amtrak.

Penn Central emerged from bankruptcy on October 24, 1978, when the Reorganization Court issued its final order consummating the Penn Central Reorganization Plan, and the reorganized company was renamed Penn Central Corporation.  *See Matter of Penn Central Transportation Company*, 464 F.Supp. 465, 466 (E.D. Pa. 1978).  The reorganized company emerged from bankruptcy with real estate, insurance and other assets, but it has not operated a railroad since April 1, 1976.  Tr. 48-49; 86.  In 1994, it changed its name to American Premier Underwriters, Inc., presumably to better reflect its business interests.[14]

---

[14] Much of this brief history is taken from Penn Central's Response to Claimant's Motion to Compel, at [2-3] (November 20, 2007).

11

## IV.     The Parties

### A.     Claimants

These arbitration proceedings involve four groups of employees who were denied merger protection benefits by Penn Central after the 1968 merger.  Between 1969 and 1974, they filed four separate civil actions in the United States District Court for the Northern District of Ohio against the railroad that they believed improperly deprived them merger protection benefits and against the unions that they believed had not protected their interests.[15]

All thirty-two claimants are former employees of the New York Central or its CUT subsidiary.[16]  All claimants are "present employes" of Penn Central within the meaning of the MPA,[17] *see* Tr. 619-20 (stipulation by Penn Central); *see also Knapik* 1976 Oral Decision, Claimants' Ex. 4, at 14, 24, and thus were entitled to merger protection benefits if they otherwise met the MPA eligibility requirements.

### !.     Knapik Claimants

The *Knapik* claimants are ten[18] of the original seventeen passenger service brakemen who were employed at the CUT and who filed *Knapik v. Penn Central Company* in September 1969 against the merged railroad, the Brotherhood of Railroad Trainmen ("BRT"), and the United

---

[15] In addition to the claims against Penn Central for merger protection benefits, each case included failure to represent and related claims against the claimants' unions under the Railway Labor Act, but these claims against the unions (as well as conspiracy and related claims against Penn Central) are no longer pending.

[16] Prior to the merger, the New York Central owned 93% of the CUT, a passenger rail carrier subsidiary. *See Augustus*, 238 F.3d at *1.

[17]The MPA defines "present employes" as "all employes of Pennsylvania or Central who render any compensated service between the effective date of this Agreement and the date the merger is consummated . . . ."

[18] The ten *Knapik* claimants are. Jack Acree, Edward Benko, Ken Day, Harvey Doran, Joseph Gastony, George Gentile, George Norris, Christ Steimle, Clarence Tomczak, and Frank Uher. To avoid confusion, it should be noted that Michael J. Knapik, the first-named plaintiff in the *Knapik* litigation, is not a claimant in these proceedings.

Transportation Union ("UTU"), the successor to the BRT.  The merger had become effective on February 1, 1968, and on February 21, 1968, Penn Central notified twenty-nine CUT employees, including the seventeen *Knapik* plaintiffs, that Penn Central was furloughing them as part of a reduction in force.  *See* Claimants' Ex. 15. The effective date of the furloughs was February 25, 1968, *see id*., and the furlough notice advised these CUT employees that they "had rights in the Cleveland Freight Yard" and that they may "stand for employment in the Freight Yard territory." The notice then advised them that they "should immediately contact" the New York Central general yardmaster.[19]

The seventeen *Knapik* plaintiffs sought merger protection benefits.  At the time of the furloughs, however, Penn Central was taking the position that the MPA did not apply to employees of subsidiaries.  *See Augustus*, 238 F.3d at *1 ("At the time . . . the BRT and the Carrier were in a dispute as to whether the MPA applied to employees of subsidiary railroads like the CUT.").[20]  Thus, Penn Central did not provide any of the *Knapik* plaintiffs with merger protection benefits after their furloughs.[21]

---

[19] The full text of the furlough notice is as follows:

> Effective 12 12:01 A.M., February 25, 1968 the extra list of Yardmen at Cleveland Union Terminal Company is being reduced and you are furloughed effective at that time.

> You have rights in the Cleveland Freight Yard territory by virtue of agreement effective February 15, 1965 and may stand for employment in the Freight Yard territory.  You should immediately contact General Yardmaster D.J. Weisbarth.

Claimants' Ex. 15.

[20] *See also* Letter of March 12, 1968, from J.A. Lyons, General Chairman, BRT General Grievance Committee ("As you are aware, the Carrier has taken the position that the CUT is not involved in the merger, and for that reason any CUT assignments would not be considered in the equity arrangements."). Claimants' Ex. 2.

[21] In 1974, the ICC ruled that CUT employees were New York Central employees and thus were entitled to the protections of the MPA, *see Pennsylvania Railroad Company--Merger--New York Central Railroad Company*, 347 I.C.C. 536, 552 (1974) ("[R]ailway employees of the . . . [listed carriers, including the CUT] were entitled, *ab initio*, to the protection afforded by the merger report . . . .") (Claimants' Ex. 5), a conclusion Judge Lambros had

13

Of the seventeen *Knapik* plaintiffs, seven never reported to work at the New York Central freight yard, while the remaining ten reported to work after being recalled. *See Augustus*, 238 F.3d at *1-2.

There have been substantial proceedings in the *Knapik* case.

In 1992, an arbitration panel dismissed the claims of all seventeen *Knapik* plaintiffs, but the ten *Knapik* claimants who are parties in these proceedings prevailed in their appeal to the STB. The STB, however, upheld the arbitration panel's dismissal of the claims of the seven *Knapik* plaintiffs who had neither reported for work (by contacting the New York Central Freight Yard after receipt of the furlough notices) nor responded to recall notices throughout the balance of 1968 and most of 1969. And the Sixth Circuit affirmed this dismissal. *See Augustus v. Surface Transportation Board*, *supra* (Penn Central Ex. 93). As a result, the claims of the seven unsuccessful *Knapik* plaintiffs (referred to as the *Augustus* claimants) are not before this panel, and we are considering only the claims of ten of the original *Knapik* plaintiffs (now referred to as the "*Knapik* claimants").

Penn Central's position is that the *Knapik* claimants are not eligible for merger protection benefits (1) because they failed to prove causation (*i.e.*, they failed to prove that they were "adversely affected" as a result of the merger); (2) because they failed to prove that they reported

---

also reached in his 1976 oral decision in *Knapik*. *See* Claimants' Ex. 4, at 14 (finding "as a matter of law that the plaintiffs are employees of the New York Central Railroad as that term is defined in the merger protection agreement . . . ."). The parties had come to the same conclusion, having agreed on July 11, 1969, that otherwise eligible former CUT employees were entitled (at least prospectively) to merger protection benefits, effective August 1, 1969, *see* Claimants' Ex. 19, at 2, clauses 7 & 8, but Judge Lambros made clear that CUT employees had been eligible for merger protection benefits since the time of the merger, if they met the other eligibility conditions of the MPA. *See Knapik* 1976 Oral Decision, at 15 ("[T]he plaintiffs were entitled to the full benefits of the job protection agreement, based on their combined wages of C.U.T. and their New York Central work, not only as of 1969, but at all applicable time prior thereto."); *see also id*. at 18-19; *id*. at 34-35 (reiterating this conclusion for the jury).

to work at the freight yard within fifteen days of the furlough notices; and (3) because they failed to prove the amount of their compensation losses in accordance with the requirements of the MPA and the WJPA. *See* Penn Central's Post-Arbitration Brief, at 40-41 (columns in chart).

## 2. Sophner Claimants

The *Sophner* claimants are sixteen carmen[22] who worked on passenger service at the CUT and who filed *Sophner v. Penn Central Transportation Company* in October 1974 against the merged railroad (which was then under control of the reorganization court) and the Brotherhood of Railway Carmen. Like the *Knapik* claimants, they were initially denied merger protection benefits because Penn Central had taken the position that the MPA did not apply to employees of subsidiaries, *see supra* note 21, but, unlike the furloughed *Knapik* claimants, the *Sophner* claimants worked continuously for Penn Central after the merger. *See* Claimants' Ex. 8 (Railroad Retirement Board earnings records). Their post-merger earnings, however, were sometimes lower than their wage guarantees. *See* Claimants' Individual Reports (Claimants' Ex. 9); *see also infra* note 61. There is no evidence in the record, however, that they failed to exercise seniority rights to all available positions.

Penn Central's position is that the *Sophner* claimants are not eligible for merger protection benefits (1) because they failed to prove causation (*i.e.*, they failed to prove that they were adversely affected as a result of the merger); (2) because they failed to prove that they exercised seniority rights to all available positions; and (3) because they failed to prove the

---

[22] The sixteen *Sophner* claimants are William Bilinsky, Joseph Crtalic, Paul Foecking, John F. Gallagher, Gus Janke, Joseph Jarabeck, E.W. Kochenderfer, Patrick McLaughlin, Robert McNeeley, Andrew Novotny, Martin Opalk, L.S. Pentz, Robert Schreiner, Paul Scuba, George Sophner, and Peter Sowinski.

15

amount of their compensation losses in accordance with the requirements of the MPA and the WJPA.  *See* Penn Central's Post-Arbitration Brief, at 42-44 (columns in chart).

**3.     Watjen and Bundy Claimants**

The *Watjen* claimants are four rate clerks[23] who were employed by New York Central, not by the CUT subsidiary, and who worked on freight, not passenger, service.  The *Bundy* claimants are two rate clerks,[24] who were also employed by New York Central, not by the CUT subsidiary, and who also worked on freight, not passenger, service.

The merger had become effective on February 1, 1968, and on January 10, 1969, Penn Central notified at least five of the *Watjen* and *Bundy* claimants that their positions were being abolished and that the work that they had been performing was being transferred to other offices. *See* Claimants' Ex. 20; *see also* Penn Central Exs. 79, 84 & 88.

In September 1969, the *Watjen* claimants filed *Watjen v. Penn Central Company* and the *Bundy* claimants filed *Bundy v. Penn Central Company*.  Both suits were brought against the merged railroad and the Brotherhood of Railway Clerks, and both sought *inter alia* merger protection benefits in the form of lump-sum separation allowances based on Penn Central's having abolished their positions, transferred their work to other locations, and refused to permit them to exercise their seniority.

In *Watjen¸* the district court granted summary judgment in favor of Penn Central on the claims for separation allowances and on the fair representation claims against the union with the exception of the fair representation claim of Robert Watjen.  In light of the pendency of this fair

---

[23] The four *Watjen* claimants are: Phillip Franz, Thomas O'Neil, Robert Watjen, and Ana Mae Wilger.

[24] The two *Bundy* claimants are David Bundy and James Feldscher.

representation claim (and, thus, the absence of a final appealable order), the Sixth Circuit dismissed the *Watjen* plaintiffs' appeal for lack of jurisdiction. *See Bundy v. Penn Central Company*, 455 F.2d 277, 278 (6th Cir. 1972) (Claimants' Ex. 23) (consolidated appeals in the *Bundy* and *Watjen* cases).

In *Bundy*, the district court initially granted summary judgment in favor of Penn Central on a wrongful discharge claim and on the claims for merger protection benefits (based on the claimants' failure to exhaust administrative remedies before the Railway Adjustment Board) and in favor of the union on the fair representation and conspiracy claims. The Sixth Circuit affirmed the grant of summary judgment and thus the dismissal of the claims brought by the *Bundy* plaintiffs with the exception of their claims against Penn Central for separation allowances under the MPA. *See Bundy*, 455 F.2d at 279-80. On these claims, the Sixth Circuit reversed the exhaustion-based dismissals and remanded the action for an evidentiary hearing.

Penn Central's position is that the *Watjen* and *Bundy* claimants are not eligible for merger protection benefits in the form of separation allowances (1) because they failed to prove causation (*i.e.*, they failed to prove that they were adversely affected as a result of the merger); and (2) because they failed to establish that they met the work/seniority-related eligibility conditions of the MPA (*i.e.*, they failed to prove that they were unable to obtain a position with Penn Central, and they failed to prove that they exercised seniority rights to all available positions). *See* Penn Central's Post-Arbitration Brief, at 44-45 (columns in chart).

IV.     **The Carrier**

On February 1, 1968, the Pennsylvania Railroad and the New York Central merged, and the surviving corporation was a Pennsylvania corporation known as the Pennsylvania-New York Central Transportation Company, a corporation commonly referred to as the Penn Central Transportation Company and more popularly (and throughout these proceedings) as "Penn Central."  In 1969, claimants filed three of the federal court actions that led to these arbitration proceedings—the *Knapik*, the *Watjen*, and the *Bundy* actions—against the merged company, which was identified in the complaints as "Penn Central Company."

On June 21, 1970, the merged company filed a petition for reorganization in the United States District Court for the Eastern District of Pennsylvania.

On March 21, 1973, pursuant to a stipulation by the parties in *Knapik v. Penn Central Company,* the reorganization court approved the continued litigation of the *Knapik* case.  *In re Penn Central Transportation Company*, No. 70-347, Order No. 5383 (E.D. Pa. March 21, 1973). The stipulation identified the action that was permitted to continue as having been brought against "Penn Central Transportation Company." *See* Emergency Petition to Stay Proceedings (November 21, 2007), Exhibit A.

On February 21, 1975, pursuant to a stipulation by the parties in *Sophner v. Penn Central Transportation Company,* the reorganization court also approved the continued litigation of the *Sophner* case.  *In re Penn Central Transportation Company*, No. 70-347, Order No. 8600 (E.D. Pa. March 21, 1975). The stipulation also identified the action that was permitted to continue as having been brought against "Penn Central Transportation Company." *See* Emergency Petition to Stay Proceedings (November 21, 2007), Exhibit B.

In 1976, the *Knapik* case went to trial before a jury, but Judge Lambros entered a directed verdict against the claimants on all claims other than their claims against Penn Central for merger protection benefits.  *See infra* at V.B. The caption of the opinion referred to the railroad as "Penn Central Railroad."  *See Knapik* Oral Decision, Claimants' Ex. 4.  In 1979, Judge Lambros consolidated the four civil actions and ordered that they be arbitrated.  The merged company had emerged from bankruptcy on October 24, 1978, and the reorganized company (which no longer operated a railroad or had any railroad assets) had been formally renamed "Penn Central Company," and Judge Lambros so described the railroad.  *See* Memorandum Opinion and Order, Claimants' Ex. 6.

On June 18, 1980, the parties signed an arbitration agreement that identified in general terms the remaining issues in these proceedings and addressed a number of procedural matters. The "employer" that signed this agreement was identified as "Penn Central Corporation, successor to Penn Central Transportation Company and its Trustees."  *See* 1980 Arbitration Agreement (June 18, 1980) (Claimants' Ex. 24).

The 1992 arbitration decision identified the carrier as "Penn Central Transportation Company," and the 1998 decision of the Surface Transportation Board recognized that the respondent before it was the "Penn Central Corporation."  *See infra* note 31; *see also* STB Decision, Claimants' Ex. 7.

In 1994, the new company that emerged from the reorganization, the Penn Central Company, changed its name to American Premier Underwriters, Inc.

In 2000, Penn Central Corporation, the reorganized company, attempted to intervene in the appeal by seven of the original *Knapik* plaintiffs to the United States Court of Appeals for the Sixth Circuit. *See Augustus v. Surface Transportation Board*, *supra* (Penn Central Ex. 93).

On November 19, 2007, Penn Central filed a petition with the reorganization court asking it to rescind the leave that it had given to pursue these arbitration proceedings, *see* Petition of Penn Central Transportation Company and American Premier Underwriters, Inc., to Rescind Leave and Enforce Prior Orders, and on November 21, 2007, Penn Central filed an emergency petition to stay the arbitration proceedings until the reorganization court decided the petition to rescind the leave to proceed.  These petitions were filed on behalf of the "Penn Central Transportation Company ('PCTC' or the 'Debtor') and American Premier Underwriters, Inc. ('APU' or the 'Reorganized Company)."   On November 29, 2007, the reorganization court denied both the petition to rescind leave and the petition to stay the arbitration proceedings.  *In re Penn Central Transportation Company*, No. 70-347, Order No. 4349 (E.D. Pa. November 21, 2007); *see also* Petition of Penn Central Transportation Company and American Premier Underwriters, Inc., to Enforce Order No. 4349 (December 5, 2007), Exhibit A.

On December 5, 2007, Penn Central (or, more specifically, Penn Central Transportation Company and American Premier Underwriters, Inc.) filed a petition to "enforce" the November 29, 2007, Order of the reorganization court (No. 4349), and to enjoin claimants and their counsel from seeking awards of interest, punitive damages and attorneys' fees against Penn Central Transportation Company and from seeking any award against the reorganized company, American Premier Underwriters, Inc.  The reorganization court refused to enjoin the claimants and their counsel from seeking prejudgment interest or other enhancements or from seeking an

20

award against the reorganized company, although the court subsequent to the evidentiary hearing "clarified" its November 29th order by ordering that "[a]ny judgment which may result from that litigation may be enforced only if specifically hereafter authorized by this Court and no other Court." *In re Penn Central Transportation Company*, No. 70-347, Order No. 4350 (E.D. Pa. January 9, 2008).

In describing this part of the procedural history of these proceedings, we have focused on the identity of the carrier because of the sharp disagreement between the parties as to the entity from which merger protection benefits are being sought.[25] From the foregoing discussion, however, it appears that three of the civil actions were commenced against the merged railroad (regardless of the name used to describe the entity) prior to the filing for reorganization, and one action, the *Sophner* action, was filed against the merged railroad after the filing for reorganization. The reorganization court, pursuant to stipulations of the parties, permitted these actions to proceed, and it is apparent that the reorganized company, which emerged from bankruptcy in 1978, has long treated these pending actions as having been brought against it. Indeed, after the debtor, the Penn Central Transportation Company, went out of existence pursuant to the consummation order entered on October 24, 1978, the reorganized company

---

[25] In its submission to the reorganization court, Penn Central argued that this panel lacked power to enter an award against the reorganized party, relying on both the consummation order and the stipulated orders, *see* Orders Nos. 5383 & 8600, that permitted the underlying litigation to go forward. *See* Orders Nos. 5383 & 8600. *See also* Penn Central's Motion to Stay Arbitration, Para. 2 (November 19, 2007) (asserting that that the reorganization court permitted the claimants to pursue their claims as long as the claims were not asserted against the reorganized company). We see nothing in these orders, however, stating or even suggesting that the parties had agreed (or that the reorganization court had ordered) that the reorganized company, which had not yet been created, would not be responsible for any award in these proceedings. In any case, we express no view as to the intendment of the consummation order on the responsibility of the reorganized company to satisfy awards resulting from the underlying litigation or from these arbitration proceedings.

signed an arbitration agreement in 1980, attempted to intervene in the Sixth Circuit proceeding in 2000, and sought to enjoin these proceedings in 2007.

Given this history, we view with skepticism the claim that counsel for Penn Central was "astonished" to learn on October 24, 2007, that the claimants were seeking an award against the reorganized company.  *See* Petition of Penn Central Transportation Company and American Premier Underwriters, Inc., to Rescind Leave and Enforce Prior Orders, Paras. 34-36.  Indeed, we view these arbitration proceedings as having been brought against the reorganized company (with the permission of the reorganization court), and we view our award as being against the reorganized company, now known as American Premier Underwriters, Inc.  The reorganized company has been an active participant in these proceedings since at least 1980, and we conclude that it is estopped[26] from denying that it is a proper party to these arbitration proceedings.[27] Finally, as noted in our discussion of the reorganization issues, *see infra* XI, we have concluded that our award should run not only against the reorganized company but also against Penn Central Transportation Corporation.  We find the interests of the variously-named and variously organized carriers in these proceedings to be identical and we further find the representation

---

[26] Penn Central's argument (as far as we can tell first made in 2007) that no award may be made against American Premier Underwriters, Inc. is very similar to the delayed raising of the affirmative defense of discharge in bankruptcy. We treat the failure to raise this defense during the first twenty-nine years of the post-consummation order litigation as a waiver of this defense, and we view the claimants as having been prejudiced by the belated raising of this defense. The litigation of these claims would likely have proceeded quite differently had the claimants known that only the defunct debtor and not the reorganized company would be available to satisfy any award that they might receive. We note that this is not the first time that the reorganized company has waived a defense that might be available to it as a result of the reorganization.  Cf. United States v. National Railroad Passenger Corp., 2004 WL 1335250, *2 (E.D. Pa. June 15, 2004) (holding that the reorganized company, a third party defendant in litigation involving the environmental contamination and clean-up at the Paoli Rail Yard, had "waived the affirmative defense of release so as to preclude APU from arguing that the 1978 Settlement Agreement released it from any liability").

[27] In concluding that the reorganized company is a proper party to these arbitration proceedings, we do not address whether or where our award is enforceable. The reorganization court has ruled that enforcement of any award is subject to its approval, and nothing that we have said is inconsistent with this.

22

provided by counsel to have easily met (and surpassed) the standards of adequacy.  Indeed, whether through principles of preclusion or the limited doctrine of virtual representation, *see Taylor v. Sturgell*, 128 S.Ct. 2161 (2008) (discussing the limited availability of the doctrine of virtual representation), we conclude that we may enter the award against both the debtor and the reorganized company both of which we see as subsumed under "Penn Central." *See infra* XIII. Relief, Para. 10.


## V.      Procedural History

### A.       *Knapik v. Penn Central Company*--1976 Decision

In July 1976, more than eight years after the merger and almost seven years after it was filed, *Knapik v. Penn Central Company* went to a jury trial against both Penn Central and the union.  Ruling from the bench after the close of evidence, Judge Lambros granted the union's motion for a directed verdict on the fair representation claim (finding no conspiracy or bad faith) and Penn Central's motion for a directed verdict on claims involving conspiracy, bad faith, and concerted action with the union.  *Knapik* Oral Decision, Claimants' Ex. 4, at 21-22.  On the claims against Penn Central for merger protection benefits, Judge Lambros rejected the CUT defense (as had the ICC in 1974),[28] identified the respective positions of the parties, and stated that the "only issue remaining . . . is the issue of the entitlement of the plaintiffs to job guarantee benefits following the February 25, 1968 furlough." *Id*. at 22.

Judge Lambros declined to resolve this final issue; instead, he indicated his plan to submit the remaining issues to another jury, which "should be informed and will be instructed as

---

[28] *See supra* note 21.

a matter of law that the plaintiffs are covered employees under the job protection agreement and fall within the coverage of the job guarantee." *Id*. at 24. Finally, he stated that "[t]he sole question [in future proceedings] will be whether or not there was a breach of the contract by the railroad, and/or . . . compliance by the plaintiffs with the terms of that agreement so as to entitle them to the benefits." *Id*.

At no place in his 1976 decision did Judge Lambros discuss or even identify the strict causation issue that Penn Central is now advancing.[29] He did, however, identify a causation-type issue that, on the surface, appears similar to the question now posed by Penn Central, (*i.e*., "Were plaintiffs placed in a worse position with respect to their employment by reason of the merger?"), *see id*. at 19, but he treated this as a factual issue exclusively going to whether the claimants declined work that was available. *See id. at 23* ("The railroad's position is that there was work available and that they did not avail themselves of that work, and thus the railroad's position is that pursuant ot the job protection agreement, that they lost and waived and rendered themselves ineligible for job guarantee benefits in view of the fact that they did not accept work that was available to them."). Thus, Judge Lambros saw the "causation" issue as involving whether the plaintiffs' post-merger conduct disqualified them from receiving merger protection benefits.

### B. Consolidated Case--1979 Memorandum Opinion and Order

In 1979, Judge Lambros issued a Memorandum Opinion and Order in *Knapik* and the other three pending cases. *See* Claimants' Ex. 6. Rather than order a new jury trial on the unresolved issues in *Knapik*, he reviewed the earlier proceedings, summarized the positions of

---

[29] Although Judge Lambros identified the decline in railroad passenger service as responsible for the claimants' loss of employment, s*ee id*. at 5-6, he did not treat this "cause" as justifying the denial of merger protection benefits.

the parties, and identified the remaining issues all of which went to the obligation of the plaintiffs to avail themselves of available work after their furloughs. He then granted Penn Central's motion to compel arbitration. *See id*. at 4.

In ordering arbitration, Judge Lambros stated that "an arbitration panel can evaluate and resolve this controversy much more rapidly than can this Court" and that "labor arbitrators will have the expertise and the inherent authority to fashion all relief warranted, including individual damages if liability is found, after fair and relatively streamlined proceedings." *Id*.

In his 1979 Memorandum Opinion and Order, Judge Lambros also addressed the other pending cases and *sua sponte* ordered that the claims for merger protection benefits in those cases also be arbitrated.

In *Sophner*, Judge Lambros noted that the only difference between the *Sophner* and *Knapik* plaintiffs was that the *Sophner* plaintiffs did different work and were represented by a different union. He then dismissed the fair representation claim against the union (subject to later refiling) and ordered arbitration. *See id*. at 4-5.

In *Watjen* and *Bundy*, Judge Lambros noted that the plaintiffs were always New York Central employees to whom the MPA applied (rather than employees of a subsidiary). He noted that the Sixth Circuit had affirmed the dismissal of the fair representation claim against the union in *Bundy,* and he similarly dismissed the pending fair representation claim against the union in *Watjen* (also subject to later refiling). In ordering the *Watjen* and *Bundy* cases to be arbitrated, Judge Lambros stated that the only remaining issue was "whether the employment options given these plaintiffs by the 1969 Implementing agreement violated the 1964 Merger Protection Agreement." *See id*. at 5.

In ordering the *Sophner*, *Watjen*, and *Bundy* cases to be arbitrated, Judge Lambros did not discuss or even identify the strict causation issue that Penn Central is now advancing. Nor did he discuss the precise nature of any work-related eligibility requirement.

### C.      Blackwell Arbitration Decision

In the 1980 Arbitration Agreement (June 18, 1980), *see* Claimants' Ex. 24, the parties accepted Judge Lambros's suggestion for serial arbitration proceedings, *see id*. at Para. 5 (deferring hearings in three of the cases), and a three-person arbitration panel chaired by Fred Blackwell (the "Blackwell Panel") held a three-day hearing in the *Knapik* case in Cleveland on May 3-5, 1990.[30]

On June 22, 1992, the Blackwell Panel reached its decision and denied the claims for merger protection benefits made by all seventeen *Knapik* plaintiffs.[31]

In reaching its decision, the Blackwell Panel distinguished the claimants who had returned to work at the freight yard after their furloughs from those who had not.  *See* Blackwell Decision, at 33a ("Some Claimants returned to work, and some did not, in response to the work offer in the February 21, 1968 furlough notice and the work offers made in the recall notices sent in 1969 to the Claimants who did not return to work.").

As to the employees who did not return to work at any time during the 21-month period from the February 25, 1968, effective date of their furlough notices to December 15, 1969, the date of the third and final recall notice, *see id.* at 43a-49a, the Blackwell Panel concluded that

---

[30] An earlier arbitration panel rendered a decision for Penn Central in 1983, but on November 23, 1985, Judge Lambros vacated this arbitration award.  *See Knapik*, Docket Sheet.

[31] Neither party provided this panel with the decision of the Blackwell Panel, but it is available in the appendix to the petition for certiorari in *Augustus*.  *See Augustus v. Surface Transportation Board*, Petition for Writ of Certiorari, 2001 WL 34125460 (U.S. Dkt, No. 00-1499) (Appendix part of pdf version of cert. petition)(29a *et seq*.).

26

their failure to return to work was inconsistent with the requirements of § 1(b) of the MPA, which, the panel noted, was now applicable to the former CUT employees.  *Id*. at 49a-51a.  In so ruling, the panel reviewed the employees' correspondence with Penn Central and described Penn Central's repeated efforts to provide this group with additional opportunities to report to work.  These seven employees, however, steadfastly refused to report to work, arguing that they had a reasonable basis for not reporting.  The panel rejected their arguments and concluded that Penn Central's alleged failure to honor its obligation under the MPA to provide merger protection benefits to otherwise eligible CUT employees did not justify the employees' refusal to return to work.  *Id*. at 51a-52a.  Finally, the panel rejected the argument that the non-comparability of work at the freight yard justified the refusal to report to work in response to the recall notices.  *See id*. at 52a ("[T]he claimants were obligated to respond to the recalls and to mark up for the freight yard jobs that they stood for under the 'Top & Bottom' Agreement without regard to whether the jobs offered were comparable to the Claimants' CUT jobs.").

The Blackwell Panel also rejected the claims of the ten claimants who had returned to work.  *See id.* at 33a ("Between February 21, 1969 [(sic); correct date is February 21, 1968] and December 1969, ten Claimants returned to work in response to the Carrier's offers of work . . . .").  Although the panel treated these employees as having complied with the return-to-work requirement, it found them ineligible for benefits because they had failed to show that they were "'adversely affected' by the consummation of the merger."  *Id*. at 39a-42a.

In relying on this causation requirement, the Blackwell Panel interpreted the MPA as requiring the denial or reduction of benefits to employees who are furloughed due to a decline in

27

business, who voluntarily "mark off" from work, or who lose time due to physical incapacity. *Id*. at 40a.

The Blackwell Panel also based its denial of benefits to the reporting claimants on their having stopped filing wage guarantee forms (thus suggesting their belief that they were not eligible for benefits) and on their failure to file grievances. *Id*. at 42a.

### D. Surface Transportation Board Decision

The seventeen *Knapik* plaintiffs sought review of the Blackwell Decision before the STB. With only a brief discussion, the STB affirmed that portion of the panel decision denying merger protection benefits to the seven claimants who never reported for work at the freight yard in response to either the furlough or recall notices. Claimants' Ex. 7, at *6.[32]  On the other hand, the STB vacated the decision of the panel in the cases of the ten claimants who had reported to to work in response to the recall notices—the ten *Knapik* claimants in the current proceeding—and remanded the proceedings.

In discussing the claimants who reported for work, the STB made clear that it was not disturbing the Blackwell Panel's findings about the obligation to comply with work-related requirements.

---

[32] The discussion by the STB of the appeals by the seven claimants who never reported for work, in its entirety, is as follows:

> The panel denied the claims of the 7 claimants who never reported for work at the freight yard. The panel ruled that those claimants contravened the 1964 merger protection agreement by failing to exercise their seniority rights to work at the freight yard. The panel rejected two defenses raised by those claimants for their failure to report, i.e., that: (1) the work offered at the freight yard was not comparable work; and (2) a doctrine of "anticipatory breach" excused them from reporting to work on the theory that the carrier was simultaneously breaching its duty to provide protective benefits. We affirm the panel's Decision as it pertains to the 7 claimants who do (sic) not report for work at the freight yard.

Claimants' Ex. 7, at 6.

The panel denied all benefits for the 10 former CUT employees who reported for work at the freight yard, refusing to proceed to . . . [the damages phase] on the grounds that the claimants failed to establish their basic eligibility for compensation. The panel found that the claimants who reported for work did not process and establish their grievance claims adequately, in that they failed to pursue arbitration when benefits were not awarded, failed to turn in wage guarantee forms, and failed to show that their wages in their new positions were less than the amounts guaranteed under the protective benefits. The panel also held that employees were required to show that their losses were "as a result of the merger" (hereafter, the "causation requirement") and that this condition was not met, at least for a key witness, Christ Steimle, who "mentioned" loss of jobs due to declining business and a physical incapacity. The panel also found that at least the key witness Christ Steimle "held the belief at the time that he was not entitled to wage guarantee payments and that the belief had a sound fact basis."  . . . [T]hese findings reflect egregious error and failure to observe the imposed labor protection conditions.

Claimants' Ex. 7, at 5 (footnotes omitted).

After rejecting the argument that the failure to pursue arbitration was a disqualifying factor,[33] the STB addressed the wage guarantee forms and proof of compensation loss.  The panel had found that by ceasing to file wage guarantee forms (to which the carrier was not responding), the claimants had evidenced a belief that they were not eligible for merger protection benefits.  The STB rejected this line of reasoning and concluded that the failure to file wage guarantee forms did not support a finding that these claimants were not eligible for merger protection benefits.  *Id*. at *6.

In reaching this conclusion, the STB made clear that Penn Central was responsible for not only administering the compensation scheme but also for keeping records that could be used to compute any compensation that may have been owed.

We can draw no inference from the panel's observation . . . that claimants . . . did not

---

[33] The STB found the panel had "erred egregiously in finding that the claimants who reported for work should be denied all relief because they did not pursue arbitration in a timely manner." STB Decision, at 5. The STB noted the uncertainty at the time as to whether individual employees, as distinguished from their union, could invoke arbitration.  The STB also noted that the district court decision ordering arbitration, which was never appealed and which remained in effect, was the law of the case.  *Id*. at 5 & n.11.

retain copies of their claims forms. The carrier arguably was the proper repository of the forms because only the carrier could take the information on them and compare it with the base ("test period") earnings information in its possession so as to compute any compensation that may have been owed. Because the carrier was litigating the issue of compensation, it was on notice to keep records of what forms were or were not submitted. Claimants had no duty to administer the compensation scheme and to act as record keepers for that purpose. Moreover, the wage and hour information on the claims forms was relevant only to the subsequent, damages (Phase II) hearing that was never held because the prior, liability (Phase I) hearing resulted in a finding that the employees were not eligible for benefits.

STB Decision, Claimants' Ex. 7, at *5 (footnote omitted).

Finally, the STB rejected the panel's finding that the losses to the reporting claimants were not caused by the merger.

> The panel found that the claimants who reported to the yard failed to show that their losses were as a result of the merger. This finding will be vacated. ***The record shows that the claimants who reported for work suffered losses as a result of the merger*** and provides no reason to find that claimants' losses were due to other causes that would excuse the carrier from paying benefits. Before the merger and furloughs took place, claimants were fully employed at the CUT passenger yard with many years of seniority. Immediately after the merger, claimants were asked to "stand for" work at a nearby freight yard where no work was available for them for many years because they were placed at the bottom of a new seniority list that was created as a result of the merger. The jobs for which the claimants were expected to "stand" were not actual jobs. The claimants experienced a drop in income immediately after they reported for work at the freight yard and their drop in income was not due to sickness, discipline, or failure to exercise seniority rights. The panel failed even to mention the voluminous evidence submitted by complainants to show injury. ***It is not clear what else claimants could have submitted to satisfy the panel that they suffered losses as a result of the merger.***

*Id*. (footnote omitted)(emphasis added).

The STB's rejection of the panel's decision effectively assigned Penn Central the burden of going forward and proving that claimants' compensation losses were caused by something other than the merger.

> The panel's Decision is especially questionable because the carrier produced no evidence at all that any of the conditions specified for refusing benefits in the 1964 merger protection agreement were satisfied for the 10 claimants who reported to the freight yard.

30

The carrier . . . defends the panel's Decision on the grounds that the "testimony presented at the hearing" shows that the claimants "had lost work due to declining business." Our examination of the hearing record, however, shows that the carrier made no effort whatsoever to identify specific periods of general business decline, emergency conditions, or other supervening events that would justify nonpayment of benefits under section 1(b) of the agreement. The fact that claimants' losses began to be experienced shortly after the merger and furlough ` that supervening causes could explain claimants' losses. Nor did the carrier come forward with evidence showing that any claimants were disabled or disciplined in accordance with that provision.

*Id*.

Because the parties had agreed to bifurcate the arbitration with the liability phase being heard first, the STB did not have a record on which it could order final relief.  Nonetheless, its decision makes clear that the STB had concluded that the ten *Knapik* claimants met the eligibility conditions for merger protection benefits and that only the question of the amount of such benefits remained to be addressed.

Under the circumstances presented on the record before us, we find that the panel committed egregious error by finding that *none* of the claimants who reported for work were entitled to *any* compensation. Unless an arbitral panel can point to evidence supporting total denial that we have overlooked and that is considerably more compelling than the evidence cited in its 1992 Decision, summary denial of all benefits is completely unjustified. Some of the reasons cited by the panel here for totally denying compensation, such as the fact that claimants may have found work elsewhere or suffered illness, will be relevant to any determination of the amount of compensation for individual claimants, but these reasons do not justify the denial of all compensation for all of the claimants.

STB Decision, Claimants' Ex. 7, at *6 (emphasis added).[34]

Thus, the STB ruled that the ten claimants who are parties in this arbitration proceeding had complied with the relevant work requirement and that Penn Central had not proven a non-merger cause for claimants' losses.

---

[34] Arguably, the STB left a small opening for Penn Central to provide "more compelling" evidence in support of a total denial of benefits, but we have rejected its "strict causation" argument on the merits, *see infra* VII, and we have not been presented with any facts or arguments that would justify our revisiting the decision of the STB as to the eligibility of the *Knapik* claimants.

Finally, we note that in reviewing the Blackwell decision, the STB applied the "Lace Curtain" abuse of discretion standard of review,[35] but even under that deferential standard for reviewing arbitration decisions, the STB concluded that it was egregious error for the panel to have denied benefits to the ten claimants who had reported to work.

As discussed below, we not only agree with the STB, but we also independently conclude that the *Knapik* claimants met the eligibility conditions of the MPA. We have also concluded that the law of the case doctrine requires this panel (on the *Knapik* remand) to treat the decision of the STB as having established the eligibility of the *Knapik* claimants for merger protection benefits (with only the amount of merger protection benefits to be determined).[36]

### E.    Sixth Circuit Review

The seven unsuccessful *Knapik* plaintiffs, the *Augustus* claimants, sought judicial review of the STB decision in the Sixth Circuit, but the court affirmed the dismissal of their claims. *See*

---

[35] The Sixth Circuit described the deferential standard of review that the STB applied to the decision of the arbitration panel.

The Board must employ a deferential standard when reviewing the decision of an arbitration panel. The applicable standard, which was adopted by the ICC in the so-called "*Lace Curtain* " decision and subsequently codified in federal regulations governing the Board's review powers, limits the Board's review of arbitration decisions to "recurring or otherwise significant issues of general importance regarding the interpretation of [the Board's] labor protective conditions." *Chicago & Northwestern Transp. Co.—Abandonment—Near Dubuque & Oelwein,* 3 I.C.C.2d 729, 735-36 (1987) ("*Lace Curtain* "), *aff'd sub nom. International Bhd. Elec. Workers v. I.C.C.,* 862 F.2d 330 (D.C. Cir. 1099. *See* 49 C.F.R. § 1115.8. The Board does not review "issues of causation, the calculation of benefits, or the resolution of other factual questions" in the absence of "egregious error." *Lace Curtain,* 3 I.C.C.2d at 735–36. "Egregious error" means "irrational," "wholly baseless and completely without reason," or "actually and indisputably without foundation in reason and fact." *See Am. Train Dispatchers Ass'n v. CSX Transp., Inc.,* 9 I.C.C.2d 1127, 1130-31 (1993) (quoting *Loveless v. Eastern Airlines, Inc.,* 281 F.2d 1272, 1275–76 (11th Cir.1982)).

*Augustus*, 238 F.3d at *3.

[36] Of course, if the interpretation of the underlying law by the Sixth Circuit pointed in a different direction, we would apply that law notwithstanding any contrary interpretation by the STB. This, however, is not the case, as the Sixth Circuit decision is entirely consistent with the STB decision on the key legal issues in these proceedings, including the causation and work-requirement issues.

32

*Augustus v. Surface Transportation Board*, 238 F.3d 419, 2000 U.S. App. Lexis 33966 (6th Cir. Dec. 12, 2000), *cert. denied*, 533 U.S. 949 (2001) (Penn Central Ex. 93). As a result, the claims of these unsuccessful claimants are not before this panel.

Penn Central had also sought review of that portion of the STB decision reversing the Blackwell Panel and ruling in favor of the ten *Knapik* claimants, but Penn Central voluntarily dismissed its appeal, presumably because there was no final appealable order. *See Augustus*, 238 F.3d at *2. n.1. Thus, Penn Central has never been heard in the Sixth Circuit on any issues directly involving the eligibility of the *Knapik* claimants for merger protection benefits. Nonetheless, the Sixth Circuit discussed the controlling law in deciding the *Augustus* appeal, and the parties recognize its importance for the current proceedings.

In affirming the decision of the STB, the Sixth Circuit applied a deferential standard of judicial review[37] to the deferential standard of administrative review that the STB used in reviewing the decision of the arbitration panel. Nonetheless, the court discussed generally the legal principles applicable to claims for merger protection benefits.[38]

Initially, the Sixth Circuit, interpreted the MPA, as requiring covered employees to accept available work as a condition of eligibility for merger protection benefits. Referring to the *Augustus* claimants, the court stated:

---

[37] *See Augustus*, 238 F.3d at *3 ("This Court reviews decisions of the Board pursuant to a similarly deferential standard. Under the Administrative Procedure Act . . . , courts may not set aside a decision of the Board unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, or unsupported by substantial evidence.").

[38] Although courts reviewing arbitration decisions apply a deferential standard of review to legal as well as factual findings, we treat the Sixth Circuit's interpretation of the law as if the court was reviewing the legal issues de novo. Our difficulty with Penn Central's arguments based on *Augustus* is that we do not read *Augustus* as Penn Central has.

33

The arbitration panel's ruling—that Petitioners' failure to report to work precluded their recovery under the MPA—was based upon the express terms of the MPA. As the arbitration panel observed, section 1(b) of the MPA expressly required covered employees to accept available work in order to qualify for benefits. As there was no exception to this requirement under the MPA, there was no basis for finding that the arbitration decision failed to "draw its essence" from the applicable labor agreements . . . .

*Augustus*, 238 F.3d at \*4.

Ultimately, the court held that the panel "did not commit egregious error" in rejecting the argument that the claimants risked waiving their rights under the MPA if they reported to work at the N.Y. Central freight yard and in rejecting the argument that the carrier anticipatorily breached its contractual obligations under the MPA. Relying on the repeated notices given this group of employees, the court concluded as follows:

The panel reasonably found that Petitioners' refusal to report to work was at their own peril, particularly in light of the numerous notices sent to Petitioners to report to work and the numerous warnings to Petitioners that they would forfeit their benefits if they failed to report. Furthermore, the panel was justified by ample record evidence in rejecting Petitioners' argument that the work at the N.Y. Central freight yard was not comparable to their previous work at the CUT.

*Id.* at \*5.

Based on the foregoing, the Sixth Circuit concluded that there was no showing that the STB determination was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, or unsupported by substantial evidence, and the court upheld the decision of the STB affirming the decision of the panel.  *Id.*

Finally, as a review of the Sixth Circuit decision makes clear, the court did not in any way suggest that employees (like the *Knapik* claimants) who eventually reported to work after having received recall notices (and even warnings) were not eligible for merger protection benefits.  Nor

did the Sixth Circuit discuss the strict causation issue that Penn Central is now advancing in these proceedings.

The Supreme Court denied certiorari, *see* 533 U.S. 949 (2001), thus ending all proceedings on behalf of the *Augustus* claimants, and only the claims of ten of the original *Knapik* plaintiffs are before this panel.

### F.      Subsequent District Court Proceedings--Renewed Efforts to Arbitrate

After the Sixth Circuit decision in *Augustus* and the Supreme Court's denial of certiorari, the dispute returned to the district court. The remaining *Knapik* claimants, now joined by the *Sophner, Watjen*, and *Bundy* claimants (whose arbitration proceedings had been stalled for more than twenty years because of 1980 Arbitration Agreement to arbitrate the cases serially), sought to re-activate the arbitration proceedings.  After some procedural skirmishes with much finger-pointing by the parties about responsibility for the delay, Judge Solomon Oliver, Jr., issued a number of orders.  Finding that that Penn Central did not have "clean hands," Judge Oliver refused to dismiss the four cases on the grounds of *laches* and exercised continuing jurisdiction over them.  *See* Order (February 18, 2005) (Claimants' Ex. 25). Judge Oliver also renewed the arbitration process, setting in motion the procedures that eventually led to the appointment of the current panel. *Id*.  Finally, he identified two potentially dispositive issues for the panel to address prior to commencing the arbitration hearings—a survival/personal representatives issue and a reporting for work issue.  *See* Order (April 28, 2006) (Claimants' Ex. 25).

### G.      Pre-Hearing Proceedings

The neutral arbitrator was appointed on June 28, 2006, *see* Order, Claimants' Ex. 25, at 1, and the party-appointed arbitrators for the consolidated proceedings were appointed by the

parties in early 2007.[39]  Between October 25, 2006, and December 5, 2007, the neutral arbitrator held five pre-hearing conferences with the parties, the parties engaged in discovery, and the panel decided two potentially dispositive motions and ruled on other pre-trial matters.

### H.    Interim Decision

In his April 28, 2005, Order, Judge Oliver identified two issues for the arbitration panel concerning who may participate in these proceedings. These issues were [1] "whether, under *Augustus* . . . employees from the *Watjen*, *Bundy*, and *Spohner* cases who did not return to work may participate in arbitration, and . . . [2] whether any plaintiffs must be dismissed because they have died and the plaintiffs have failed to substitute a party."  Order, at 3 (April 28, 2005) (Claimants' Ex. 25).

Relying on *Augustus*, Penn Central argued that the decision of the Sixth Circuit on the reporting for work issue was binding on the twenty-two non-*Knapik* claimants and thus precluded them from "relitigating" the work-requirement issue and from participating in the arbitration.  Penn Central recognized that these claimants were not parties in the *Augustus* appeal but argued that the doctrine of privity supported applying res judicata (or actually issue preclusion) to them.

The claimants, on the other hand, did not dispute the legal conclusion reached in the *Augustus* case, namely that employees who did not report for work were not eligible for merger protection benefits.  They argued, however, that the issue of whether an employee reported for

---

[39] Initially, Judge Oliver ordered the four separate arbitration proceedings to go forward simultaneously, *see* Arbitration Order (June 23, 2006)(Claimants' Ex. 25), and the parties each appointed four arbitrators—one for each case. Ultimately, the parties agreed that a single consolidated proceeding was preferable, and Judge Oliver accepted this stipulation and ordered a single consolidated proceeding before a three-person panel.  *See Knapik*, Docket Sheet Marginal Entry Order (March 13, 2007).

work required a factual determination and that—even if there was privity with the *Augustus* claimants—issue preclusion cannot deny them the opportunity to litigate issues on which they have not been heard.

> In our interim decision, we noted that
>
> The parties do not appear to disagree with the basic proposition that claimants who do not report for work are not eligible for merger protection benefits.  To be sure, Penn Central argues that claimants "who failed to report for work" are ineligible for benefits, while the claimants argue that *Augustus* involved only claimants who *never* reported for work and thus only stands for the proposition that claimants "who never reported for work" are ineligible for merger protection benefits.

Interim Decision, at 4.

In our interim decision, we did not decide whether there was "a substantive difference between these formulations of the 'reporting for work' standard."  We also declined to rule on whether the non-*Knapik* claimants were in privity with the *Augustus* claimants, but we did note "that even if there was privity it would be a misapplication of generally recognized principles of issue preclusion to prevent the claimants from arguing in favor of a legal standard that (as far as we can tell on this record) was not 'actually litigated and determined' in the earlier proceedings. *See generally* Restatement (Second) of Judgments §27 (1982)."  Interim Decision, at 4-5.

We also concluded that "[t]he 'reporting for work' issue appears to be primarily a factual issue" and that, even if there was privity, "issue preclusion does not prevent the claimants from litigating the unique factual issues concerning their alleged failure to report for work."  *Id*. at 5. Finally, we concluded "that any claimant who is found not to have reported for work will not be eligible for merger protection benefits[,]" *see id*. at 6,[40] but "that the factual claims of the . . .

---

[40] In this opinion, we have concluded that there is a substantive difference between "failing to report for work" and "never reporting for work," *See infra* VIII.A.

37

non-*Knapik* claimants for reasons related to their alleged failure to report for work are yet to be determined."[41] *Id*. at 6.

In our interim decision, we also rejected the argument that the doctrine of *laches* required the dismissal of proceedings when the original claimant had died and no substitutions had been made. We noted that the district court had rejected a closely-related *laches* argument when it resumed jurisdiction over these proceedings. *See* Order, at 7-10 (February 18, 2005) (Claimants' Ex. 25). We also relied on, by analogy, Fed.R.Civ. P. 25(a)(1), which requires motions for substitution to be made not later than 90 days of the filing of a "suggestion of death," and we concluded that the claimants could pursue these proceedings by filing notices of substitution for deceased claimants.[42]

## I.      The Hearing

The hearings began on December 10, 2007, and lasted for four days. Both sides presented an expert witness, and the claimants presented testimony from nine fact witnesses. Three of these fact witnesses were claimants, one of whom appeared by video deposition because of health issues.[43] The remaining six fact witnesses were family members of deceased Penn Central employees, and their testimony provided insights into how the merger and the subsequent loss of employment affected their families. Although their testimony provided little

---

[41] Subsequent to our interim decision, Penn Central moved for summary adjudication on the reporting for work issue. The issue was fully briefed, but the panel denied the motion without an opinion.

[42] If any of the five claimants who were alive at the time of the hearing have died or if any of the survivors or other personal representatives need be replaced, the claimants should have an opportunity to make such changes. Therefore, we will be ordering the claimants to take appropriate steps to accomplish this. *See infra*, Relief, at Para. 9.

[43] John Gallagher, a *Sophner* claimant, and Phillip Franz, a *Watjen* claimant testified in person. Robert McNeely, a *Sophner* claimant, testified without objection by video deposition because of health reasons. Tr. 251-54. *See also* Claimants' Ex. 55 (McNeely transcript).

38

first-hand information of the underlying issues before us, they were able to describe the efforts of their family members to exercise their seniority and to make themselves available for employment after the merger.[44]

Most of the evidence that we have considered was documentary, but because of the age of these proceedings no one was available to authenticate or in any way explain the documents. The parties had not been able to agree on a statement of uncontested facts or on a joint set of exhibits, so both parties submitted their exhibits along with objections as to the admissibility of their opponents' exhibits.  In response, we admitted into evidence the full documentary record that had been presented to us, including the complete transcript of the 1990 hearing before the Blackwell Panel, subject to subsequent arguments about authenticity, reliability, and weight.  In so ruling, we recognized that these are arbitration proceedings to which the formal rules of evidence did not apply. *See* Tr. 6, 255.

## VI.    Preliminary Issues

Initially, we address four preliminary but interrelated issues involving delay, spoliation, burdens of proof, and evidence.  The age of these proceedings, Penn Central's alleged responsibility for the delay that has characterized them, and its alleged spoliation of evidence are relevant to the enhancement issues as well as to our decisions on the allocation of the burdens of proof and on evidentiary issues.

---

[44] The non-claimant witnesses included James Knapik, a former Penn Central employee who was the son of Michael Knapik, one of the unsuccessful *Augustus* plaintiffs; Virginia McNabb, the daughter of *Knapik* claimants George Norris; Anne Marie Pentz, the daughter of *Sophner* claimant L.S. Pentz; Anna Jo Bundy, the widow of *Bundy* claimant David Bundy; Paul William Scuba, the son of Sophner claimant Paul Scuba.; and Marybeth Verdi, the daughter of *Knapik* claimant Frank Uher.

39

Penn Central argues that the delay was caused primarily by the claimants, and it suggests that the alleged spoliation was really a failure by the claimants to use available discovery tools. It also argues that the claimants have the burden of proof on all issues, *see* Penn Central Pre-Arbitration Brief, at 10-11, that evidence offered by the claimants is both inadmissible and unreliable, *see* Penn Central's Post-Arbitration Reply Brief, at 19-25; 29-32; 36-39; *see also* Penn Central's Objections to Claimants' Exhibits (December 7, 2007), and that the claimants failed to meet their burdens on all the key issues. *See* Penn Central's Post-Arbitration Brief, at 2 ("None of the Claimants is entitled to any recovery because not one of them met their evidentiary burden on any, let alone all three, of the contract issues."). The claimants respond by arguing that they met their various burdens, but they also point to the delay that they claim was primarily caused by Penn Central, to the age of these proceedings, and to the alleged spoliation of evidence to support their claims for both merger protection benefits and enhancements.

## A.    Delay

The claimants have pointed to the delay that has plagued these proceedings and to Penn Central's alleged responsibility for it to support their argument for an enhancement of the awards of merger protection benefits. *See* Claimants' Post-Arbitration Reply Brief, at 33.  As we discuss below, the age of these proceedings as well as the delay provide support for our decision to award the claimants prejudgment interest, and further support our decisions on the allocation of the burdens of proof on the variously-defined work requirements as well as our decisions on evidentiary issues.  We do not, however, find that Penn Central or its lawyers engaged in the type of egregious conduct that, standing alone, would justify enhancements in the form of awards of punitive damages, attorney fees, or costs.

40

In attempting to avoid responsibility for the delay, Penn Central tries to shift the blame to the claimants by identifying actions by the claimants that delayed resolution of this dispute since the Sixth Circuit's 2000 decision in *Augustus*, *see* Penn Central's Post-Arbitration Brief, at 39, but Judge Oliver effectively rejected this effort in the course of rejecting Penn Central's laches argument. His conclusion was that the claimants "were within their rights to appeal the [earlier] arbitration findings" and that they had not been complacent since the *Augustus* decision. *See* Order (February 18, 2005), Claimants' Ex. 25, at 9.

Remarkably, Penn Central relies upon Judge Oliver's February 18, 2005, Order resuming jurisdiction, which it interprets as "finding that Claimants and Penn Central were equally responsible for the protracted length of these proceedings." Penn Central's Post-Arbitration Reply Brief, at 45-46. Had Judge Oliver made such a finding, we would surely respect it, but a careful review of his opinion, *see* Claimants' Ex. 25, at 7-10, makes clear that Judge Oliver did not conclude that the claimants were "equally" responsible for the protracted delay in these proceedings. Rather, he rejected Penn Central's *laches* argument, which was based on allegations of claimant-caused delay, and stated that he viewed the claimants as "no more responsible" than Penn Central for the delay. [45] He also found that Penn Central failed to "come

---

[45] In rejecting the laches argument, Judge Oliver described the conduct of Penn Central:

> [T]he defendant does not come with clean hands. In assessing the causes of the delay over the past five years, the Court concludes, based on Plaintiffs' letters calling for new mediation panels and a return to arbitration, that Plaintiffs are no more responsible than Penn Central for the delay . . . Penn Central rejected Plaintiffs' calls for a new mediation panel for the remaining *Knapik* plaintiffs, insisting on resuming hearings with the old arbitration panel, even though there is some indication the old panel was no longer hearing cases. Additionally, some portions of the delay in resuming arbitration is attributable to Penn Central's argument that *Watjen* and *Bundy* should not be arbitrated due to laches. This argument is inconsistent with the previous agreements between the parties to follow Judge Lambros' suggestion that Knapik be concluded before commencing the other cases.

Claimants' Ex. 25, at 8 (February 18, 2005 Order).

[into equity] with clean hands." *Id.* at 8.  Consequently, we interpret Judge Oliver as having left open the possibility of our finding that Penn Central more culpable than the claimants for the delay.

This *Knapik* case has been pending for four decades.  During this time, Penn Central has defended the *Knapik* and the other actions vigorously, and this vigorous defense has surely contributed to the delay that has characterized these proceedings.  But there is nothing wrong with vigorous representation.  Nonetheless, we have identified actions taken by Penn Central throughout these proceedings that arguably go beyond "vigorous representation" and that can best be explained in terms of a litigation strategy designed to delay the ultimate resolution of this controversy.  It is not possible to say whether Penn Central's "leave no stone unturned" approach to the underlying dispute and to these proceedings was deliberately designed to exhaust the claimants and their resources and to make it prohibitive for them to pursue what (soon after the litigation was filed) was narrowed to a relatively modest suit for merger protection benefits, but that has been the effect of the defense it has mounted.  Indeed, what we have seen during our limited involvement in these proceedings and from our review of the record supports our conclusion that Penn Central bears the greater share of the responsibility for the delay in these proceedings.  Delay in litigation typically favors defendants, and it appears that Penn Central rarely missed an opportunity to pursue an issue that could delay final resolution of this dispute.

As we review the record, we question how Penn Central could have continued to advance its CUT defense at the 1990 hearing before the Blackwell Panel, *see* Transcript, 1990 Arbitration Proceeding, Claimants' Ex. 34, at 80-91 (Ellert testimony), so many years after the 1969 Agreement to cover CUT employees and the rejection of the CUT defense by the ICC in 1974

42

and by Judge Lambros in 1976.[46] *See supra* note 21. We also question its effort to re-litigate the liability issue for the *Knapik* claimants in light of the clear holding of the STB; its strained interpretations of Judge Lambros's 1976 Oral Decision (Claimants' Ex. 4) and the Sixth Circuit's decision in *Augustus* to support its proximate causation and its reporting-to-work/preclusion arguments; its belated raising of its strict causation defense and its strained reading of the relationship between § 1(a) and § 1(b) of the MPA; its misrepresentation of Judge Oliver's conclusion about responsibility for the delay; its repackaging of its unsuccessful *laches* argument in an effort to scuttle the proceedings because of the non-appointment of personal representatives; its failure to produce the employee personnel records (after promising to do so); its effort to shift responsibility for not producing the employee personnel records that it was required to maintain; its argument that the failure of the claimants to present these documents in evidence amounted to a failure of proof; and its repeated efforts to modify the hearing schedule.

Finally, nothing better highlights the consequences of delay on these proceedings than the inability of Penn Central to produce a knowledgeable Fed.R.Civ.P. 30(b)(6) witness. Ultimately, we refused to issue the order to compel sought by claimants based on Penn Central's representation that there was no one left who could provide the relevant testimony.[47] We

---

[46] We read the record as Penn Central taking the position that despite the 1969 agreement, CUT employees were not protected by the MPA at the time of the merger. We construe both the ICC ruling and Judge Lambros's decision as concluding that the CUT employees were covered by the MPA and thus otherwise eligible employees were entitled to the benefits of the MPA at the time of the merger. *See also supra* note 21. At the 1990 hearing, however, George Ellert, Penn Central's only witness, appears to be testifying that the *Knapik* claimants were not eligible for the benefits of the MPA at the time of the furloughs and that Penn Central had not acted inappropriately in denying them coverage.

[47] *See also* Letter from William F. Kershner of Pepper Hamilton LLP, Penn Central's former attorneys, to the Director of Mediation Services, National Mediation Board (April 17, 2001) (Claimants' Ex. 26) ("All of the witnesses with knowledge of the factual background of the cases and who are essential to verify the documents and records in the cases are deceased.").

accepted that representation, but the fact that it was made underscores the impact that delay has had on these proceedings.

Penn Central suggests that the four decade delay in these proceedings is nothing more than the delay inherent in railroad labor arbitration. *See* Penn Central's Post Arbitration Reply Brief, at 46. To be sure, delay happens. And with the wisdom of hindsight, we can identify actions by the parties, by their lawyers, and by decision-makers that contributed to the delay. Indeed, everyone involved in these proceedings bears some responsibility for the delay. Nonetheless, we reject the argument that we are only dealing with "inherent delay." Railroad labor arbitration may have many steps, but the nub of this dispute has remained unchanged since Judge Lambros's 1976 decision narrowed the original dispute to one involving only merger protection benefits (although Penn Central has labored mightily to expand the issues that must be addressed to resolve this dispute). It has taken thirty-three years since Judge Lambros's initial decision, and the course of the proceedings since that date leads us to conclude that Penn Central was doing what it could to prevent them from moving forward.

Although we have concluded that Penn Central was more responsible than the claimants for the delay, we are not willing to characterize its vigorous defense, which we view as disproportionate to the amount of merger protection benefits at stake, as sanctionable, perhaps because we recognize, as do the parties, that prejudgment interest has the potential to alter significantly the stakes involved. Nor are we willing, on this record, to find that Penn Central or its lawyers acted in bad faith to prolong this litigation. *Cf.* 28 U.S.C. § 1927 (requiring unreasonable and vexatious conduct that prolongs litigation to support awards of costs, expenses,

and attorney fees) or violated any of the standards that are imposed by the frequently-changing Fed.R.Civ. P. 11.

Nonetheless, even without a finding of subjective (or even objective) bad faith, it seems clear that Penn Central's litigation strategy was to delay the ultimate resolution of this dispute and, in all likelihood, to exhaust the resources of the claimants.  And the strategy appeared to be working; at the time of the hearing, twenty-seven of the original thirty-two claimants were deceased, and only Judge Oliver's rejection of the *laches* defense thwarted this tactic.  As a result, the claimants have had to expend significantly more time and money than seems reasonable given the amount of "unenhanced" merger protection benefits they are seeking.

Even if we assume that the parties did nothing more than litigate their positions vigorously and appropriately, these proceedings have already gone on for more than four decades, and the clock is still ticking.  And, thus, independent of any fault-based delay, there is the question of whether any special considerations should be made because of the age of these proceedings.  Put somewhat differently, we must decide which party will bear the cost of the delay that has characterized these proceedings.

On one level, we have imposed some of the costs of the delay on Penn Central, albeit indirectly, through our procedural rulings.  Our decision on the allocation of the various burdens is strengthened when we consider the delay as well as the role played by Penn Central in causing it.  Likewise our willingness to relax the evidentiary standards is not only a function of this being arbitration but also a function of the protracted delay, the inability of Penn Central to produce a Fed.R.Civ.P. 30(b)(6) deponent, and the failure of Penn Central to produce employee personnel records as required by the MPA, as expected by the STB, and as promised by its counsel.

45

Finally, our willingness to accept proof of damages calculated (for some claimants) on a forecasted wage guarantee and (for all the claimants) on an annual and not a monthly basis is supported by our recognition of the age of these proceedings, Penn Central's primary responsibility for the delay, and the unavailability of key personnel records.

The delay is also relevant to the claims for enhancements.  Thus, despite our conclusion that neither Penn Central nor its lawyers acted in bad faith to cause the delay in these proceedings, we must determine whether Penn Central's role in delaying these proceedings as well as the age of these proceedings provide support for the enhancements being sought.

### B.        Spoliation

The claimants allege that Penn Central, either deliberately or negligently, spoliated evidence (and violated § 1(b) of the MPA) by having failed to maintain and produce employee personnel records, including wage guarantee information, that would have supported their claims.  *See* Claimants' Post-Arbitration Brief, at 46-48; *see also* Claimants' Post-Arbitration Reply Brief, at 30-32.  The employee personnel records in question were maintained by Penn Central and not the claimants.  *See* Ellert 1980 Testimony, at Tr. 626-28 (Claimants' Ex. 34).

To remedy this alleged spoliation, the claimants seek to bar Penn Central from contesting issues on which it failed to produce the relevant employee personnel records, *see* Claimants' Post-Arbitration Brief, at 39-40 & 48; *see also* Claimants' Post-Arbitration Reply Brief, at 32, and they ask us to infer that the missing records would fill any evidentiary gaps in their case.  *See id*. at 48.  They also seek damages to compensate them for having had to hire an expert and for other substantial costs incurred in these proceedings, *see* Claimants' Ex. 53, including the portion of any award that will be used to satisfy their contingency contract for attorney fees.  *See*

46

Claimants' Post-Arbitration Brief, at 45. Finally, the claimants argue that the alleged spoliation is a independent compensable breach of the MPA. *See id*. at 39-40.

Penn Central responds forcefully to the charges of spoliation by treating the dispute about the missing records as little more than a garden-variety discovery dispute and by declaring that the allegation "that Penn Central hid or destroyed documents . . . [is] [a]n absolute falsehood." Penn Central's Post-Arbitration Brief, at 34. It then explains that it conveyed legal custody of the personnel records to Conrail on April 1, 1976, pursuant to an Act of Congress, *id*., and that the claimants' failure to obtain these records from Conrail is not attributable to Penn Central. *Id*. at 37.

Spoliation is a serious charge. Typically, it refers to the deliberate destruction of evidence and calls into question the integrity of the attorneys and others responsible for it. But spoliation is a broad term, encompassing a range of actions that can result in evidence or records not being available for trials or other purposes. It can involve the deliberate destruction of documents, but it can also involve the negligent or even inadvertent loss of documents. *See generally* MARGARET M. KOESEL, DAVID A. BELL, TRACY L. TURNBULL & DANIEL E. GOURASH (EDITOR), SPOLIATION OF EVIDENCE: SANCTIONS AND REMEDIES FOR DESTRUCTION OF EVIDENCE IN CIVIL LITIGATION (ABA Torts and Insurance Practice Section 2000).

In addressing spoliation, we apply federal not state law to determine whether spoliation has taken place and the appropriate sanctions for it. *See Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (en banc) ("We now recognize--as does every other federal court of appeals to have addressed the question--that a federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence.").

47

We understand that some jurisdictions, including Ohio, recognize an independent tort for the intentional destruction of evidence, *see e.g., Smith v. Howard Johnson Company, Inc*. 615 N.E.2d 1037 (Ohio 1993),[48] but the claimants have not made an independent spoliation claim for damages under Ohio law.  They have, however, asked us to award damages for spoliation under the MPA both as an enhancement of the award of merger protection benefits and as an independent item of damages. *See* Claimants' Post-Arbitration Brief, at 39-40.

Reducing the spoliation argument to its basics, the claimants do not deny that legal custody of the employee personnel records was conveyed to Conrail.  Rather, they allege that Penn Central had the records in 1969 and 1974, when the underlying federal actions were filed; that Penn Central was responsible for preserving documents relevant to pending litigation; that Penn Central maintained control of the employee personnel records until it transferred control to Conrail on April 1, 1976, pursuant to an Act of Congress, *see* Penn Central Ex. 105; that even after the transfer of records to Conrail, Penn Central was still obligated to retain records relating to pending litigation; that the STB recognized Penn Central's responsibility for maintaining and producing such records (a duty also imposed by the MPA); that Penn Central retained or was able to obtain many boxes of personnel information after the 1976 transfer of records to Conrail, *see* Claimants' Brief in Opposition to Defendant's Motion to Compel Discovery, at 2 n. 1 (October 30, 2007) (discussing the production by Penn Central of approximately twenty bankers' boxes of personnel and wage information); that even after the transfer of records to Conrail, Penn Central had the ability to obtain and produce the records, *see* Deposit Agreement between Penn Central and the Pennsylvania Historical and Museum Commission, at 3, Para. 4(6) (Claimants'

---

[48] There is no independent cause of action for spoliation under federal law. *See, e.g*., *Lombard v. MCI Telecommunications Corp*., 13 F.Supp.2d 621, 627-28 (N.D. Ohio 1998).

48

Ex. 32), and that, perhaps most importantly, Penn Central advised the claimants and this panel on January 24, 2007, that it would be producing the twenty-two personnel files of the non-*Knapik* claimants, *see* Groppe e-mail (January 24, 2007); and one week later reaffirmed that it would do so.  *See* Third Prehearing Conference, Para. 8 (January 31, 2007).

In light of the foregoing, we reject Penn Central's attempt to shift responsibility for the unavailability of the employee personnel records to the claimants and to characterize this issue as simply a discovery dispute.  And we conclude that even if the claimants had other options for obtaining the records (such as subpoenaing the records from Conrail), Penn Central was still responsible for producing them, *see* Claimants' Post-Arbitration Brief, at 46-47; *see also* Claimants' Post-Arbitration Reply Brief, at 30-32, and failed to do so.

With respect to the alleged deliberate destruction or hiding of documents, we have not been presented with evidence that supports a finding that Penn Central or its lawyers acted in bad faith to deliberately destroy or hide relevant evidence. Thus, these proceedings do not involve the type of egregious conduct that supports spoliation sanctions.  Moreover, we reject the argument that the MPA provides a compensation remedy for either spoliation or for the failure to maintain and produce records.  And though it might be possible for an Ohio litigant to pursue a state tort spoliation claim based on a violation of a federal statute, a policy of federal labor law, or a contractual obligation such as the MPA, we are unwilling to add such a claim to these already complex proceedings.  Thus, we reject the availability of an independent claim for damages whether the claim is based on state or federal law or on the MPA.  And we are unwilling to preclude Penn Central from defending the claims for which the claimants would have used the

relevant records or to draw inferences that the missing information would fill gaps in claimants' case.

Nonetheless, even absent a finding of deliberate destruction or hiding of employee personnel records, we must still determine which side should bear the consequences of the absence of the relevant records.

We have already rejected the argument that the failure of the claimants to obtain these records from Conrail absolved Penn Central of its responsibility for not having produced them,[49] but we are not willing to bar Penn Central from contesting issues on which it failed to produce the relevant employee records.  We conclude, however, that in the circumstances of the present proceedings, it would be inappropriate and unfair to penalize the claimants for Penn Central's failure to meet its duty to maintain and produce the relevant employee personnel records. Although we do not view this failure, standing alone, as supporting the sought-after enhancements of merger protection benefits, we treat Penn Central's failure to produce the relevant employee records as providing additional support for our decisions to impose the burden of proof on the work-related requirements on Penn Central, to relax the evidentiary rules concerning the admissibility of employee wage and other information, and to permit the use of a flexible (*i.e.*, annual as contrasted to monthly) approach to the proof of compensation loss.

---

[49] Time has apparently also taken its toll on the employee records.  In 2001, Penn Central's prior counsel advised the National Mediation Board that "the physical integrity of the documents and records themselves have been adversely affected by the passage of time and movement to and from multiple storage facilities." (Letter from William F. Kershner of Pepper Hamilton LLP, to the Director of Mediation Services, National Mediation Board) (April 17, 2001))(Claimants' Ex. 26).

C.      **Burdens of Proof**

Compliance with the MPA is a condition for the receipt of merger protection benefits, but it is necessary to determine which party has the burden of proof in litigation involving claims for contractual benefits under the MPA.

Penn Central takes the position that the burden of proof on *all* issues is on the claimants, *see* Penn Central Pre-Arbitration Brief, at 10-11, but we do not agree. To be sure, the presumptive burden of proof in contract cases is on the party alleging a breach of the contract, and that party must typically allege compliance with the terms of the contract. *Cf.* Fed.R.Civ.P 9(c) (permitting conditions precedent to be alleged generally but requiring denial of conditions precedent to be alleged with particularity).

In the present proceedings, the claimants have the burden of proof (as well as the other burdens) with respect to the causation and compensation loss issues, but we treat differently the burdens relating to the variously-defined work requirements.

In many ways, the allocation of burdens concerning the work-related requirements under the MPA is similar to the allocation of burdens on affirmative defenses in civil litigation. Defendants must plead affirmative defenses, *see* Fed.R.Civ.P 8(c), and the party with the pleading burden typically bears the burden of going forward and the burden of persuasion on such defenses.

In considering the allocation of burdens in litigation involving claims under the MPA, we conclude that the claimants were not required to anticipate and rebut the potentially disqualifying factors listed in § 1(b) of the MPA any more than plaintiffs in civil litigation are expected to plead and prove that their actions were not barred by the statute of limitations, by preclusion, or

by *laches*.   Thus, the claimants were not required to prove that their post-merger "worse position" was ***not*** the result of their "resignation, death, retirement, dismissal for cause . . . , or failure to work due to disability or discipline, or failure to obtain a position available . . . in the exercise of . . . seniority rights . . . ."  MPA, §1(b)

Each of these potential disqualifying factors, if established, would prove that an employee had not been "deprived of employment or placed in a worse position with respect to his compensation, rules, working conditions, fringe benefits, or rights and privileges pertaining thereto." *Id*.  But we have concluded that the claimants were not required to negate the existence of these disqualifying factors any more than plaintiffs in civil litigation have the burden of pleading, the burden of going forward, or the burden of persuasion on the various affirmative defenses listed in Fed.R.Civ.P. 8(c).[50]

In the present proceedings, the initial burden of establishing the claimants' status as "present employes" of Penn Central within the meaning of §1(b) of the MPA is on the claimants, but there is no dispute on this issue.  *See* Tr. 619-20 (stipulation); *see also Knapik* Oral Decision, Claimants' Ex. 4, at 14, 24. Likewise, if there is a causation eligibility requirement in the MPA, the burden of establishing the nexus between the merger and the subsequent losses of employment would be on the claimants, but, as we explain below, *see infra* VII., we do not interpret the MPA as having a causation requirement (at least not in a strict proximate cause

---

[50] In addition to nineteen enumerated affirmative defenses, Fed.R.Civ.P. 8(c) identifies a residual category of "confession and avoidance" defenses, and there are many judicially-identified affirmative defenses.  *See generally* WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE, vol. 5, §1271 (identifying non-enumerated confession and avoidance affirmative defenses).  We view compliance with work requirements, though not an expressly-identified affirmative defense, as a confession and avoidance affirmative defense.

sense).  Similarly, the burden of establishing the amount of damages or compensation losses to which otherwise eligible claimants are entitled is on the claimants.

On the other hand, Penn Central has the burden of proving non-compliance with the variously-defined work requirements (or other supervening causes for the employment losses). Our decision to assign this burden to Penn Central is based on our reading of the MPA and the other agreements.  We view these agreements as treating the work-related requirements as potential disqualifying factors.  That is, non-compliance with work requirements is one reason why an otherwise eligible employee would not be entitled to merger protection benefits. Similarly, voluntary absences from employment would be a basis for a reduction in displacement allowance to which an employee was otherwise eligible.

In addition to the structure of the MPA and the analogy to the Federal Rules of Civil Procedure, it makes sense to assign the burdens on the work-related requirements to Penn Central.  After all, the information needed to prove (or to negate) compliance with the various work-related requirements is uniquely within the possession of Penn Central.  *Cf.* STB Decision, Claimants' Ex. 7, at *7 (discussing record-keeping obligations of Penn Central under the MPA). The employer is in the best position to know (and to have records establishing) when a furloughed employee failed to report for work after a recall or failed to exercise seniority rights for available positions. *Accord* WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE, vol. 5, §1271 (discussing "fairness" in the context of pleading burdens, and observing that "'[f]airness' probably should be viewed as a shorthand expression reflecting the judgment that all or most of the relevant information on a particular element of a claim is within

the control of one party or that one party has a unique nexus with the issue in question and therefore that party should bear the burden of affirmatively raising the matter")

Finally, even if the above allocation of burdens on the work-related requirements is not always applicable to disputes involving merger protection benefits, the special circumstances of these proceedings justify their application.  This dispute has been pending for more than four decades, and Penn Central has long been aware that non-compliance with the work requirements was a basis for denying merger protection benefits.  Indeed, it raised this defense in the 1976 trial before Judge Lambros, and Judge Lambros identified it as a central issue for future proceedings. *See Knapik* 1976 Oral Decision, Claimants' Ex. 4, at 23-24.  Additionally, for at least the last decade, Penn Central has been aware of the record-keeping obligation imposed on it by the STB. Given these circumstance, it is appropriate to expect Penn Central to bear the burden of going forward and the burden of proof on the work-related eligibility requirements.

To conclude, Penn Central has the burden of raising the issue of non-compliance with the work-related requirements, which it has done.[51]  It also has the burden of presenting evidence to support this defense and the burden of persuading us of its correctness, which it has not done. *See infra* at VIII.A.

---

[51]  Penn Central did not plead non-compliance with the work-related requirements as an affirmative defenses in its answers to the complaints, *see, e.g.,* Claimants' Ex. 28 (*Knapik* and *Sophner* answers), but we do not treat Penn Central as having waived these defenses.  The work-related requirement defenses have been part of these proceedings for many years, *see Knapik* 1976 Oral Decision, Claimants' Ex. 4, at Tr. 23-24 (identifying but not deciding these issues), and Penn Central's failure to raise them affirmatively in their answers at the outset of these proceedings has not prejudiced the claimants.  *Cf. Huss v. King Co., Inc.*, 338 F.3d 647, 652 (6th Cir. 2003)("If a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.").

**D.      Evidentiary Issues**

To meet their burdens of proof on issues involving the putative strict causation requirement and their compensation losses (and to respond to Penn Central's arguments that they failed to comply with the variously-defined work requirements), the claimants relied primarily on documents created by Penn Central or its agents at the time of the merger and throughout these proceedings, including the transcript of the 1990 hearing.  In addition, they relied on testimony of three claimants and six family members.

The formal rules of evidence are not applicable to these proceedings.  Nonetheless, in considering the testimony and in receiving the exhibits presented by both sides, *see* Tr. 6; we have tried to strike a proper balance, keeping in mind the importance of assuring that the evidence on which we rely is reliable.  Our willingness to admit broadly the evidence presented, subject to subsequent arguments about reliability and weight, was strengthened because of the nature of these proceedings (*i.e.*, arbitration) and because of the special circumstances surrounding them (*i.e.*, the age of the proceedings; Penn Central's primary responsibility for the delay; Penn Central's failure to produce the relevant employee personnel records; and the absence of any current or former Penn Central official who could testify about Penn Central's policies at the time of the merger or who could authenticate or explain the exhibits).

To be clear, we conclude that the fact that these are arbitration proceedings justifies our reliance on the exhibits, although, independently, we view the special circumstances of these proceedings as providing additional support for our decision to admit the documentary evidence that has been presented to us and to rely on it.

We note also that Penn Central has not challenged the authenticity of the various exhibits discussed below or the other exhibits offered into evidence by the claimants.  Instead, it has argued that the claimants failed to meet their formal burden of authenticating the evidence on which they are relying.  In traditional civil litigation, Penn Central's point would be well taken, but given the nature of these proceedings and the special circumstances surrounding them, it is reasonable to have expected Penn Central to challenge more directly the substance of the exhibits on which the claimants have relied.

Despite our willingness to admit all the exhibits offered into evidence, there are several exhibits that are particularly important to these proceedings, and we will review them separately.

### Railroad Retirement Board Records

The Railroad Retirement Board administers a pension system for railroad employees, and in the course of executing its federally-assigned responsibilities it collects earnings records of railroad employees much the same way that the Social Security Administration collects earnings records of non-railroad employees.

The claimants rely on the certified records of their railroad earnings, as provided by the Railroad Retirement Board, to establish the post-merger annual earnings of the *Knapik* and *Sophner* claimants.  *See infra* at IX.B.4. (discussing the use of annual, as contrasted to monthly, earnings data).  The claimants' expert testified as to the reliability of Railroad Retirement Board documents, *see* Tr. 393, and we have no reason to doubt the authenticity and the reliability of the records that were presented.

56

### *O'Neill Letter*

The O'Neill letter was purportedly written by Robert O'Neill, a member of the Blackwell Arbitration Committee, to Fred Blackwell on February 28, 1900.  *See* Claimants' Ex. 29.  The letter contains an attachment, which is described in the letter as a work sheet with the test period earnings of the CUT employees who were the plaintiffs in the *Knapik* case along with "each employees' monthly 'guarantee' under the Penn Central Merger Protective Agreement."  *Id*.  *See also* 1990 Arbitration Proceedings, at Tr. 130 (description of O'Neill letter by William E. Kershner, one of the Penn Central lawyers).  The letter states that Mr. O'Neill obtained the work sheet in response to a ruling by Chairman Blackwell that the carrier search its records "and have such 'new evidence' available at the hearing."  *Id*.  Finally, the claimants asserted in their Post-Arbitration Brief, at 8 n.9, that Penn Central provided the O'Neill letter to them in response to discovery requests during the 1990 arbitration.  Penn Central has not disputed this statement, and we view the letter and the attached work sheet as admissible.

Penn Central argues that this exhibit is really a Conrail document and that it is inherently unreliable, *see* Penn Central's Post-Arbitration Reply Brief, at 22-25, but letter was provided to the Blackwell arbitration panel by Penn Central (through its appointed arbitrator) in the 1990 arbitration proceeding, and this provides strong support for both its authenticity and its reliability on the wage guarantees of the *Knapik* claimants.  We also note that the wage guarantee figures in this letter are identical to the wage guarantees contained in the employee personnel records contained in exhibits presented to this panel by Penn Central.  *See* Penn Central Exs. 18-27.  Therefore, we conclude that the O'Neill letter is admissible, and we further find that it is reliable.  Additionally, we conclude that Penn Central, having introduced this exhibit at the 1990

Arbitration Proceeding, *see* Tr. 128-131 (1980 proceedings) (Claimants' Ex. 34), may not now deny its admissibility or challenge its reliability.

### Employee Personnel Records

Penn Central included in its list of exhibits a set of ten documents that included wage-related and other information about the *Knapik* claimants, including a hand-written notation of the amount of each claimant's wage guarantee. *See* Penn Central Exs. 18-27. No one was available to explain how and when these documents were created or to otherwise authenticate them. Nonetheless, we have noted that these documents contain wage guarantees that are consistent with those in the O'Neill letter, see Claimants' Ex. 29, and we have treated these records as providing additional support for the determination of the wage guarantees.

### Standard Forms

The claimants rely on what they characterize as Penn Central's "standard forms" to show how Penn Central administered MPA benefits. *See* Claimants' Exs. 57-59. They then argue that these simple one-page forms used by Penn Central confirm the claimants' interpretation of the MPA. *See* Claimants' Post-Arbitration Brief, at 11-13. They note that these forms record hours worked and other employee wage-related and other information; they also note that the forms do not appear to require a showing of "causation" and contemplate the payment of displacement allowances in months in which otherwise eligible employees had no Penn Central income.

Penn Central, on the other hand, challenges the relevance of the forms (*i.e.*, their inapplicability to CUT employees), the absence of foundation or authentication, their status as "rank hearsay" and the absence of context, and their absence of probative value. *See* Penn Central's Post-Arbitration Reply Brief, at 19-21.

58

It is this last point—the claimed absence of probative value—that we take most seriously. In effect, Penn Central is arguing that the payment of merger protection benefits to other former employees at other locations has no probative value as to whether the claimants in these proceedings are entitled to benefits based on their individual circumstances. We agree with Penn Central on this broad point, but we note that the claimants are not arguing that the standard forms establish their eligibility. Rather, they have argued that the standard forms (the genuineness of which Penn Central has not challenged) support their interpretation of the MPA, and we agree that the forms provide such support. As we discuss in the substantive sections of this opinion, however, the claimants' interpretation of the MPA is supported by the text of the MPA independent of any additional support that is provided by the standard forms.

## VII.   The Causation Issue

Eligibility for merger protection benefits is governed by the MPA, and but for the merger and the resulting coordinations[52] the claimants would not have viable claims for benefits.

Penn Central argues, however, that the MPA conditions benefits upon the claimants' showing that the merger was the "proximate cause" of any adverse effect on them. *See* Penn Central's Post-Arbitration Brief, at 9. It then argues that the decline in intercity railroad passenger service in the decades preceding the merger, as contrasted to the merger, caused their losses of employment. *See id*. at 9-15. The claimants, on the other hand, argue that the MPA provides "attrition benefits" to protect the compensation and related benefits of otherwise

---

[52] The term "coordination" is defined in the WJPA as a "joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities." WJPA, §2(a).

eligible employees in the event of a merger and to insure that the merger would not "deprive[] [them] of employment or place[] [them] in a worse position with respect to . . . [their] compensation, rules, working conditions, fringe benefits, or rights and privileges pertaining thereto." *Id*.  MPA, § 1(b).  The issue, then, is whether the MPA requires the claimants to prove that the merger was the proximate cause of their loss of employment?  And if there is a "causation" requirement of any kind, did the claimants satisfy it?

Section 1(a) of the MPA defines the available merger protection benefits by incorporating the Washington Job Protection Agreement of 1936 ("WJPA"), which was attached as Appendix A to the MPA.  Specifically, the MPA provides that "[i]f, notwithstanding the opposition of the . . . [signatory] labor organization, the Commission should approve the said merger, . . . the provisions of the Washington Job Protection Agreement of 1936 . . . shall be applied for the protection of all employes . . . who may be adversely affected . . . incident to approval and effectuation of said merger . . . ." MPA, §1(a).  The WJPA, which was "the blueprint for all subsequent job protection arrangements" for the protection of the interests of employees of merging railroads,[53] contained a strict "causation" requirement under which benefits available to employees in the event of mergers were expressly limited to changes in employment "solely due to and resulting from such coordinations."

> [T]he fundamental scope and purpose of this agreement is to provide for allowances to defined employes affected by coordination as hereinafter defined, and ***it is the intent that the provisions of this agreement are to be restricted to those changes in employment in the Railroad Industry solely due to and resulting from such coordination***.  Therefore, the parties hereto understand and agree that fluctuations, rises and falls and changes in volume or character of employment brought about solely be other cases are not within the contemplation of the parties hereto, or covered by or intended to be covered by this agreement.

---

[53] *See New York Dock Railway v. United States*, 609 F.2d 83, 86 (2d Cir. 1979).

WJPA, §1 (emphasis added).

Section 1(b) of the MPA also addresses eligibility for merger protection benefits.  This section, which does not contain an explicit causation requirement, expands the merger protection benefits available under the MPA by adding two new categories of benefits "in addition to benefits set forth in the said Washington Job Protection Agreement."  *See* MPA, §1(a).  First, §1(b) contains a preservation of employment clause under which the merged railroad was required to "take into its employment all employes of . . .  [both railroads] who are willing to accept such employment . . . ."  Second, §1(b) provides that "none of the present employes of either of the said Carriers shall be deprived of employment or placed in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment."  MPA, §1(b).[54]

Though we agree with Penn Central that the "incident of approval and effectuation of said merger" language in §1(a) "reinforces" the causation requirement of the WJPA, *see* Penn

---

[54] Sections 1(a) and 1(b) of the MPA are central to an understanding of the issues in this case, and we quote these subsections in their entirety and highlight the language that is most important.

> (a) If, notwithstanding the opposition of the said labor organizations, the Commission should approve the said merger, then upon consummation thereof, the provisions of the Washington Job Protection Agreement of 1936 (a copy of which is attached hereto as Appendix A) shall be applied for the protection of *all employes* of the Pennsylvania and Central, as of the effective date of this Agreement or subsequent thereto up to and including the date the merger is consummated *who may be adversely affected* with respect to their compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto *incident to approval and effectuation of said merger*; provided, however, that *in addition to benefits set forth in the said Washington Job Protection Agreement, it is further agreed as follows*:

> (b) On the date the said merger of Central into Pennsylvania is consummated the merged company will take into its employment all employes of Pennsylvania and Central as of the effective date of this Agreement or subsequent thereto up to and including the date the merger is consummated who are willing to accept such employment, and *none of the present employes of either of the said Carriers shall be deprived of employment or placed in a worse position* with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto an any time during such employment.

MPA, § 1(a) & §1(b) (emphasis added).

61

Central's Post-Arbitration Brief, at 6, it does so *only* for benefits sought under §1(a) of the MPA. And instead of treating §1(a) as limiting benefits, we look at §1(a) as a whole and view its final phrase (*i.e.*, "that in addition to benefits set forth in the said Washington Job Protection Agreement, it is further agreed as follows") as not only extending benefits without regard to the temporal limitations of the WJPA (*i.e.*, the five-year cap on merger protection benefits) but also eliminating the strict causation requirement of §1 of the WJPA. And the Sixth Circuit recognized this expansion of benefits in *Augustus* when it stated that "[u]nder the MPA, affected employees were entitled to significantly greater benefits than required under then-prevailing railroad labor law." *Augustus*, 238 F.3d at *2-3.

In urging the adoption of a strict causation requirement, Penn Central has focused on § 1(a) of the MPA (but has largely ignored §1(b)), to argue that the MPA fully incorporates the WJPA's strict causation requirement and only extends merger protection benefits to employees who can prove that their loss of employment was "proximately caused" by the merger. It then argues that the decline in intercity railroad passenger traffic, not the merger, caused the claimants' loss of employment.

There is little doubt that the fundamental cause of the loss of employment for railroad employees working on passenger service at the CUT and elsewhere was the decline in intercity railroad passenger service in the quarter century following World War II. Judge Lambros recognized this in 1976, *see Knapik* 1976 Oral Decision, Claimants' Ex. 4, at 5-6, and Penn Central's expert witness provided a compelling, but sad, story of the decline in intercity railroad passenger service during this period. *See* Weinman Testimony (Tr. 505-575), Weinman Report and Affidavit (Penn Central's Exs. 1 & 2).

But this argument proves too much and, if accepted, would undermine not only the requirements of the MPA but also its obvious purpose.  There is little doubt that the railroad industry was ailing in the decades following World War II and that mergers were viewed as a means of stopping the hemorrhaging and saving the industry.  Mergers are designed to save money, and they come at a cost to employees, and the MPA was the collective response of the merging railroads and the employees' unions.  Although the decline in intercity railroad passenger service may have led to (or even caused) the merger, it was the implementation of the merger that led to the coordinations that deprived the claimants and other railroad employees of employment.  And the MPA was crafted to protect the employment interests of the "present employes" of the railroads that were seeking to merge.

In arguing for a strict causation requirement, Penn Central attempts to deflect attention away from the text of §1(b) of the MPA.  It points to the title of the agreement (*i.e.*, "Agreement for Protection of Employees in the Event of Merger"), which, it argues, suggests the incorporation of a strict causation requirement.  It also points to the prefatory language in para. 3 of the MPA in which the merging railroads made clear their "intent and purpose . . . to effectuate the merger through the unification, coordination, and consolidation of their separate facilities, ***all of which will or may have adverse effect*** upon [the represented] employes . . . ."  MPA, Whereas Clause, Para. [3](emphasis added).  Finally, it argues that this language (which only recognizes the reality that Penn Central's post-merger actions would adversely affect some employees) somehow imposes a strict causation eligibility requirement for merger protection benefits.  *See generally* Penn Central's Post-Arbitration Brief, at 6-7.

63

We reject these arguments.  We see neither the title of the MPA nor its prefatory clauses as providing a clear statement that the MPA contains a strict causation requirement, and we are not willing to treat either the title or the prefatory clauses as trumping the operative language of §1(b) of the MPA.[55]

To support its causation argument, Penn Central also cobbles together an argument based on a misreading of Judge Lambros's 1976 opinion at the *Knapik* trial.  *See* Penn Central's Post-Arbitration Brief, at 6.  In identifying the issues that were not resolved in an earlier motion for summary judgment, *see Knapik* 1976 Oral Decision, Claimants' Ex. 4, at 16, Judge Lambros defined the "third question" for the jury as follows:  "[w]ere plaintiffs placed in a worse position with respect to their employment by reason of the merger.?"  *Id*. at 19.  Seventeen lines down, after a discussion of seniority and work requirements, the judge continued:  "[I]f the railroad takes the position that they declined work which was available, then of course the merger protection agreement provides that that would not be a condition where they were placed in a worse position."  *Id*. at 20.  And from these scraps, Penn Central argues that "Judge Lambros specifically required the Claimants to demonstrate causation, thereby framing their first contract issue."  Penn Central's Post-Arbitration Brief, at 8.

We reject this argument.  Judge Lambros was clearly addressing non-compliance with work requirements, which he treats as a supervening cause that might make an otherwise eligible employee ineligible for merger protection benefits.  His opinion provides no support for the strict causation argument that Penn Central is advancing.  *Accord* STB Decision, Claimants' Ex. 7, at

---

[55] *Cf. Hawaii v. Office of Hawaiian Affairs*, 129 S.Ct. 1436, 1444-45 (2009) (giving only limited weight to "whereas" clause of congressional resolution). *Accord District of Columbia v. Heller,* 128 S.Ct. 2783, 2790 n. 3 (2008) ("[W]here the text of a clause itself indicates that it does not have operative effect, such as 'whereas' clauses in federal legislation . . . , a court has no license to make it do what it was not designed to do.").

64

*7 (concluding that "the claimants who reported for work suffered losses as a result of the merger" and treating the causation requirement as referring to supervening causes that could excuse Penn Central from paying benefits to otherwise eligible employees).

Our conclusion that §1(b) of the MPA does not contain a strict causation requirement is supported solely by our review of the language of the contract.  There is, however, other support in the record for our interpretation of the MPA as not containing a strict causation requirement.

First, in its order approving the proposed merger, the ICC recognized that the railroads had agreed to provide benefits under the MPA than were greater than those typically made available in other railroad mergers.  Specifically, the ICC expressly referred to both the "job-retention (attrition)" protection under the MPA and to the fact that the MPA "embrace[s] protection from adverse effects not causally connected with the merger."  Pennsylvania Railroad Company—Merger--New York Central Railroad Company, 327 I.C.C. 475, 545 (1966), Claimants' Ex. 5.[56]

Second, in the valuation proceeding concerning the sale of the Penn Central and its subsidiary, the Erie Lackawanna Railroad, the reorganization court recognized that the MPA had provided otherwise eligible employees with "attrition" protection, which it described as

> [t]he most generous type of labor protection . . . which guarantees employment or its equivalent in wages and fringe benefits until an employee dies, retires, resigns, becomes disabled, or refuses to accept a bona fide job opening.  The . . . PCMPA [Penn Central MPA] . . . provided attrition protection for covered employees.

---

[56] The full statement of the ICC is as follows:

It must be recognized that applicants have agreed to certain benefits greater than we have heretofore required of any section 5 applicant, e.g., the job-retention (attrition) and the limitations against reduction in force, which embrace protections from adverse effects not casually connected with the merger.

327 I.C.C. at 545.

*In the Matter of the Valuation Proceedings under Section 303(C) and 306 of the Regional Rail Reorganization Act of 1973*, 531 F.Supp. 1191, 1263 n.136 (Sp.Ct.R.R.R.A. 1981).

Third, the MPA contains a business decline clause that permits limited reductions in force "in the event of a decline in the merged company's business in excess of 5% [based on a complex formula]. . . ."  *See* MPA, §1(b), Para. [4]. It is difficult to understand, however, why Penn Central and the unions would have negotiated such a business decline clause had the MPA already contained an independent strict causation requirement for merger protection benefits (based only on declines in the intercity passenger segment of the business) under §1(b) of the MPA.  The most likely explanation is that there is no strict causation eligibility requirement applicable to §1(b) of the MPA, but Penn Central could have attempted to rely on an overall decline in service to justify its refusal to provide merger protection benefits under the limited circumstances of the business decline clause.[57]

Fourth, the parties' course of performance under the MPA, including the standard forms used by Penn Central, *see* Claimants' Exs. 57-59, to pay more than $100 million in wage guarantees and other labor protection costs under the MPA, *see In the Matter of the Valuation Proceedings under Section 303(C) and 306 of the Regional Rail Reorganization Act of 1973*, 531

---

[57] Had Penn Central invoked the business decline clause, it would have had the burden of establishing that its conditions had been met.  The STB concluded, however, that Penn Central had not invoked the business decline clause at the first arbitration hearing.

> Our examination of the hearing record, however, shows that the carrier made no effort whatsoever to identify specific periods of general business decline, emergency conditions, or other supervening events that would justify nonpayment of benefits under section 1(b) of the agreement. The fact that claimants' losses began to be experienced shortly after the merger and furlough makes it unlikely that supervening causes could explain claimants' losses. Nor did the carrier come forward with evidence showing that any claimants were disabled or disciplined in accordance with that provision.

STB Decision, at *5. Claimants' Ex. 7  Nor did Penn Central attempt to invoke the business decline clause in the present proceeding.  *See supra* note 5.

F.Supp. 1191, 1291 n.176 (Sp.Ct.R.R.R.A. 1981), supports an interpretation of the MPA as not containing a strict causation requirement.

Fifth, Penn Central itself touted the principle of attrition, stating in its company newsletter that the MPA "is based on the principle of 'attrition,' meaning that it preserves the employment of present employees except in case of their resignation, death, retirement, etc."[58] And it made clear that only members of signatory unions would have the benefits of the MPA for the "rest of their working lives."[59]

For the above reasons, we conclude that the MPA does not limit merger protection benefits to otherwise eligible employees who meet the strict causation requirement of the WJPA. Rather, the MPA provides merger protection benefits to Penn Central employees who lost employment after the date of the merger as long as the loss of employment was not the result of any of the enumerated disqualifying factors contained in the MPA.

Finally, despite the absence of a strict causation requirement for merger protection benefits under §1(b) of the MPA, we construe the MPA as requiring the claimants to establish a nexus between post-merger coordinations and their loss of employment.  But this is, at best, a modest causation requirement, and it does not require claimants to show that their losses of employment were "solely due to and resulting from such coordinations" within the meaning of § 1(a) of the MPA.

---

[58] Claimants' Ex. 11 (Headlight)(February 1965).  *See also* Tr. 96-97 (James Knapik) (testifying that Headlight was one of the sources of information about the lifetime job protections of the MPA).  *Accord* Tr. 157 (John Gallagher).

[59] Claimants' Ex. 11 (Headlight)(February 1965).

Our interpretation of the MPA as not including a strict causation requirement for merger protection benefits under §1(b) is dispositive of the causation issue. The claimants were all "present employes" during the base period within the meaning of the MPA and were all placed in a "worse position" with respect to compensation as a result of post-merger coordinations. Thus, none of the claimants may be denied merger protection benefits based on Penn Central's argument that the decline in intercity railway passenger traffic, as contrasted to the merger and post-merger coordinations, caused the losses of employment. Put slightly differently, we conclude that all the claimants are eligible for merger protection benefits even if they could not prove that their loss of employment was "solely due to and resulting from such coordinations" within the meaning of § 1(a) of the MPA.

### A.    *Knapik* Claimants

Less than three weeks after the merger became effective, Penn Central notified the *Knapik* claimants that they were being furloughed, *see* Claimants' Ex. 15, and this timing strongly supports a finding that the merger caused the furloughs. Moreover, the STB concluded that "[t]he fact that claimants' losses began to be experienced shortly after the merger and furlough makes it unlikely that supervening causes could explain claimants' losses." STB Decision, Claimants' Ex. 7, at *5. And the STB further concluded that Penn Central had not met its burden of identifying "specific periods of general business decline, emergency conditions, or other supervening events that would justify nonpayment of benefits under section 1(b) of the agreement." *Id*.

68

For these reasons, we conclude that the *Knapik* claimants met not only the putative strict causation requirement (if one existed) but also any burden that they may have had to establish a nexus between the merger and their subsequent losses of employment.

### B.  *Sophner* Claimants

After the merger, the *Sophner* claimants worked continuously for Penn Central,[60] but their earnings from Penn Central in a majority of their post-merger working years were less than their wage guarantees, as adjusted for general wage increases.[61]  *See* Claimants' Individual Reports, Claimants' Ex. 9, at 4.  As a result, they are seeking displacement allowances that represent the difference between their actual earnings and their adjusted wage guarantees.

The *Sophner* claimants met any burden that they had to establish a nexus between the merger and their subsequent losses of employment, but if there is a strict or proximate cause requirement either for merger protection benefits sought under §1(b) of the MPA or for benefits

---

[60] In 141 of the 151 years in which *Sophner* claimants had post-merger earnings from Penn Central, including 1968 but excluding the last year in which they were employed, they had earnings in all twelve months.  *See* Claimants' Individual Reports, at 4 (Claimants' Ex. 9)(Sophner claimants); *see also* Claimants' Ex. 8 (Railroad Retirement Board Records).  The claimants' expert pointed out that the Railroad Retirement Board records included the number of months of earnings.  Tr. 411.

[61] Of the 167 years in which *Sophner* claimants had post-merger earnings from Penn Central, including both 1969 and their final year of employment), their earnings were less than their wage guarantees in 76 years.  Of the remaining 91 years, their post-merger earnings were more than their wage guarantee in 71 years.  This latter figure includes 45 years in which their earnings were less than the maximum taxable earnings that railroads were required to report to the Railroad Retirement Board but more than their wage guarantees, and 26 years in which their earnings were more than the maximum taxable earnings and more than their wage guarantees.  In the remaining 20 years, the claimants' earnings were more than the maximum taxable earnings but (because the maximum taxable earnings were less than the wage guarantees) it was not possible to determine whether the actual earnings were more or less than the wage guarantees.  *See infra* at IX.A.1.  (discussing the exclusion of these years).

In light of the foregoing (and assuming the correctness of the experts' methodology), it appears that all the *Sophner* claimants experienced post-merger losses of compensation and that the post-merger earnings of the group were less than their wage guarantees in approximately 52% of their post-merger working years (*i.e.*, 76 of 147 years) for which it was possible to make a determination.

69

sought under §1(a) of the MPA and the WJPA, the *Sophner* claimants did not meet such requirement.

### C. *Watjen and Bundy* Claimants

In January 1969, Penn Central notified the *Watjen and Bundy* claimants, all of whom worked on freight service, that their "positions . . . [were] being abolished as the work you are now performing is being transferred [to a different office] . . . ." Claimants' Ex. 20; *see also* Penn Central Exs. 79, 84 & 88.  Clearly, this loss of employment resulted from one of the anticipated post-merger activities—the further consolidation of accounting-related freight work—and the *Watjen and Bundy* claimants met not only the putative strict causation requirement (if one existed) but also any burden that they may have had to establish a nexus between the merger and their subsequent losses of employment.[62]

## VIII.  The Work-Related Eligibility Issues

Assuming there is no causation requirement in the MPA (or that the claimants met any causation requirement), there is an independent question of whether the claimants met all other (*i.e.*, non-causation) MPA eligibility requirements, particularly work-related eligibility requirements.  Relying on the text of the MPA, Penn Central argues that the claimants failed to prove that they were "willing to accept . . . employment" after the merger and that the claimants "fail[ed] to obtain a position available . . .  in the exercise of . . . seniority rights . . . ." MPA, § 1(b).

---

[62] The facts concerning the *Watjen* and *Bundy* claimants are discussed in greater depth in the section on their obligation to exercise their seniority rights.

Penn Central's position on the work-related eligibility requirements differs in important ways among the different groups of claimants.[63]  It argues:

> (1) that the *Knapik* claimants failed to prove that they reported to work at the freight yard within fifteen days of the furlough notice, a requirement Penn Central claims is supported by the Sixth Circuit decision in *Augustus*;

> (2) that the *Sophner* claimants failed to prove that they exercised seniority rights to all available positions; and

> (3) that the *Watjen* and *Bundy* claimants failed to prove that they were unable to obtain a position with Penn Central and failed to prove that they exercised seniority rights to all available positions.

Given these different formulations, it is necessary to review carefully the MPA and the other relevant agreements as well as the interpretation of these agreements at earlier stages of these proceedings.

### *Merger Protection Agreement*

The first paragraph of § 1(b) of the MPA provides that the merged company "will take into its employment all **employes** of Pennsylvania and Central . . . **who are willing to accept such employment**, and **none of the present employes** of either of the said Carriers **shall be deprived of employment or placed in a worse position** with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment." *Id*. (emphasis added).  The fourth paragraph of § 1(b) of the MPA defines when an employee is **not** to be regarded as "deprived of employment or placed in a worse position with respect to . . . compensation, rules, working condition, fringe benefits or rights and privileges pertaining thereto." MPA, § 1(b).  It does so by identifying in negative terms a

---

[63]  *See* Penn Central's Post-Arbitration Brief, at 40-45 (columns in chart).

number of supervening causes that could be the basis for disqualifying otherwise eligible employees.

> An employee shall not be regarded as deprived of employment or placed in a worse position with respect to his compensation, rules, working conditions, fringe benefits, or rights and privileges pertaining thereto in case of his resignation, death, retirement, dismissal for cause in accordance with existing rules or agreements, or failure to work due to disability or discipline, or *failure to obtain a position available to him in the exercise of his seniority rights* in accordance with existing rules or agreements, or reductions in force due to seasonal requirements.

MPA, § 1(b) Para. [4] (emphasis added) (Claimants' Ex. 1).

The MPA, as originally agreed upon, did not include an express requirement that conditioned merger protection benefits on claimants' having "report[ed] to work" but only required Penn Central "to take into its employment" all employees of the merging railroads "who are willing to accept such employment." MPA, §1(b), Para. [1]. It further denied benefits to an otherwise eligible employee who "failed to obtain a position available to him in the exercise of his seniority rights . . . ."  *Id*. at Para. [4].

### *Top and Bottom Agreement*

In 1965, in anticipation of the merger and after the January 1, 1964, effective date of the MPA, the New York Central and the BRT negotiated a supplementary agreement, known as the Top and Bottom Agreement.  Penn Central Ex. 97.  Under this agreement, CUT employees, who were railroad passenger workers, were given an opportunity to work at a nearby New York Central freight yard after the merger took effect. This agreement combined the CUT employees' seniority roster with the existing New York Central seniority roster.  The CUT employees, however, were placed at the bottom of the merged roster in the order of their seniority at the CUT, with a common seniority date of September 10, 1964, while the New York Central

employees retained their place on the roster in order of their dates of employment on the New York Central.  Inasmuch as all the New York Central employees were employed prior to September 10, 1964, all the New York Central employees ranked above the CUT employees on the merged seniority roster.  *See Augustus*, 238 F.3d at *3.

The Top and Bottom Agreement contained a work-related eligibility requirement under which furloughed employees were required to "report for service" within fifteen days of being "recalled from furlough for assignments."

> All furloughed employees on the present separate seniority rosters will be recalled to service before new men are employed.  Cleveland Union Terminals Co. yardmen recalled from furlough for assignments, including the extra list, in NYC Cleveland Freight Yard territory must report for service within fifteen days of the date notified by U.S. Mail at their last known address or forfeit all seniority in both territories.

Top and Bottom Agreement, Art. 5, Para. [6]; Penn Central Ex. 97.

### 1969 Agreement

In 1969, Penn Central, the CUT, and the UTU signed an agreement, effective August 1, 1969, that  abrogated earlier agreements (including the Top and Bottom Agreement).  *See* 1969 Agreement, Art. 4, Claimants' Ex. 19.  In the 1969 Agreement, the parties agreed to an allocation of employment for the former CUT employees that guaranteed them a percentage of the jobs at the New York Central freight yard.  This percentage would have provided them with more jobs than would have been available based solely on their place on the merged seniority list.  The 1969 Agreement, however, did not contain any independent work-related requirements beyond those in the MPA.[64]

---

[64] The 1969 Agreement also addressed Penn Central's policy of denying the benefits of the MPA to CUT employees, and the parties agreed to apply the MPA to CUT employees for purposes of determining eligibility for merger protection benefits and for determining the amount of such benefits.

73

Taken together, these agreements establish that at all relevant times the MPA authorized the denial of benefits to employees who were not "willing to accept . . . employment" or who "fail[ed] to obtain a position available . . . in the exercise of . . . seniority rights . . . ."  *See* MPA, § 1(b).  In addition, during the period from February 1, 1968, the date of the merger, to July 31, 1969, the last effective date of the Top and Bottom Agreement, merger protection benefits were not available to otherwise eligible employees who were placed in a worse post-merger position because they failed to report for service within fifteen days of their recall notices.  None of the agreements, however, required employees to report to work within fifteen days of furlough notices.  And none of the earlier decisions in these proceedings required employees to report to work within fifteen days of furlough notices.[65]

---

It is understood and agree that Cleveland Union Terminal Company yard services employees . . . will, . . . become subject to all the terms and conditions of the Merger Protective Agreement . . . .  It is further understood that the Cleveland Union Terminals Company and former New York Central Railroad earnings during the test period established by Appendix E. of the Merger Protective Agreement will be combined for purposes of computing the earnings guarantees for Cleveland Union Terminal employees who are entitled to such guarantees under the provisions of this agreement subject to the qualifying conditions of the November 16, 1964 Merger Protective Agreement and appendices thereto.

Agreement of July 11, 1969, Art. 7.  Claimants' Ex. 19.  *See also supra* note 21.

[65] There is much confusing terminology concerning the work-related requirements.  We agree with Penn Central that "recall to work" and "report to work" have different meanings, *see* Penn Central's Post-Arbitration Brief, at 37-38, but not in the sense that Penn Central has suggested.  Unlike a "recall to work" which is an action initiated by Penn Central, "reporting to work" (and "standing for work") refer to actions taken by employees,

In the context of these proceedings, we construe "stand[ing] for work" as an employee advising the appropriate Penn Central officials that the employee was willing to accept employment.  It was apparently not necessary to report physically to the work site in order "to stand for work."  *See* Tr. 102 (James Knapik).  "Standing for work" is what the *Knapik* claimants were asked to do when they were furloughed and told to contact the yardmaster.  On the other hand, when Penn Central had available work for furloughed employees, the employees were "recalled to work," as was done with the *Knapik* plaintiffs subsequent to their furlough notices.  *See* Tr.105-106, 143-144 (James Knapik).  In response to such recall notices, employee were expected to "report for work," which in this context meant that the employees were told to show up for actual jobs.  We recognize that the Sixth Circuit used the phrase "reporting for work" to refer both to "standing for work" (or advising the yardmaster of availability) and to responding to recall notices and actually showing up for work.  Nonetheless, the decision of the Sixth Circuit as well as the Blackwell and STB Decisions recognized that the ten *Knapik* claimants, unlike the seven *Augustus*

74

Based on our review of the relevant agreements and the earlier decisions in these proceedings, especially the Sixth Circuit decision, we conclude that neither the MPA nor the Top and Bottom Agreement required furloughed employees (including furloughed CUT employees) to report to work within fifteen days of receipt of furlough notices.  Furloughed CUT employees, however, who not only failed "to stand for employment in the Freight Yard territory . . . [by] immediately contacting] . . . [the] Yardmaster," *see* Claimants' Ex. 15, after being furloughed but who also failed to "report for service" within fifteen days of being "recalled from furlough for service for assignments" (as specified in the recall notices and required by the Top and Bottom Agreement) were not eligible for benefits.

Though we have concluded that the burden of proof on the work-related issues falls on Penn Central, we have reviewed the submissions by the parties and combed the record for evidence of compliance with the various work-related requirements.  And, as described more fully in our discussions of the different groups of claimants, we have found enough evidentiary support to conclude that all the claimants established compliance with the various MPA work-related requirements.

A.   *Knapik Claimants*

Penn Central's position is that the *Knapik* claimants are not eligible for merger protection benefits because they failed to prove that they reported to work at the freight yard within fifteen days of the furlough notice as Penn Central claims is required by the Sixth Circuit. *See* Penn Central's Post-Arbitration Brief, at 17-21; *see also* Penn Central Proposed Finding of Fact, Para. 43-44 (proposed findings resting on an interpretation of *Augustus* as requiring reporting to work

---

claimants, reported to work (*i.e.*, actually showed up for work and worked) in response to recall notices, as required by Top and Bottom Agreement, Penn Central Ex. 97.

within fifteen days of the furlough notice). They then argue that this interpretation of the MPA is controlling precedent.

We are surely bound by the Sixth Circuit decision in *Augustus*, but we do not read the court as having held that furloughed employees who failed to report to the freight yard within fifteen days of being furloughed (but who subsequently report to work in response to recall notices) were ineligible for merger protection benefits.[66]

Penn Central makes its argument about the meaning of the Sixth Circuit decision in *Augustus* by conflating the court's discussion of the facts in the background section, *see Augustus*, 283 F.3d at *3-4, with its discussion at the end of its opinion, *see id.* at *14 & *16, affirming the STB's rejection of the anticipatory breach and comparability arguments made by the *Augustus* claimants, who (the court recognized) had failed to report to work at their own peril after having received numerous warnings. Indeed, in its summary of the facts, the Sixth Circuit noted that the *Augustus* claimants "never reported for work at the N.Y. Central freight yard and were discharged without compensation after failing to respond to a final notice to report dated December 15, 1969." *Augustus*, 238 F.3d at *1. The *Knapik* claimants, on the other hand, did report to work, *see id.* at *2 ("Ten of these claimants had reported to work at the N. Y. Central freight yard, whereas seven had not."), and it is a stretch to treat the Sixth Circuit discussion of the "never-reporting" *Augustus* claimants as fully applicable to the "reporting" *Knapik* claimants.[67]

---

[66] The Sixth Circuit concluded that the STB did not abuse its discretion under the *Lace-Curtain* standard, *see supra* note 35, when it ruled that the Blackwell Panel had not abused its discretion in rejecting the excuses offered by the claimants who not only failed to report to the freight yards within fifteen days of the furlough notice but who also failed to respond to any of the subsequent notices to report for work.

[67] In denying merger protection benefits to all seventeen *Knapik* plaintiffs, the Blackwell Panel did not treat the claimants' failure to report for work within fifteen days of the furlough notice as an independent basis for denying

Our conclusion that the Sixth Circuit decision in *Augustus* does not compel us to reject the claims of the *Knapik* claimants, however, does not require us to rule for them.  Instead, we have had to determine the precise nature of the work requirement for furloughed employees, such as the *Knapik* claimants.  And in addressing this issue, we accept Penn Central's factual claim that the *Knapik* claimants did not physically report to the freight yard within fifteen days of the furlough notice.[68]

It is apparently Penn Central's position that the failure of the seventeen *Knapik* plaintiffs to contact the New York Central freight yard within fifteen days of the furlough notice rendered them forever ineligible for merger protection benefits even if they subsequently reported to work after being recalled.  *See* Penn Central's Brief in Support of Summary Adjudication, at 34.  Put slightly differently, Penn Central contends that any claimant who failed to contact the yardmaster "immediately" after receiving a furlough notice was rendered permanently ineligible for merger protection benefits and that Penn Central was not required to give them a second chance even if

---

eligibility.  Instead, it considered whether the claimants ever returned to work by referring both to the furlough notice and to Penn Central's subsequent offer of available work in the recall notices.  *Blackwell Decision,* at 30a & 56a.

The decision of the STB overturning, in part, the Blackwell Decision also distinguished those claimants who never reported for work from those who did.  *See* STB Decision, Claimants' Ex. 7, at 2 ("[W]e must distinguish between those of the 17 petitioning claimants who accepted the carrier's invitation to stand for work in the freight yard and those who did not.")(footnotes omitted).  And the STB made clear that Penn Central had not presented evidence to support the argument that the ten *Knapik* claimants, who reported for work in response to the recall notices, had somehow not complied with the work requirements of the MPA. *See id*. at 8 ("The panel's Decision is especially questionable because the carrier produced no evidence at all that any of the conditions specified for refusing benefits in the 1964 merger protection agreement were satisfied for the 10 claimants who reported to the freight yard.").

[68]  It is unclear whether the Sixth Circuit viewed these ten claimants as having physically reported to the N.Y. freight yard "immediately" (or within fifteen days) after receipt of the furlough notice or having only "contacted" the N.Y. freight yard, but it is clear the court believed that they responded adequately (though under "protest") to post-furlough recall notices, *see* Claimants' Ex. 16 (recall notice), by eventually reporting for work.  *See* Claimants' Ex. 17 (letter by *Knapik* claimants stating that they were reporting to work in response to recall notices "to avoid jeopardizing . . . [our] employment and seniority rights").

Penn Central had subsequently relented (as it did) and offered them another chance to report to work.  We find this position untenable.  It ignores the distinctions drawn by all the decision-makers below, including the Blackwell Arbitration Panel, between the never-reporting *Augustus* claimants and the eventually-reporting *Knapik* claimants.  It also asks us to ignore the very letters in which Penn Central assured the claimants that they would not be penalized for reporting to the freight yard and urging them to redeem themselves and respond to recall notices.[69]  *See* Claimants' Ex. 17 (recall letter).  Thus, we reject the argument that this second chance was gratuitous, and we conclude that Penn Central was not justified in denying merger protection benefits to furloughed employees who took the railroad at its word and reported to work after receiving recall notices.[70]

As this discussion makes clear, there is no requirement in the MPA that employees report to work within fifteen days of receipt of furlough notices.   Indeed, the treatment of the *Knapik* claimants (as not having completely refused to make themselves available for work) by the Blackwell Panel and the STB is consistent with our interpretation of the subsequent Sixth Circuit decision.  Thus, we conclude that the *Knapik* claimants were not made ineligible for merger

---

[69] That the furloughed *Knapik* claimants returned to work in 1968 and 1969 after being recalled is also supported by Penn Central documents, *see* Penn Central Exs. 18-27 (indicating furlough and recall dates), and by a memorandum from Ray Glenn to Bob Siverd.  This memorandum contains an attachment that identifies by name the ten *Knapik* claimants and states that "between February 21, 1968 and December 31, 1969, the following Claimants returned to work, and worked until retirement or their death . . .:  The attachment then identifies the *Augustus* claimants, who "did not at any stage return to work."  Claimants. Ex. 30, at [6] (PCC03186).

[70] As required by Judge Oliver, *see* Order, at p. 3 (June 23, 2006) (Claimants' Ex. 25), our interim decision addressed whether the interpretation of the work-related requirement in *Augustus* precluded the other claimants from pursuing their claims. Interim Decision, at 4.  Wedid not decide that issue at the time, but we stated that "[i]f there is a substantive difference in the formulations of the legal standard and the parties wish to pursue it, that issue can be explored more fully in the trial briefs or at other stages in these proceedings."  *Id*. at n.3. And as is clear form the text, we have now concluded that there is a substantive difference between the different formulations of the "reporting-for-work" standard.

78

protection benefits because of their failure to report to the freight yard within fifteen days of the furlough notice.

Finally, our conclusion that the *Knapik* claimants met the work-related eligibility requirement is supported by the STB's disposition of the case. We do not believe that the STB invited the parties to re-litigate the entire reporting-to-work issue.  To be sure, the STB did not enter a final award for the claimants, but, given the bifurcation of the proceedings, there was no record to support an award of specific amounts of compensation.  Nonetheless, the STB left only a narrow opening for Penn Central on work-related issues, and that opening applied principally to the possibility of merger protection benefits being denied for supervening causes (*e.g.*, disability, dismissal for cause) or being reduced or off-set for voluntary absences from work. STB Decision, Claimants' Ex. 7. at *6.  We believe the STB expected this panel to focus on the amount of compensation to which the *Knapik* claimants were entitled.   And while we have reviewed anew (and at length) the work-related eligibility issue, we believe that the conclusion we have reached is not only correct but was also reached by the STB earlier in these proceedings, and that we are required by the law of the case to follow it.[71]

**B.    *Sophner Claimants***

Penn Central's position is that the *Sophner* claimants are not eligible for merger protection benefits because they failed to prove that they exercised seniority rights to all available positions. *See* Penn Central's Post-Arbitration Reply Brief, at 30; *see also* Penn Central, Proposed Findings, Para. 55 ("No *Sophner* Claimant has put forth any evidence proving

---

[71] Penn Central also argued in its pre-trial brief that all the claimants are ineligible for merger protection benefits for having failed to prove that they complied with the duty to exercise seniority rights.  *See* Penn Central Pre-Arbitration Brief, at 23-32. It is unclear if it is still making this argument, post-hearing, for the *Knapik* claimants, but if it is we reject it for the same reasons we reject this argument for the *Sophner* claimants. *See infra* VIII.B.

that he exercised his seniority rights to obtain all available work during months in which he is claiming a displacement allowance.").

The claimants, relying on the Railroad Retirement Board records, *see* Claimants' Ex. 8, argue that every *Sophner* claimant continued to work after the merger and that their cases were not "furlough & recall" cases like those of the *Knapik* claimants.  *See* Claimants' Post-Arbitration Brief, at 31. They do not point to specific evidence in the record that establishes that they exercised their seniority rights to obtain all available work during months in which they were working for Penn Central but for which they claim displacement allowances.

Penn Central discussed the duty to exercise seniority extensively in their Pre-Arbitration Brief, *see* Penn Central Pre-Arbitration Brief, at 23-32, where they relied upon a number of arbitration decisions taking the position that the exercise of seniority rights is a condition of receiving merger protection benefits under the MPA.  *See id*. at 24-26 (citing arbitration decisions). We do not disagree with this proposition in the abstract; nor do we understand the claimants to disagree with it.  The issues, rather, go to the nature of the duty to exercise seniority rights as well as to the allocation of the burden of proof on the issue of the exercise or non-exercise of such seniority rights.

With regard to the duty to exercise seniority rights to obtain all available work, we do not understand why Penn Central employees who were employed continuously after the merger, as were the *Sophner* claimants, would even be required to exercise seniority to obtain other employment. *See supra* note 60.

Assuming, however, that the *Sophner* claimants' were required to exercise their seniority rights to obtain all available work during months in which they are claiming displacement

allowances, we reject Penn Central's argument that claimants had the burden of demonstrating compliance with this requirement. Therefore, even if the *Sophner* claimants did not prove or even present evidence that they exercised seniority rights to obtain all available work in the months for which they are claiming displacement allowances, it is equally true that Penn Central did not present any evidence much less prove that the *Sophner* claimants had *not* exercised seniority rights to obtain all available work.

Thus, we are at equipoise. No evidence has been introduced on this issue, and thus its resolution turns on the allocation of burdens. And, as we discussed earlier, *see supra* V.C., we view the seniority-related work requirement as a disqualifying factor on which Penn Central has the burden of persuasion. Thus, in light of Penn Central's failure to present evidence that the *Sophner* claimants failed to exercise seniority rights to obtain all available work in months for which they are claiming displacement allowances, we conclude that the *Sophner* claimants met the work-related/seniority eligibility requirement of the MPA (or, perhaps more accurately, are not ineligible because of an alleged failure to prove that they exercised their seniority rights to all available positions).

**C.** ***Watjen and Bundy* Claimants**

Penn Central's position is that the *Watjen* and *Bundy* claimants are not eligible for merger protection benefits in the form of separation allowances (1) because they failed to prove causation (*i.e.*, they failed to prove that they were adversely affected as a result of the merger); and (2) because they failed to establish that they met the work/seniority-related eligibility conditions of the MPA (*i.e.*, they failed to prove that they were unable to obtain a position with

81

Penn Central, and they failed to prove that they exercised seniority rights to all available positions).  *See* Penn Central's Post-Arbitration Brief, at 44-45 (columns in chart).[72]

In response, the *Watjen and Bundy* claimants argue that Penn Central refused to provide them with lump-sum or separation allowances after abolishing their positions and not permitting them to obtain regularly assigned positions through the exercise of their seniority.

The merger became effective on February 1, 1968, but the *Watjen* and *Bundy* claimants (who were freight clerks on the Detroit seniority list despite their not working in Detroit, *see* Tr. 225-227; 236 (Franz)) remained on their jobs until early 1969.  On January 10, 1969, however, they received virtually identical letters from E.T. Scheper, Manager-Freight Accounting in Detroit, advising them that their positions were being abolished and that the work that they had been performing was being transferred to other offices.[73]  *See* Claimants' Ex. 20.[74]  *See also* Penn Central Exs. 79, 84 & 88.  The letters also advised them that they had ten (10) days "to obtain a regularly assigned position available to you in the exercise of your seniority" and that, "[i]f you fail to obtain a regularly assigned position with ten (10) calendar days you will become a utility employe subject to use by the Company in accordance with the terms of the Merger

---

[72] More specifically, Penn Central argues that the *Watjen* and *Bundy* claimants are not eligible for separation allowances because they were not "deprived of employment" in that they were given full-time jobs as utility employees and they quit these jobs.  *See* Penn Central's Post-Arbitration Reply Brief, at 32.

[73] Of the four *Watjen* claimants, Franz and Watjen worked in Cleveland; *see* Tr. 218, and their work was transferred to Chicago; O'Neil worked in Syracuse, and his work was transferred to Detroit; and Wilger worked in Cincinnati, and her work was transferred to Indianapolis.  *See* Claimants' Ex. 20.  Of the *Bundy* claimants, Bundy worked in Selkirk, New York, and his work was transferred to New York City; Feldscher worked in Cleveland, and his work was transferred to Chicago.  Claimants' Exs. 20 & 22; *see also* TR. 218, 230-31 (Franz)..

[74] There does not appear to be a job abolition notice in the record for Bundy, but the handwritten letter from Bundy to Penn Central supports the finding that Bundy received the same letter, *see* Penn Central Exs. 86 & 87, and Penn Central apparently views the *Watjen* and *Bundy* claimants as having received identical job abolition notices.  *See* Penn Central, Proposed Findings, Paras. 62 & 63.

82

Implementation Agreement." [75]  *See* Claimants' Ex. 20; Penn Central Exs. 79, 84 & 88.  *See also* Penn Central, Proposed Finding, Para. 62.

Within a few days of receiving the job abolition notices, the *Watjen* and *Bundy* claimants attempted to exercise their seniority rights.  Claimants Watjen and Franz wrote to Scheper advising Scheper of their "intent . . . [to] obtain[] a position available to me by the exercise of my seniority" and requesting that Scheper provide them "a complete list of jobs available to me by the exercise of my seniority rights."  Claimants' Ex. 21; *see also* (Tr. 219-20) (Franz), In response to these letters, Scheper traveled to Cleveland for a meeting with claimants Franz, Watjen, and Feldscher, all of whom worked in the Cleveland office.  Tr. 220-21 (Franz).  In that meeting, Scheper advised the clerks that they would not be permitted to exercise seniority in Detroit, the only place they had seniority.  Tr. 220-21; 225-26; 229 (Franz); *see also* Tr.331-34 (Anna Jo Bundy) (widow of David Bundy testifying about the abolition of his job in late January or February 1969, his unsuccessful efforts to exercise seniority to get a new position, and his request for a severance allowance).  The *Watjen* and *Bundy* claimants then attempted to resign their positions with Penn Central and requested lump-sum separation allowances, *see* Claimants' Ex. 22; Tr. 221-23 (Franz), but Penn Central did not respond to their requests and did not provide them separation allowances.  Tr. 223, 228-32 (Franz) (testifying as to the experience of the

---

[75] The individual letters to the *Watjen* and *Bundy* claimants have different dates for abolition of their positions and identify different places to which the work was being transferred, but the letters all advised the claimants of their obligation to obtain "a regularly assigned position available to you in the exercise of your seniority."  The full paragraph is as follows:

> Under the provisions of existing agreements you have ten (10) calendar days in which to obtain a regularly assigned position available to you in the exercise of your seniority.  If you fail to obtain a regularly assigned position within ten (10) calendar days you will become a utility employe subject to use by the Company in accordance with the terms of the Merger Implementing Agreement.

Claimants' Ex. 20.

*Watjen* and *Bundy* claimants); *accord* Tr.337 (Anna Jo Bundy) (testifying that her husband, David Bundy, never received a response from Penn Central to his request for a severance allowance).

Subsequently, the *Watjen* and *Bundy* claimants accepted utility jobs with Penn Central. In these utility jobs, which were apparently derisively known as "garbage jobs," see Tr. Tr. 224 (Franz)(describing a utility clerk "as a person who gets all the garbage jobs that can't be filled by bidding purposes. Nobody wanted them."), the *Watjen* and *Bundy* claimants had new "seniority dates" of February 11, 1969, (Tr. 226-27) (Franz) which meant that they effectively lost their seniority.  For example, claimant Franz, who lost fourteen years of seniority, testified about his unsuccessful efforts to bid on other jobs.  Tr. 227-28 (Franz).

Within a few months of the abolition of the jobs in which they had worked for many years and their assignment to utility jobs, all the *Watjen* and *Bundy* claimants quit their employment with Penn Central.

Under § 1(a) of the MPA, employees are entitled to the benefits of the WJPA.  Under § 9 of the WJPA, "any employe eligible to receive a coordination allowance under Section 7 hereof may, at his option, at the time of coordination, resign and (in lieu of all other benefits and protections provided in this agreement0 accept a lump sum separation allowance."

Section 7(a) of the WJPA states that "[a]ny employe of any of the carriers participating in a particular coordination who is deprived of employment as a result of said coordination shall be accorded an allowance (hereinafter termed a coordination allowance), based on length of service."  Finally, § 7(c) of the WJPA defines eligibility for such coordination allowances (and thus for separation allowances) by providing that

84

[a]n employee shall be regarded as deprived of his employment and entitled to a coordination allowance . . . when the position which he holds on his home road is abolished as a result of coordination, and he is unable to obtain by the exercise of his seniority rights another position on his home road or a position in the coordinated operation.

The parties disagree, however, in their interpretation of § 7(c). Penn Central argues that this provision conditions eligibility for coordination allowances on an employee's ability "to obtain a position anywhere within the merged company." Penn Central's Post-Arbitration Brief, at 22. The claimants, on the other hand, construe this provision as only conditioning eligibility for coordination allowances on an employee's ability to obtain a position either on his or her home road or in the coordinated operation by the exercise of his seniority rights. Thus, the claimants construe the seniority clause in § 7(c) as applying both to positions on the employee's home road and to other positions with Penn Central.

This is an important issue for these claimants. As noted above, their seniority was in Detroit, and they attempted, unsuccessfully, to exercise it. They also sought information about other positions for which they could exercise their seniority, *see* Claimants' Ex. 21, but Penn Central did not provide such additional information to them and did not permit them to exercise their seniority. Tr.219-23 (Franz).

We agree with the claimants. The plain meaning of § 7(c) is that the "exercise of . . . seniority rights" clause applies not only to positions on the employees' home road but also to other positions in the coordinated operation. Indeed, any other interpretation would render superfluous the underscored and highlighted portion of the following phrase: "by the exercise of his seniority rights ***another position on his home road***."

85

Given our interpretation of § 7(c) and our conclusion that the *Watjen* and *Bundy* claimants attempted to exercise their seniority rights on their home road (Detroit) and our conclusion that there was nowhere else where they could exercise seniority rights for other positions, we conclude that the availability of jobs as utility employees (for which they did not need to exercise seniority) and their subsequent leaving those jobs did not disqualify them from receiving separation allowances.  *Cf*. STB Decision, Claimants' Ex. 7, at 5 ("The jobs for which the [*Knapik*] claimants were expected to 'stand' were not actual jobs.").

Our conclusion that the *Watjen* and *Bundy* claimants may not be denied eligibility for lump-sum separation payments because of an alleged failure to prove that they exercised seniority rights to all available position initially flows from our earlier conclusions that the burden of proof on work-related eligibility issues is on Penn Central, and that Penn Central failed to meet this burden.  Going a step further, however, it is clear that these claimants attempted to exercise their seniority rights to obtain available positions with Penn Central after they were advised that their jobs were being abolished and their work was being transferred to other locations.  Their attempts to exercise their seniority were rebuffed, and even if they had the burden of proving that they exercised their seniority rights to all available positions, we would conclude that they met their burden.


## IX.    The Compensation Loss Issues

Having determined that all thirty-two claimants met the eligibility requirements for merger protection benefits, we must now decide if the claimants also met their burden of proof

on the compensation loss issue.[76]  The claimants, relying on the report and testimony of their expert, Dr. Harvey S. Rosen,[77] and the documentary record, have calculated the merger protection benefits they are seeking.  *See* Expert Reports, Claimants' Exs. 9, 44 & 45.  Penn Central, however, argues that none of the claimants met their burden of proving compensation loss for reasons that go primarily to the alleged failure of claimants' expert to follow the specific requirements of §6(c) of the WJPA, which it argue is required by the MPA. *See* Penn Central's Post-Arbitration Brief, at 25.

The MPA is the starting point for determining not only eligibility for merger protection benefits but also the amount of such benefits.  And to provide guidance in calculating the benefits due employees, the merging railroads and the unions negotiated a "Memorandum of Understanding Re Employment Information to be Furnished upon Request and Computations Respecting Compensation Due Operating Employes Under Agreement." This memorandum was attached to the MPA as Appendix E.

Section 1(b) of the MPA, Para. [3], required the railroads to furnish the unions with rosters "of all employes entitled to preservation of employment, compensation, and fringe benefits as of the effective date of this Agreement . . . ."  Paragraph [2] of Appendix E added greater detail to this information-sharing obligation and required Penn Central to provide "information respecting . . . current rate of pay, compensation paid and hours worked during a

---

[76] The claimants have the initial burden of proving compensation loss for each claimant.  Penn Central then has the burden of establishing the basis for any reductions in compensation based on voluntary absences, receipt of wages from Penn Central, or other offsets.  *See supra* V.B. (discussing burdens).

[77] Penn Central stipulated that Dr. Rosen was qualified to testify as an expert.  *See* Tr. 377-78. Dr. Rosen's initial report is contained in Claimants' Ex. 9 (which includes individual reports on all thirty-two claimants), and his testimony is at Tr. 377-493.  Dr. Rosen's initial reports included prejudgment interest through January 1, 2007.  He subsequently supplemented his reports to reflect prejudgment interest through December 31, 2007.  *See* Claimants' Exs. 44 & 45.

[12-month] base period . . . ."  And Appendix E expressly defined the "base period" as "the last twelve (12) months in which he performed compensated services immediately preceding May 16, 1964." *Id*.[78]

Appendix E then specified the method for calculating the displacement allowances for two discrete groups of Penn Central employees—employees entitled to preservation of employment and employees not entitled to preservation of employment.

Employees entitled to preservation of employment are described in § 1(b) of the MPA. "[N]one of the present employes of either of the said Carriers shall be deprived of employment or placed in a worse position with respect to compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment."  *Id*. (emphasis added).  These "present employes," *see* Tr. 619-20, are "all employes of Pennsylvania or Central who render any compensated services between the effective date of this Agreement and the date the merger is consummated . . . ." MPA, § 1(b) Para. [2].  And Appendix E, Para. [3] defined the method for "determining whether, or to what extent, . . . an employe [on the furnished roster] has been placed in a worse position with respect to his compensation . . . ." Under this methodology, the annual base period compensation is divided by twelve and the resulting figure (*i.e,* the monthly "wage guarantee") is compared (after an adjustment for "subsequent general wage increases") to the employee's actual monthly compensation.  To the extent current monthly compensation from Penn Central, if any, was less than the wage guarantee for the month, the employee was entitled to the difference (less any offsets for such

---

[78] The WJPA also uses a "base period," which it defines as the "test period" and which refers generically to the last "twelve (12) months of months . . . of performed service immediately preceding the date of his displacement."  *See* WJPA, §6(c).

88

items as compensation lost because of voluntary absences).  This is the basic formula for determining displacement allowances to be paid to otherwise eligible employees under Appendix E, Para. [3].[79]

Para. [4] of Appendix E addresses the compensation available to a different group of employees—employees who are "not entitled to preservation of employment" under § 1(b) of the MPA.  This group of employees was entitled to merger protection benefits under § 1(a) of the MPA (assuming they were otherwise eligible for benefits) but their entitlement was to a lesser amount of benefits based on §6(c) of the WJPA.   And these benefits, which were to be "computed in accordance with the provisions of the said Washington Job Protection Agreement," MPA, Appendix E, Para. [4],[80] were capped (*i.e.*, five-years of benefits) and only available upon a showing of causation.

---

[79] The full text of Appendix E, Para. [3], of the MPA, is as follows:

> For purposes of determining whether, or to what extent, such an employe [appearing on the roster] has been placed in a worse position with respect to his compensation, his total compensation and total time paid for during the base period will be separately divided by twelve.  If his compensation in his current position is less in any month (commencing with the first month following the date of consummation of the merger) than his average base period compensation (adjusted to include subsequent general wage increases), he shall be paid the difference less compensation for any time lost on account of voluntary absences to the extent that he is not available for service equivalent to his average time paid for during the base period, but he shall be compensated in addition thereto at the rate of the position filled for any time worked in excess of the time paid for during the base period; provided that, however, that in determining compensation in his current position the employe shall be treated as occupying the position producing the highest rate of pay and compensation to which his seniority entitles him under the working agreement and which does not require a change in residence.

[80] The full text of Appendix E, Para. [4], of the MPA, is as follows:

Employes not entitled to preservation of employment but entitled to the benefits of the Washington Job Protection Agreement pursuant to the provisions of Section 1(a) of the Protective Agreement shall be entitled to compensation computed in accordance with the provisions of said Washington Job Protection Agreement.

Despite the different provisions for computing compensation loss, a comparison of the methods under §6(c) of the WJPA[81] and under Para. [3] of Appendix E of the MPA reveals (with the exception of a more explicit description in the MPA of the dates for the "base period" and some slightly different language possibly affecting employees who performed no work for Penn Central while on furlough) only minor textual differences.  To the extent there are substantive differences, however, we treat merger protection benefits sought under §1(b) of the MPA as subject to the requirements of Appendix E and benefits sought under §1(a) of the MPA as subject to the requirements of §6(c) of the WJPA.

Under § 1(a) the MPA, employees (who are eligible to the benefits specified under §1(b)) may also seek benefits under the WJPA.  And § 7(a) of the WJPA provides that employees who are "deprived of employment as a result of . . . coordination" are eligible to receive monthly "coordination allowances" for as long as five years (depending on length of service). WJPA, § 7(a).[82]

---

[81] The full text of §6(c) of the WJPA is as follows:

> Each displacement allowance shall be a monthly allowance determined by computing the total compensation received by the employe and his total time paid for during the last twelve (12) months in which he performed service immediately preceding the date of his displacement (such twelve (12) months being hereinafter referred to as the "test period") and by dividing separately the total compensation and the total time paid for by twelve, thereby producing the average monthly compensation and average monthly time paid for, which shall be the minimum amounts used to guarantee the displaced employe, and if his compensation in his current position is less in any month in which he performs work than the aforesaid average compensation, he shall be paid the difference, less compensation for any time lost on account of voluntary absences to the extent that he is not available for services equivalent to his average monthly time during the test period, but he shall be compensated in addition thereto at the rate of the position filled for any time worked in excess of the average monthly time paid for during the test period.

[82] Under § 7(a) of the WJPA, a coordination allowance is a "monthly allowance equivalent . . . to . . . 60% of the average monthly compensation of the employee in question during the last twelve months of his employment in which he earned compensation, prior to the date he is first deprived of employment as a result of the coordination." *Id*.  The number of months that an employee could receive such coordination allowances was limited by length of service with a maximum of 60 months. *See id*.

90

And under §9 of the WJPA, employees entitled to coordination allowances had the option of resigning and accepting lump sum separation allowances based on length of service and monthly pay, with employees who had worked five years or more being entitled to separation allowances of twelve months of pay.

In the present case, the *Knapik* and *Sophner* claimants sought displacement allowances that represented the difference between their wage guarantees and their post-merger income. The *Watjen* and *Bundy* claimants, on the other hand, sought lump-sum separation allowances (based on the length of their service) that were twelve times their monthly wages.  *See* Expert Report, Claimants' Ex. 9.

### A.    **Expert Testimony—Proof of Compensation Loss**

To prove compensation loss, the claimants relied upon the testimony of their expert and the exhibits in the record.  Their expert summarized the methods that he followed in calculating compensation loss in his four-page general report (July 30, 2007) and in individual reports prepared for each of the claimants.  *See* Claimants' Ex. 9 (general report and initial individual reports) & Ex. 45 (updated claimants' individual reports); *see also* Claimants' Ex. 44 (Revised Master Summary Sheet).[83]

### 1.    *Knapik* **Claimants (Tr. 395-408)**

To prove compensation loss for each *Knapik* claimant, claimants' expert initially relied on the wage guarantee information contained in documents developed by Penn Central. *See* Expert Report, at 3 (Claimants' Ex. 9); *see also* Tr. 396-97.  The O'Neill letter, *see* Claimants' Ex. 29; contained a chart with wage guarantees.  *See also* Penn Central Exs. 18-27.  The expert

---

[83] Claimants' expert also testified to his calculations of prejudgment interest, but we address this part of his testimony in our discussion of enhancements.

then used these wage guarantees, which he assumed were for 1969,[84] as the starting point for adjustments for "subsequent general wage increases." *See* Appendix E, Para. [3], of the MPA.

To calculate the "subsequent general wage increases" (or the "forecasted wage guarantees"), claimants' expert relied on wage rate data for brakemen provided by the UTU.  Tr. 382; 397-99; *see also* Claimants' Ex. 9, at 9 (daily rates for *Knapik* brakemen); Claimants Ex. 42, p. 5 (daily rates of pay for yard brakemen helpers).[85]  The expert calculated the daily wage growth rates and then transferred this data to the individual reports for each *Knapik* claimant. *See* Claimants' Ex. 9 & 45, at 4.

Having determined the initial wage guarantees and the daily wage growth rates, claimants' expert was then able to calculate the forecasted wage guarantees for each *Knapik* claimant. *Id.*

The expert then determined the post-merger annual railroad earnings of each *Knapik* claimant, relying on information maintained by the Railroad Retirement Board.  *See* Tr. 393; *see also* Claimants' Ex. 8 (certified annual earnings records from the Railroad Retirement Board). Before subtracting the earnings from the forecasted wage guarantees, however, the expert excluded all years in which claimants' earnings exceeded the maximum taxable earnings that railroads were required to report to the Board.  (Tr. 399-401).  Thus, in years in which a *Knapik* claimant earned more than the maximum taxable earnings, the expert did not calculate (and the claimants are not seeking) displacement allowances.  *Id.  See also*  Claimants' Exs. 9 & 45, at 4.

---

[84] The wage guarantees appear in a column in the O'Neill letter denominated "8-1-69," and it is unclear whether the wage guarantees in this exhibit are based on 1968 or 1969.  The expert assumed that the figures were for 1969 and extrapolated backward to determine the wage guarantees for 1968.  Tr. 404-06.  By doing this, the expert made a conservative assumption that resulted in lower wage guarantees and thus reduced the displacement allowances.

[85] Because the wage rate data reflected mid-year adjustments, the expert calculated an average annual rate of wage increases, *see* Claimants Ex. 9, at 10-11 (individual reports for the ten *Knapik* claimants).  Tr. 397-98.

Finally, the expert compared the annual forecasted wage guarantees to the individual claimant's annual railroad earnings, as reported to the Railroad Retirement Board, to determine the displacement allowance for each year for which an otherwise eligible claimant was eligible for benefits.  He made this calculation for the period lasting until the records indicated that the employee had become ineligible for benefits because of death, resignation, or retirement. Tr. 401-02. He also increased this figure by the amount of lost pension benefits[86] to arrive at the annual (unenhanced) compensation loss for each *Knapik* claimant.  *See* Expert Report and Claimants' Individual Reports (Claimants' Exs. 9).

Because no monthly post-merger earnings information was available, the claimants' expert used annual, not monthly, earnings information to make the compensation loss calculations for the *Knapik* claimants.  Tr. 404, 406-08.  As a result, he did not calculate displacement allowances for those years in which the annual income of the *Knapik* claimants exceeded the forecast annualized wage guarantees even though wage fluctuations in any such year might have entitled the *Knapik* claimants to displacement allowances for some low-wage months in excluded years.  Consequently, the resulting displacement allowances understate the actual losses calculated on a monthly basis.  Tr. 406-408.

### 2.    *Sophner* Claimants (Tr. 412-25)

To prove compensation loss for the *Sophner* claimants, claimants expert initially determined their annual wage guarantees.  Because there were no Penn Central documents

---

[86] The claimants' expert calculated lost pension benefits by applying the employer's contribution to the wages.  *See* Claimants' Expert Report, at 4 (Claimants' Ex. 9); *see also* Claimants' Ex. 9 & 45, Tables 2 & 5; Tr. 402-03. Although the expert included employer pension contributions in determining compensation loss, he did not include free transportation and health care, two benefits to which eligible claimants would have also been entitled. *See* Tr. 408.

93

containing wage guarantees as there were for the *Knapik* claimants, *see* Expert Report, Claimants' Ex. 9, at 3, the expert estimated the annual wage guarantees by assuming full-time employment (i.e., 2080 hours per year) at prevailing wage rates. (Tr. 422-23). Relying on wage rate data provided by the Brotherhood of Railway Carmen, *see* Tr. 380-82; 413-21, *see also* Claimants' Ex. 42 (Brotherhood of Railway Carmen, Wage Rate Progression Chart); Claimants' Ex. 9, at 9 (individual *Sophner* reports), the expert determined the forecasted wages for each year (without having to apply a daily wage growth rate as he did for the *Knapik* claimants). The expert then transferred this data to the individual reports for each *Sophner* claimant. *See* Claimants' Ex. 9, at 4 (Individual Reports for *Sophner* claimants).

Relying on the earnings records maintained by the Railroad Retirement Board, the expert then determined the annual post-merger railroad earnings of each *Sophner* claimant. *See* Tr. 393; *see also* Claimants' Ex. 8 (certified annual earnings records from the Railroad Retirement Board). Before subtracting the earnings from the forecasted wage guarantees, however, the expert excluded all years in which a claimant's earnings exceeded the maximum taxable earnings that railroads were required to report to the Board, as he had done for the *Knapik* claimants (Tr. 424). Thus, the expert did not calculate (and the claimants are not seeking) a displacement allowance for years in which a *Sophne*r claimant earned more than the maximum taxable earnings. *Id*. *See also* Claimants' Ex. 9, at 4 (individual *Sophner* reports).

Finally, as with the *Knapik* claimants, the expert compared the annual forecasted wage guarantees to the individual claimant's annual railroad earnings, as reported to the Railroad Retirement Board, to determine the displacement allowances for each year for which an otherwise eligible *Sophner* claimant was eligible for benefits. As with the *Knapik* claimants, he

94

made these calculations for the period lasting until the records indicated that the employee had become ineligible for benefits because of death, resignation, or retirement.  *See* Claimants' Ex. 9 (individual *Sophner* reports); Tr.402.  He also increased these figures by the amount of lost pension benefits (Tr. 423-24) to come up with the annual (unenhanced) compensation loss for each *Sophner* claimant.  *See* Expert Report and Individual Claimants' Reports (Claimants' Ex. 9).

In making the compensation loss calculations for the *Sophner* claimants, the expert used annual, not monthly, earnings information.  Thus, he did not include displacement allowances for those years in which the annual income of the *Sophner* claimants exceeded the forecast annualized wage guarantees, even though wage fluctuations in any such year might have entitled the *Sophner* claimants to displacement allowances for some low-wage months in those excluded years.  Consequently, the resulting displacement allowances for the *Sophner* claimants (as for the *Knapik* claimants) understate the actual losses calculated on a monthly basis.  See Tr. 406-08.

### 3.  *Watjen* and *Bundy* Claimants (Tr. 408-12)

The *Watjen* and *Bundy* claimants sought lump-sum separation allowances under the WJPA.

Because Penn Central had not provided "the daily rate of pay received by the employee in the position last occupied prior to time of coordination," *see* WJPA, §9(b), the claimants' expert obtained earnings information from two different sources to prove compensation loss for these claimants.  For the Watjen, Feldscher, and Franz claimants, the expert relied on monthly wage information that was contained in the letters advising them that their jobs had been abolished.  Claimants' Ex. 20 (Scheper Letter); *see also* Claimants' Ex. 9, p. 4 n. (b) (individual

95

reports for Watjen, Feldscher, and Franz).  For the O'Neil, Wilger, and Bundy claimants, the expert relied on annual earnings as reported to the Railroad Retirement Board.  *See* Expert Reports, Claimants' Ex. 9, p. 4; *see also* Claimants' Individual Reports. *id*. at 4 n. (b) (individual *Watjen* and *Bundy* reports for O'Neil, Wilger, and Bundy).  In both cases, the expert looked to the earnings for the last full year of employment, which for these claimants was 1968.  (Tr. 410-11).[87]

To determine the individual separation allowances, claimants' expert applied the formula contained in §9 of the WJPA, which took into consideration wages earned and length of employment. He then determined that these claimants, all of whom had more than five years of service, were entitled to a separation allowance that represented twelve months of pay. The precise amount of that separation allowance was calculated by dividing their annual earnings by 260 days worked to find a daily rate, by then multiplying the daily rate by 30 to find the monthly rate, and by then multiplying the monthly rate by twelve to reflect their entitlement to twelve months of separation allowances.  *See* Claimants' Ex. 9, p. 4 n. (c) (individual *Watjen* and *Bundy* reports); see also Tr. 411-12).

Because these claimants were seeking separation, not displacement, allowances, the expert did not calculate any "subsequent general wage increases" and did not add the value of lost pension benefits.

---

[87]  In their post-arbitration brief, the claimants stated that because "Penn Central again failed to provide the necessary documents . . . Dr. Rosen was forced to determine the severance allowances based upon the daily rates provided by the clerks' unions."  *See* Claimants' Post-Arbitration Brief, at 39.  This description, however, is not consistent with Dr. Rosen's description of the methods that he followed to determine the separation allowances for the *Watjen* and *Bundy* claimants.  *See* Claimants' Ex. 9, p. 4 (expert report), and *id*. at 4 n. (a) & (b) (individual reports for all *Watjen* and *Bundy* claimants). We rely on the expert's testimony and his reports.

The expert then transferred this data on the lost separation allowances to the individual report for each *Watjen* and *Bundy* claimant. *See* Claimants' Ex. 9 & 45, at 4.

### B.    Penn Central's Arguments—Compensation Loss

To support its argument that the claimants failed to prove compensation loss, Penn Central makes seven discrete arguments. *See generally* Penn Central's Post-Arbitration Brief, at 36-39; Penn Central's Post-Arbitration Brief, at 25-33.

First, it argues that the claimants' expert inappropriately applied Appendix E of the MPA and thus failed to follow the requirements of § 6(c) of the WJPA.

Second, it argues that there was a failure of proof in that the claimants did not establish wage guarantees based on the base period earnings of each claimant.

Third, it argues that there was a failure of proof in that the *Knapik* and *Sophner* claimants did not establish the post-merger earnings for each claimant.

Fourth, it argues that claimants' expert inappropriately used annual, not monthly, earnings information to calculate compensation loss of the *Knapik* and *Sophner* claimants.

Fifth, it argues that claimants' expert ignored § 6(c) of the WJPA by calculating displacement allowances for *Knapik* and *Sophner* claimants who had no earnings from Penn Central in otherwise covered months.

Sixth, it argues that claimants' expert erred in the way in which he forecast future wages for the *Knapik* and *Sophner* claimants to account for general wage increases.

And seventh, it argues that claimants' expert failed to offset losses of wages due to voluntary absences in calculating the displacement allowances for the *Knapik* and *Sophner* claimants.

97

### 1.      Failure to Follow § 6(c) of the WJPA

Penn Central's principal legal argument on compensation loss is that the claimants' expert inappropriately applied Appendix E of the MPA and thus failed to follow the requirements of § 6(c) of the WJPA in calculating merger protection benefits.  *See* Penn Central's Post-Arbitration Brief, at 31 ("[T]he Claimants failed to meet their burden of proof on the third contract issue before this Panel because Claimants presented no evidence of compensation loss as required by Section 6(c) of the WJPA.");  *see also* Penn Central's Post-Arbitration Reply Brief, at 36-38.  In making this argument, however, Penn Central ignores the independent force of Appendix E for employees entitled to preservation of employment under §1(b) of the MPA, which added greater specificity to the May 1936 WJPA and which provided merger protection benefits *in addition to* those available under the WJPA.

We have already described in detail the relationship between the WJPA and the MPA, and we reject Penn Central's effort to ask us to read § 6(c) of the WJPA as trumping Appendix E of the MPA.  Thus, to the extent there are conflicts between Appendix E and the WJPA, we treat the former as governing.

### 2.      Failure of Proof--Wage Guarantees/Base Period Earnings

To determine whether an employee "has been placed in a worse position with respect to his compensation" within the meaning of Appendix E, Para. [3], the MPA and Appendix E require claimants to establish their annual earnings for a twelve-month base period.  This annual compensation was the basis for the wage guarantees to be used to calculate the displacement allowances for Penn Central employees who suffered compensation losses after the merger. *See* MPA, Appendix E, Paras. [2] &  [3] (requiring use of compensation for the twelve-month base

period preceding May 16, 1964, to calculate the wage guarantee to which post-merger income is to be compared); *but see* WJPA, §6(c) (requiring use of compensation for the last twelve-month period preceding the date of displacement).

Relying on §6(c) of the WJPA, Penn Central contends that there was a failure of proof because the claimants "did not use the total compensation in the twelve months preceding displacement as the base period salary[.]" *See* Penn Central's Post-Arbitration Brief, at 27; *see also* Penn Central's Post-Arbitration Reply Brief, at 38 (questioning the expert's use of Railroad Retirement Board records, not "actual compensation before or after the merger").

Having failed to maintain and produce the relevant wage guarantee and other employee earning information, Penn Central's failure of proof argument has little force. In any case, the claimants did present credible evidence of the wage guarantees and annual earnings that are needed to calculate the displacement and separation allowances that they are seeking.

For the *Knapik* claimants, proof of the monthly wage guarantees was contained in documents generated by Penn Central and its representatives, including the February 28, 1990, O'Neill Letter (Claimants' Ex. 29) (Tr. 380), and employee personnel documents (with identical wage guarantee information) provided by Penn Central. *See* Penn Central, Exs. 18-27.[88] And there is no reason to doubt the accuracy of the wage guarantees contained in these documents. *See generally* Claimants' Post-Arbitration Brief, at 17-19. Though it is not clear precisely which twelve-month period Penn Central used to calculate these wage guarantees, given their source

---

[88] In addition, Appendix A to Claimants' Post-Arbitration Brief consists of tables that contain the *Knapik* monthly wage guarantees. The claimants assert that this was a Penn Central document, apparently prepared for litigation, but it was not on the list of exhibits submitted at the hearing, and we have insufficient information about this document to permit us to rely upon it.

and the willingness of the claimants to accept them, we will treat these wage guarantees as reliable.

For the *Sophner* claimants (for whom there were no wage guarantee figures in the Penn Central documents), Penn Central did not provide any wage guarantee figures, despite the obligations imposed by the MPA and the STB.  Given the absence of this information for the *Sophner* claimants, claimants' expert "estimated the annual guarantee by assuming full-time employment at the prevailing Carmen wage rate in effect for each year." Claimants' Expert Report (Claimants' Ex. 9, at 3); Claimants' Individual Reports (Claimants' Ex. 9, at 4); *see also* Tr. 413-14.  Penn Central argues that the use of estimated wage guarantees is not authorized, but we conclude that this procedure is acceptable in light of the absence of actual earning information.

Finally, for the *Watjen* and *Bundy* claimants, who sought lump-sum separation allowances under § 9 of the WJPA, rather than monthly displacement allowances, Penn Central had not provided "the daily rate of pay received by the employee in the position last occupied prior to time of coordination."  *See* WJPA, §9(b).  Thus, Dr. Rosen was again required to estimate a key element of the compensation loss, and he used the monthly wage information from the job-abolition notices provided three of the claimants, *see* Ex. 20 (Scheper Letter), and annual earnings data provided by the Railroad Retirement Board for three other claimants, *see* Tr. 409-12; he then adjusted these annual wages to come up with a daily wage rate, which he multiplied by 30 to come up with monthly wage rates.  See Tr. 410-11.  Finally, he multiplied the monthly wage rates by twelve to come up with the separation allowances to which these claimants, who had more than five years of service with Penn Central, and were thus entitled to a

100

twelve-month separation allowance.  *See* Claimants' Expert Report (Claimants' Ex. 9, at 3);

Claimants' Individual Reports (Claimants' Ex. 9, at 4) (Watjen and Bundy claimants).

In its Pre-Arbitration Brief Penn Central argued that the "[c]laimants have not, and will

not, be able to demonstrate what their base salary was because they have not kept their own wage

and salary records which relate to this litigation."  Pre-Arbitration Brief Penn Central, at 32.  But

this position ignores the record-keeping obligations imposed on Penn Central by the MPA, an

obligation made clear by the STB.

In light of the absence of the relevant wage information, we find it appropriate for the

claimants' expert to have used the wage information from Penn Central documents and from the

official records of the Railroad Retirement Board as the source of base period wage information

for the *Sophner Watjen,* and *Bundy* claimants.

Based on our review of the record as a whole, we conclude that the *Knapik* and *Sophner*

claimants met their burden of having established their wage guarantees, and that the *Watjen* and

*Bundy* claimants met their burden of having proven the amount of separation allowances to

which they were entitled.

### 3.    Failure of Proof—Post-Merger Earnings

Penn Central argues that there was a failure of proof in that the claimants did not

establish the post-merger earnings for each claimant.  *See* Penn Central's Post-Arbitration Reply

Brief, at 38 (questioning the expert's use of Railroad Retirement Board records, "not actual

compensation before or after the merger").

To calculate the displacement allowances for the *Knapik* and *Sophner* claimants,

claimants' expert was required to subtract the claimants' post-merger earnings from their wage

guarantees. To make this calculation, the expert needed post-merger earnings information, but he concluded that the only post-merger earnings information provided by Penn Central, *see* Penn Central Exs. 44-57, was not reliable. *See* Tr. 387-91. Therefore, he relied on the more reliable earnings information that Penn Central reported to the Railroad Retirement Board. *See* Claimants' Post-Arbitration Brief, at 19 & 30. The claimants' expert testified that economists generally viewed the Railroad Retirement Board data as reliable, *see* Tr. 393, and Penn Central did not challenge that testimony. Moreover, we take notice that the Railroad Retirement Board, like the Social Security Administration, is charged under federal law with maintaining earnings records for covered employees. Therefore, we reject Penn Central's argument that the claimants failed to establish the post-merger earnings for the *Knapik* and *Sophner* claimants.[89]

### 4. Use of Annual Earnings

Penn Central argues that the use of annual, not monthly, earnings by the claimants' expert to determine compensation loss is inconsistent with the methodology required by the MPA. *See* Penn Central's Post-Arbitration Brief, at 28.

Penn Central is correct in pointing out that the MPA (and indeed the WJPA) contemplated the use of monthly data so monthly earnings could be compared to monthly wage guarantees to determine monthly displacement allowances. Such a methodology was designed to insure that employees were not in a worse position after the merger; and the compensation system was apparently designed to work smoothly with a minimum of red-tape and delay.

For the *Knapik* and *Sophner* claimants, all of whom sought monthly displacement allowances, the compensation system did not work. Penn Central initially denied them benefits

---

[89] Because the *Watjen* and *Bundy* claimants sought separation allowances based on their income prior to the abolition of their jobs, it was not necessary to determine their post-merger earnings

because of its policy of denying benefits to CUT employees, *see supra* note 21, and the efforts by some *Knapik* claimants to file monthly requests for benefits were not even taken seriously. *See* STB Decision, Claimants' Ex. 7, at *4 (discussing testimony of Christ Steimle). And now, forty years later, Penn Central is arguing that even if the claimants are otherwise eligible for merger protection benefits, we cannot award such benefits because the claimants do not have the monthly earnings records that could have established their monthly displacement allowances. But Penn Central never produced the employee personnel records and wage guarantee data that it was required to maintain.

We have already indicated our willingness to relax evidentiary and other burdens in light of the nature of these proceedings, the age of these proceedings and Penn Central's primary responsibility for the delay.  For purposes of calculating compensation loss, however, the relaxation that we are approving is modest. The use of annual, not monthly, earnings information provides claimants with a ***reduced*** level of compensation loss, but they have relied on annual earnings because these are the only earning figures available. Thus, we accept claimants' position and conclude that in the context of these proceedings it is appropriate to use annual, not monthly, earnings figures to calculate displacement allowances.

### 5.    *Denial of Benefits to Those without Any Income*

Penn Central argues that the *Knapik* and *Sophner* claimants are not eligible for displacement allowances for months in which they received no earned income from Penn Central.  *See* Penn Central's Post-Arbitration Brief, at 29-32 (discussing "step 6" of the formula for calculating displacement allowances).   In effect, Penn Central takes the position that displacement allowances are only available to employees who are engaged in part-time work and

103

thus are not available to employees for months in which they performed no work for Penn Central.

Penn Central finds support for this argument in §6(c) of the WJPA, which defines the calculation to be made to determine the amount of merger protection benefits as follows: "*[I]f his compensation in his current position is less in any month in which he performs work* than the aforesaid average compensation he shall be paid the difference . . . [less the offset for voluntary absences]." (emphasis added).

Initially, we reject the applicability of §6(c) of the WJPA to employees claiming benefits under § 1(b) of the MPA.  Merger protection benefits under §1(b) of the MPA are governed by Appendix E, which does not contain the language on which Penn Central has relied.  But even if §6(c) of the WJPA applied to the clams by the *Knapik* and *Sophner* claimants, we do not read it as requiring the denial of merger protection benefits for months in which otherwise eligible employees had no Penn Central earnings.

Indeed, we reject Penn Central's interpretation §6(c) of the WJPA.  We do not read the above-quoted and highlighted language as supporting the conclusion that an employee who is not working at all for Penn Central is not eligible for any merger protection benefits while an employee who is performing some work for Penn Central is eligible for such benefits.  Rather, the quoted language in §6(c) makes clear that there are reduced displacement allowances for employees who are partially employed, and that employees whose earnings are more than their guarantees are not entitled to displacement allowances.  However, we read the phrase "compensation in his current position" as encompassing not only employees with limited compensation from part-time employment but also furloughed employees who receive no

104

compensation at all in a given month.  Thus, as is clear from a review of the entire paragraph, an employee who performs some work is entitled to a reduced guarantee while an employee with no wages is entitled to a full wage guarantee.  Indeed, any other interpretation would produce the absurd result of denying all merger protection benefits to employees who had no work while providing possibly substantial benefits to employees who performed only minimal work.[90]

Thus, we conclude that otherwise eligible *Knapik* and *Sophner* claimants with no Penn Central earnings were eligible to receive merger protection benefits.

### 6.    Forecasting of Future Wages

Penn Central argues that the claimants' expert erred in the way in which he forecast future wages to account for general wage increases for the *Knapik* and *Sophner* claimants.  More specifically, it claims that the expert used "an improper generic 'forecasted wage' formula that allegedly shows what the average carman or trainman made in a given year."  Penn Central's Post-Arbitration Brief, at 32.  It then suggests that the expert should have obtained the wage information from Conrail rather than from "third party sources."  *Id*.  Finally, Penn Central asserts that the use of a ""forecasted wage" formula" is not permitted by the MPA.  *Id*.

In adjusting the wage guarantees to account for general wage increases, claimants' expert relied upon wage rate data obtained from the claimants' unions, *see infra* IX.A.1 & 2 (discussing proof of compensation loss for the *Knapik* and *Sophner* claimants), and Penn Central is correct in pointing out that neither the MPA nor the WJPA specifically authorizes the use of such data for

---

[90] We reject claimants' argument that Penn Central deliberately sought to mislead the panel on this issue by misquoting Para. [4] of Appendix E in their Post-Arbitration Brief, at 32.  We note that Penn Central quoted the language correctly on the prior page of its Brief, and though it should have caught the error on page 32 (especially in light of its having based an argument on the erroneous version), we do not believe there was an effort to mislead the panel.

forecasting wage increases.  On the other, hand neither the MPA nor the WJPA bar the use of such data or mandate the use of other data.

Given the lack of specific guidance in either the MPA or the WJPA and considering the overall circumstances of these proceedings, we conclude that the expert's use of daily wage rate data for adjusting the wage guarantees for the *Knapik* and *Sophner* claimants was a reasonable interpretation of the MPA and is acceptable.

### 7.        Offsets for Voluntary Absences

Penn Central also argues that in calculating the displacement allowances for the *Knapik* and *Sophner* claimants the expert failed to subtract compensation for time lost on account of voluntary absences.  *See* Penn Central's Post-Arbitration Brief, at 29.  Clearly, the expert did not make these deductions, Tr. at 459, but it was Penn Central's obligation to present evidence of offsets for compensation lost on account of voluntary absences, s*ee supra* V.C., and they failed to present such evidence.  Thus, we reject the argument that the absence of calculations for offsets in any way undercuts the validity of the expert's testimony as to the compensation loss for the *Knapik* and *Sophner* claimants.

### C.        Proof of Compensation Loss

In concluding that the claimants proved compensation loss, we recognize that they did not follow the specific requirements of the MPA and, where applicable, the WJPA.  Nonetheless, such deviations are justified in light of the age of these proceedings, the delay for which Penn Central was primarily responsible, and the failure of Penn Central to maintain and produce the required wage guarantee and other employee personnel information. Given these circumstances,

we conclude that it was appropriate to give the claimants some latitude in proving their compensation loss.

Thus, we have concluded that each group of claimants has proven compensation loss and the amount of (unenhanced) merger protection benefits to which they are entitled.

## X.  The Enhancement Issues

Having determined that the claimants are entitled to merger protection benefits, we must decide whether to increase the awards by prejudgment interest, punitive damages, attorney fees, or costs.  And if we order Penn Central to enhance the awards, we must determine the amount of any such enhancements.

The 1980 Arbitration Agreement, *see* Claimants' Ex. 24, does not address enhancements, but the MPA does so albeit indirectly.  Although silent about prejudgment interest and punitive damages, the arbitration provision of the MPA requires the parties to share equally the compensation and expenses of the chairman of the arbitration panel and further provides that "[a]ll other expenses shall be borne by the party incurring them." MPA, § 1(e).[91]

Our authority to enhance awards of merger protection benefits is governed by the MPA and by the general legal principles governing federal labor arbitration that inform our consideration of the MPA.[92]  *Cf. Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957) (applying the federal common law of labor in construing collective bargaining agreements).  And as a

---

[91] Section 1(e) of the MPA substituted a new arbitration provision for the virtually identical one that was in §18 of the WJPA and which provided that "[a]ll other expenses shall be paid by the party incurring them." *Id*.

[92] Although both parties cite various Ohio cases in support of their construction of the MPA, federal law guides us in interpreting the MPA and in determining the availability of prejudgment interest and the other enhancements,

prefatory matter, we believe that arbitrators, including labor arbitrators, have authority to provide a full range of relief unless specific forms of relief are made off limits either expressly or by implication.  Indeed, Judge Lambros, in referring these proceedings to arbitration in 1979, noted that labor arbitrators have "the inherent authority to fashion all relief warranted . . . ."  *Knapik* Memorandum Opinion and Order, Claimants' Ex. 6, at 4.

The common legal issue concerning enhancements is how to interpret the relative silence of the governing agreements.  Should we construe the silence of the MPA and the Arbitration agreement concerning prejudgment interest and punitive damages as depriving us of authority to make such awards, or may we rely on general principles involving arbitration, especially labor arbitration, in deciding whether to make such awards?  And what about attorneys fees and costs?  Should we interpret the language of the MPA requiring the parties to bear the expenses of arbitration as depriving us of authority to award attorney fees and costs, or (given the absence of an absence of an explicit bar) may we award attorney fees and costs in appropriate circumstances?

The specific issues with respect to the enhancements are (1) whether we have power to order a particular enhancement; (2) if we have the power to order an enhancement, what are the governing legal standards; (3) does the record support the requested enhancement; and (4) what should be the amount of any such enhancement.

A.      **Prejudgment Interest**

1.      **Availability**

The claimants are seeking prejudgment interest to compensate them for the loss of the time value of the money they should have received many years ago.  To support this claim, the

claimants' expert calculated prejudgment interest based on the prime rate, a short-term interest rate that banks use for loans to their best corporate customers, and on the rate for ten-year treasury securities, an intermediate-term interest rate. (Tr. 425-27).  Describing prejudgment interest as "the benefit or the enrichment that the railroad would have received by virtue of having had the access to the sums of money for this entire period of time[,]" Tr. 425, the expert concluded that, prejudgment interest was necessary to make the claimants whole.  *See* Tr. 428 ("From an economic and financial standpoint, without being compensated for . . . [interest], they clearly would not be made whole.").

Claimants' expert included prejudgment interest, compounded quarterly,[93] in the individual reports that he prepared for all thirty-two claimants, *see* Claimants' Exs. 9 & 45, and in a one-page revised master summary sheet (updated through December 31, 2007).  Claimants' Ex. 44.  And he expressed his opinion that the prime rate, as contrasted to the ten-year treasury securities rate, was the appropriate rate. Tr. 426-27.

In support of their claim for prejudgment interest, the claimants rely initially on *West Virginia v. United States*, 479 U.S. 305, 310 (1987), a Supreme Court decision involving a suit to reimburse the Army Corps of Engineers for the cost of temporary housing for state residents. And they argue that the Court has described prejudgment interest as "an element of complete compensation," *see id*. at 310, and has described its purposes in terms of the time value of the use of money.  "Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full

---

[93] The expert did not discuss the compounding period in his report or in his testimony, but it is clear that his individual reports used quarterly compounding.  *See* Claimants' Ex. 9, at 6, n. (b) (*Knapik* and *Sophner* individual reports) & *id*. at 6 n. (c) (*Watjen* and *Bundy* individual reports).

compensation for the injury those damages are intended to redress."  *Id.  See also* Claimants'
Post-Arbitration Brief, at 40.

The claimants then argue that prejudgment interest is the norm in federal court litigation,
that federal courts presume its availability, and that numerous courts and arbitration panels have
awarded prejudgment interest in labor cases.  *See* Claimants' Trial Brief, at 31-33; Claimants'
Post-Arbitration Brief, at 40-41.  Finally, they argue that the prime rate, not the Consumer Price
Index or the ten-year treasury rate, is the proper measurement for calculating awards of
prejudgment interest.[94]  *See* Claimants' Trial Brief, at 31-41; *see also* Claimants' Post-Arbitration
Brief, at 40-43 (reiterating arguments on prejudgment interest and providing a chart for proposed
enhanced awards).

Penn Central responds by relying on what they describe as the "longstanding rule in
arbitration that pre-award interest may not be allowed on a labor claim if the underlying
agreement does not specifically authorize such an award."  Penn Central's Post-Arbitration
Reply Brief, at 40.  They then point out that neither the MPA nor the 1980 Arbitration
Agreement (Claimants' Ex. 24) expressly addresses prejudgment interest.  *See generally id*. at
40-44.

We agree with the claimants that prejudgment interest is a "full compensation" (or
"make-whole") remedy, but we do not accept the claimants' argument that awards of merger
protection benefits should routinely be enhanced by prejudgment interest.  Indeed, many of the
cases on which claimants rely to support awards of prejudgment interest in labor cases do not
automatically or presumptively make such awards but rather involve the exercise of discretion.

---

[94] The claimants argue for the use of the prime rate, but their fallback position is the ten-year treasury rate.  Their
expert calculated the prejudgment interest awards using both rates.  *See* Expert's Report, Claimants' Exs. 9 & 45;
*see also* Tr. 425-27 (explaining the different rates).

*See* Claimants' Ex. 35 (collecting arbitration decisions involving awards of prejudgment interest).

On the other hand, we do not accept Penn Central's position that the absence of express authority in the relevant agreements precludes us from awarding prejudgment interest.  None of the cases on which it relies contain any significant discussion of this issue, and two of them, *see Cincinnati Public Schools*, 124 LA 143, 149 (2007), and *Dobson Cellular Systems*, 120 LA 929, 934 (2004), by referring to "historic" or "traditional" practices effectively acknowledge that arbitrators have moved beyond their earlier reluctance and now award prejudgment interest in labor arbitration despite the absence of express authority.

Because of the importance of the prejudgment interest issue, we have reviewed this issue in depth.  And we conclude that we have the power to exercise discretion to award prejudgment interest even absent express authority in the MPA or the Arbitration Agreement and even absent a finding of egregious or bad faith conduct on the part of Penn Central or its lawyers.

At common law, prejudgment interest was only available when damages were "liquidated" or "readily ascertainable," *see generally* DAN B. DOBBS, LAW OF REMEDIES, vol. 1, § 3.6(1), at 333-39 (West Publishing Co. 2d ed. 1993) (discussing the traditional rule that prejudgment interest will not be awarded unless the plaintiff's claim is liquidated or ascertainable), and awards of prejudgment interest are a standard element of relief in contract cases. *See* Restatement (Second) of Contracts § 354(1)(1979) **("**If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled."); *see also United States v. Texas,* 507 U.S.

111

529, 533 (1993) (discussing the federal common-law right to collect prejudgment interest); *American Enka Co. v. Wicaco Mach. Corp.*, 686 F.2d 1050, 1056 (3d Cir. 1982)("Common law pre-judgment interest is based on the principle of compensation and the understanding that a plaintiff wrongfully deprived of a sum of money is not made whole unless the delay in recovery is accounted for.").

The availability of prejudgment interest as a make-whole remedy has deep roots both at common law and in the federal system.  For example, in *Miller v. Robertson*, 266 U.S. 243 (1924), a breach of contract case arising under the Trading with the Enemy Act, the Supreme Court summarized the rationale for awarding prejudgment interest.

> Compensation is a fundamental principle of damages whether the action is in contract or in tort. . . . One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. . . . One who has had the use of money owing to another justly may be required to pay interest from the time the payment should have been made. Both in law and in equity, interest is allowed on money due. . . . Generally, interest is not allowed upon unliquidated damages. . . . But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages.

*Id*. at 257-58 (citations omitted).

The Supreme Court has recognized that "the failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest."  *Rodgers v. United States*, 332 U.S. 371, 373 (1947); *see also id*. ("[I]n the absence of an unequivocal prohibition of interest on such obligations, this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court."); *Royal Indemnity Co. v. United States,*

313 U.S. 289, 296 (1941) (holding that "[i]n the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest for non-payment of the amount found to be due"); *cf. United States v. Texas,* 507 U.S. 529, 533 (1993) (discussing the federal common-law right to collect prejudgment interest).

The availability of prejudgment interest as a make-whole remedy is also supported by the practice of the National Labor Relations Board's (NLRB). At one time, the NLRB declined to enhance awards with prejudgment interest, but in 1962 (prior to the execution of the MPA) it changed its position and approved the availability of awards of prejudgment interest despite the absence of express statutory to do so. *See Isis Plumbing Co*., 138 NLRB 716, 719 (1962) (characterizing interest on back pay as "not a fine or penalty imposed" but as "an indebtedness arising out of an obligation imposed by statute--an incident fixed by law to the employer-employee relationship. A liability based on quasi-contract . . . ."), *rev'd on other grounds*, 322 F.2d 913 (9th Cir. 1963). As a result, the NLRB now awards prejudgment interest as a normal aspect of a make-whole remedy.

Some commentators have seen the early reluctance of the NLRB as having contributed to the reluctance of labor arbitrators to provide such relief, *see generally* FRANK ELKOURI & EDNA ELKOURI, HOW ARBITRATION WORKS 1218-19 (Alan Miles Ruben ed.) (ABA Section of Labor and Employment Law 6th ed. 2003), but this reluctance seems to have faded away and the trend has been to make prejudgment interest available in labor arbitration. *See* MARVIN F. HILL, JR., & ANTHONY SINICROPI, REMEDIES IN ARBITRATION 460 (BNA Books, 2d ed. 1991)("While interest in arbitration awards has traditionally not been awarded, there is reason to believe that a contrary

113

trend has developed."); *cf. Monessen Southwestern Railway v. Morgan*, 486 U.S. 330 (1988) (rejecting the availability of prejudgment interest as part of damages in FELA actions because in 1908, when FELA was enacted, the common law did not permit prejudgment interest in suits for personal injury or wrongful death).

Labor arbitrators may also award prejudgment interest without the express authority in the underlying agreements.  For example, in *Kohler Co*., 122 LA 1221 (2006), the arbitrator reviewed the evolution in arbitral thinking on the availability of prejudgment interest and ruled that employees should be awarded prejudgment interest despite the absence of express authority in the collective bargaining agreement and despite the absence of fault by the company.

> The Union requests that this Arbitrator should "make all affected employees whole in all respects" if the instant grievance were to be sustained. Such a request raises the question whether interest should be allowed on the principal sum that is awarded. A review of recent authorities indicates that there has been an evolution in the thinking of a number of arbitrators in awarding interest. . . . "[T]he modern view is that the award of interest is within the inherent power of the arbitrator and in fashioning a "make-whole" remedy it appears that a growing number of arbitrators are willing to exercise the discretion to award interest where appropriate."

122 LA at 1237 (quoting FRANK ELKOURI & EDNA ELKOURI, HOW ARBITRATION WORKS, 1218-19 (Alan Miles Ruben ed.) (ABA Section of Labor and Employment Law 6th ed. 2003) (footnotes omitted); *see also id*. at n. 183 (citing cases).

Finally, the ICC made clear that prejudgment interest is available in railroad arbitration awards despite the absence of express authority in the underlying agreement.  *See Burlington Northern, Inc.—Control Merger—St. Louis San Francisco Railway Company,* 6 I.C.C.2d 352, 356 (1990) (noting that the availability of an arbitration award of prejudgment interest was not a matter of first impression, and recognizing that the Board had previously approved such an award); *see also Chicago & North Western Transportation Company—Abandonment—Near*

114

*Dubuque & Oelwein,* 3 I.C.C.2d 729, 732 & 736 (1987) (approving an arbitration award of prejudgment interest despite the absence of express authority), *aff'd sub nom. International Bhd. of Elec. Workers v. I.C.C.*, 862 F.2d 330 (D.C. Cir. 1988).

Based on the foregoing, we conclude that arbitrators may exercise discretion and award prejudgment interest to enhance lost compensation and other awards of damages that are either liquidated or readily ascertainable even absent express authority in the underlying agreement. And we further conclude that in the present proceedings this panel has the power to exercise discretion and award prejudgment interest to enhance the awards of merger protection benefits absent express authority in the MPA or the Arbitration Agreement and absent a finding that Penn Central or its lawyers acted in bad faith or engaged in egregious conduct    *Accord Falstaff Brewing Corp. v. Local No. 153, Intern. Broth. of Teamsters*, 479 F.Supp. 850, 862 (D. N.J., 1978)("Interest is not a penalty against the Company. Its function is to make the employees reasonably whole, and that is the proper remedy. I am also mindful of the long time that has passed since the layoff of the employees."), *cert. denied*, 444 U.S. 1079 (1980).  On the other hand, we reiterate that prejudgment interest is not presumptively available as a make-whole remedy, and its availability is based on our exercise of discretion after a complete review of the record.

We have exercised our discretion in this matter and reviewed the record as a whole, and we conclude that the claimants are entitled to prejudgment interest so that they may be fully compensated for the time that has elapsed since their denial of merger protection benefits.  These benefits were intended to be replacement income for railroad employees who lost employment and income as a result of post-merger actions by Penn Central.  In reaching our conclusion, we

have relied on the special circumstances of these proceedings, the nature of the benefits being sought, and the fact that the amount of the underlying merger protection benefits is readily ascertainable.  We have also considered the delay that has characterized these proceedings and our conclusion that Penn Central bore the major responsibility for the delay.  But even if the delay was only the delay inherent in railroad labor arbitration, *see* Penn Central's Post Arbitration Reply Brief, at 46, our conclusion as to claimants' entitlement to prejudgment interest would be the same.

In ordering this enhancement, we do not find that the vigorous defense of these proceedings by Penn Central and its attorneys crossed the line or violated any standards of conduct, including those imposed (at least by analogy) by Fed.R.Civ.P. 11 and 28 U.S.C. §1927. And although we have concluded that Penn Central bears primary responsibility for the delay in these proceedings, its initial denial of benefits and its litigation tactics are not the basis for our ruling on prejudgment interest.  Indeed, even if responsibility for the delay was apportioned equally between the parties, we would still exercise discretion and award prejudgment interest.[95]

Thus, regardless of fault, Penn Central, and not the claimants, should bear the cost of the delay, and we are ordering that the award of merger protection benefits be enhanced by an award of prejudgment interest.[96]

---

[95] The parties have not addressed the issue of post-judgment interest.  We assume that any delay in implementing this award will entitle the claimants to post-judgment interest, *cf.* 29 U.S.C. § 1961, at the federal statutory rate.  In the event the parties cannot resolve the issues involving post-judgment or post-award interest, we assume its availability will be addressed by the courts that may be called upon to review or enforce this award.

[96] The claimants' expert calculated prejudgment interest to December 31, 2007. *See* Claimants' Ex. 44 (Revised Master Summary Sheet); Ex. 45 (updated individual reports).  To bring the prejudgment interest to the date of this award, we will be ordering the claimants to submit an updated  set of individual reports akin to Claimants' Exs. 44 and 45, using the same methodology that we have approved.  Penn Central will have an opportunity to provide the claimants with comments on the updated reports.  We hope the parties will be able to agree to the proper amount of

116

### 2.      Interest Rate and Compounding

Claimant are seeking compounded prejudgment interest at the prime rate.  *See* Claimants' Trial Brief at 36-39.  At the hearing, claimants' expert testified that the prime rate, which is the short term interest rate used by banks for their best commercial customers, is the appropriate measure of the damages suffered by the claimants and the enrichment received by Penn Central for the use of these funds.[97]  Tr. 425-28; *see also* Claimants Exs. 9 & 45.  The claimants presented the panel with expert testimony and reports that relied on the prime rate (and alternatively the ten-year treasury rate) compounded quarterly.  Penn Central did not challenge the use of the prime rate, as contrasted to the ten-year treasury rate, or the compounding of the interest (perhaps for tactical reasons) but rather argued that an award of prejudgment interest at any rate was inappropriate.  *See* Penn Central's Post-Reply Arbitration Brief, at 40-44.

Because of the failure of the parties to join issue on the selection of the proper rate, we have reviewed this issue independently and have concluded that the use of the prime rate is not only proper but is the preferred method for calculating prejudgment interest.

In *Natoli v. Carriage House Motor Inn, Inc*, 1988 WL 53397 (N.D.N.Y. May 24, 1988), an unreported district court case relied upon by the claimants, the court discussed the reasons for using the prime rate to calculate prejudgment interest.

> The proper measure of the "fruits of wrongdoing," however, is not what the corporation might have received had it invested sums diverted by the defendants, but rather the benefit the defendants derived from borrowing and using corporate funds without paying

---

post-December 31, 2007, prejudgment interest, but we will retain limited jurisdiction over these proceedings to resolve any disagreements on the amount of the revised prejudgment interest.

[97] he prime rate is established periodically by the Secretary of the Treasury, *see* 26 U.S.C. § 6621. *See generally Taxman v. Board of Educ. of Tp. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996), *cert. dismissed*, 522 U.S. 1010 (1997).

interest. . . . The proper measure of recovery, then, is the interest defendants would have had to pay if they had borrowed the funds from a lender rather than from the corporation. The only proof submitted in that regard was from plaintiff's expert accountant, . . . [who] utilized an IRS interest rate which was based on the prime rate during the relevant periods, to calculate the interest that would have been paid by the defendants on the open market. The court accepts that testimony . . . .

*Id*. at *12 (footnote omitted).

And the Seventh Circuit in *In re Oil Spill by the Amoco Cadiz,* 954 F.2d 1279 (7th Cir. 1992), explained the rationale for using the prime rate.

Any market interest rate reflects three things: the social return on investment (that is, the amount necessary to bid money away from other productive uses), the expected change in the value of money during the term of the loan (i.e., anticipated inflation), and the risk of nonpayment. The best estimate of these three variables is the amount *the defendant* must pay for money, which reflects variables specific to that entity. Amoco has publicly traded notes and debentures; a court could draw an interest rate directly from them. As we [have] suggested . . . unless it engages in such refined rate-setting, a court should use the "prime rate"-that is, the rate banks charge for short-term unsecured loans to creditworthy customers. This rate may miss the mark for any particular party, but it is a market-based estimate.

*Id.* at 1332.

These explanations for the use of the prime rate are quite cogent, and federal courts, including the Third and Sixth Circuits, approve the use of the prime rate. *See Taxman v. Board of Educ. of Tp. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996) (noting that "[t]he adjusted prime rate, established periodically by the Secretary of the Treasury . . . has been used regularly by district courts to calculate prejudgment interest"), *cert. dismissed*, 522 U.S. 1010 (1997); *E.E.O.C. v. Erie County,* 751 F.2d 79, 82 (2d Cir. 1984) (trial court did not abuse its discretion in using adjusted prime rate to calculate the amount of prejudgment interest to be paid on backpay award under the Equal Pay Act).; *Wynn Oil Co. v. American Way Service Corp*., 1995 WL 431019, *4 (6th Cir. 1995) (rejecting an argument that a district court erred in applying the prime rate to the prejudgment interest calculation, and stating that "[t]he prime rate 'is a readily

118

ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default . . . .'")(quoting *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,* 874 F.2d 431, 436 (7th Cir. 1989); *Florida Steel Corp.*, 231 NLRB 651 (1977)(adopting an adjusted prime rate for calculating prejudgment interest).

The prime rate is not perfect.  Sometimes it overvalues the time loss of money and at other times it undervalues it.  Likewise, it does not perfectly reflect the risk involved in lending money.  *See generally* MICHAEL S. KNOLL, A PRIMER ON PREJUDGMENT INTEREST, 75 TEX. L. REV.  294, 320-27 (1996). Nonetheless, we find strong support among courts and commentators for the use of the prime rate as the best interest rate for measuring the time loss value of money and making awards of prejudgment interest, and we especially find attractive the fact that the prime rate is readily ascertainable and easily applied, and these are virtues that are important in these proceedings and generally.  *See id.* at 327 (endorsing the Seventh Circuit's use of the prime rate unless either party provides a more accurate estimate of the defendant's cost of unsecured borrowing, and noting that this "is a good rule because the prime rate is readily ascertainable and reflects changing market conditions").  Indeed, if the award of prejudgment interest in these proceedings is enforced, it will be necessary to make additional adjustments to account for prejudgment interest since December 31, 2007, the date to which the claimants' expert had calculated prejudgment interest.  *See* Claimants' Ex. 44 (Revised Master Summary Sheet).  The use of the readily ascertainable and easily applied prime rate should permit the adjustments to be made without the need to reconvene this or any other arbitration panel.

119

The final issues concerning prejudgment interest involve compounding.  The claimants seek interest compounded quarterly, and at the hearing claimants' expert testified as to the importance of compounding in economic analysis, *see* Tr. 427-28 (referring to the "magic of compound interest"); Tr. 488-90 (responding to the role of consumption in calculating prejudgment interest), but there were no discussions in the briefs on compounding.   In his reports, the expert used quarterly compounding to come up with his figures, *see* Expert's Report, Claimants' Ex. 9 & 45 (individual reports), but there was no testimony at the hearing on the use of quarterly as contrasted to annual compounding.

Penn Central, though opposing prejudgment interest, did not object specifically to compounding, but we note that there is substantial case law support for compounding. *See e.g*., *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.,*  874 F.2d 431, 436-37 (7th Cir. 1989) (treating the issue of whether to award compounded interest to be a matter for the discretion of the district court); *cf. Dynamics Corp. of America v. United States,* 766 F.2d 518, 520 (Fed.Cir.1985) (reversing the refusal to award compound, as contrasted to simple, prejudgment interest).   Thus, we have approved the use of compounding in calculating the award of prejudgment interest.

Our analysis of the period for compounding, however, takes a slightly different approach. Unlike the use of compounding on which there was testimony at the hearings (and on which we have found persuasive decisions), we have not (in our limited independent research) found legal authority on the choice of the compounding period.  We would have preferred to see this issue addressed, but in the absence of any briefing we accept as reasonable the use of quarterly compounding of prejudgment interest.

120

### B.    Punitive damages

The claimants are seeking punitive damages to enhance the award of merger protection benefits.  They argue that we are authorized to order such payments because of the conduct of Penn Central in initially denying merger protection benefits and because of the conduct of Penn Central and its lawyers in prolonging this litigation.  In support, they argue that arbitrators, like courts, have inherent power to award punitive damages.

Penn Central challenges our power to award punitive damages at all.  They point out that traditionally punitive damages are not awarded in contract cases, *see* Penn Central's Post-Arbitration Brief, at 49-50, and they further argue that the legal system accounts for delay through prejudgment interest (though not conceding the availability of prejudgment interest) and not through awards of punitive damages.

*In Raytheon v. Automated Business Systems,* 882 F.3d 6 (1st Cir. 1989), the arbitrator in a commercial dispute had ordered an award of punitive damages despite the absence of a specific provision in the arbitration agreement authorizing such an award.  In affirming the punitive damage award, the First Circuit held that the absence of express authority in the contract did not preclude the arbitrator from making such an award.  In so ruling, the court relied on the broad arbitral powers in the Federal Arbitration Act, the breadth of the standard arbitration contract, the rule giving arbitrators the power to "grant any remedy or relief which is just and equitable and within the terms of the agreement of the parties," and the fact that courts have interpreted broad arbitration clauses as permitting awards of punitive damages. *Id*. at 9-12.

*Raytheon*, however, distinguished labor arbitration, *see* 882 F.2d at 10, and the "generally accepted rule in labor arbitration is that a monetary award should be limited to the amount

necessary to make the injured employee whole." MARVIN F. HILL, JR., & ANTHONY SINICROPI, REMEDIES IN ARBITRATION 459 (BNA Books, 2d ed. 1991). There are, however, signs of change, and many labor arbitrators now construe their authority broadly and consider punitive damages as an available remedy, at least in cases involving egregious conduct. *See generally* FRANK ELKOURI & EDNA ELKOURI, HOW ARBITRATION WORKS, 1216-17 (Alan Miles Ruben ed.) (ABA Section of Labor and Employment Law 6th ed. 2003).

Although there are strong arguments why labor arbitrators should have authority to award punitive damages in appropriate cases, there are also strong arguments why such awards, which may be outside the contemplation of the contracting parties, should not be available by implication. And unlike prejudgment interest, which is a traditional contract remedy in cases involving damages that are liquidated or readily ascertainable, punitive damages are rarely available in either contract cases or in arbitration proceedings.

Although we conclude that we have authority to award punitive damages, we decline to award them in this case because the claimants have not made a showing that would justify such an award. *Cf. Smith v. Wade*, 461 U.S. 30, 51 (1983) ("[R]eckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages."). Indeed, for the same reasons that we were unwilling to impose sanctions against Penn Central for the alleged spoliation or to treat the award of prejudgment interest as a sanction, we conclude that the award of merger protection benefits should not be enhanced by an award of punitive damages.

We have already concluded that Penn Central is primarily responsible for the litigation strategy that produced the delay that has characterized these proceedings, and we have treated

122

this as an additional reason for exercising discretion and awarding prejudgment interest to the claimants.  We do not believe, however, that either the initial denials of merger protection benefits or the conduct of these proceedings supports an award of punitive damages.

Finally, even if we concluded that we could enter an award of punitive damages on this record, we would decline to do so.  There is often a thin line between vigorous advocacy and overreaching, and Penn Central has clearly mounted a vigorous and skillful defense.  We are loath to treat this defense—even if it prolonged the litigation—as a basis for punitive damages. We recognize that in the world of labor-management relationships the protagonists often fight very hard, but punitive damages hardly seem an appropriate response for what are really contract violations.  Finally, and perhaps most importantly, the nub of the current controversy now involves the delay in resolving these proceedings, and the tool that the legal system uses to address delay is prejudgment interest.

### C.      Attorney fees and costs

The claimants are seeking attorney fees and costs to enhance the award of merger protection benefits.  They argue that we are authorized to order such payments to make them whole.  *See* Claimants' Post-Arbitration Brief, at 43-45.  They rely primarily on arbitration decisions as well as a federal statute that codifies the inherent power of federal judges to impose sanctions against attorneys for "multiply[ing] the proceedings in any case unreasonably and vexatiously," *see* 28 U.S.C § 1927, and they point to the forty-year delay of these cases

The starting point in our review of these issue is § 1(e) of the MPA, which requires each party to the arbitration to bear all expenses other than the compensation and expenses of the chairman of the arbitration panel.  We recognize that an argument could be made that "expenses"

123

under §1(e) could refer to costs but not attorney fees, but we do not find that argument strong, and we construe § 1(e) as barring awards of attorney fees and costs.

Despite our construction of §1(e), we assume we have the inherent power to award both attorney fees and costs as sanctions in particularly egregious cases, *see, e.g.*, *Reliastar Life Insurance Company of New York v. EMC National Life Company*, 564 F.3d 81(2d Cir. 2009) (awarding payment of costs and fees for egregious conduct despite arbitration agreement requiring parties to bear their own costs), but (as we concluded in our discussions of prejudgment interest and punitive damages), we do not believe an adequate showing has been made to justify an award of attorney fees and costs as a sanction.

Nor are we willing to accept the suggestion that attorney fees and costs should be recast as damages.  Neither the requirements of the American Rule on fee-shifting, *see generally Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 257 (1975) (describing the "general rule . . . that, absent statute or enforceable contract, litigants pay their own attorneys' fees"), nor the prohibitory language of § 1(e) can be so easily circumvented.

We also note that the Supreme Court, albeit in a different context, has prohibited the application of fee-shifting statutes to justify an award of expert witness fees absent express statutory authority.  *See generally West Virginia University Hospital, Inc. v. Casey*, 499 U.S. 83 (1991).

Finally, because the requirement that both sides bear their own costs is so clear and because we have not been presented with the type of conduct that would justify our imposing an award of attorney fees or costs as a sanction, we will not go through the task of determining

which of the claimed expenses would be recoverable were we to order Penn Central to pay the claimants' costs.[98]

## XI.    The Reorganization Issues

As described earlier, three of the federal court actions that led to these arbitration proceedings were filed before the merged Penn Central filed for reorganization in 1970, and one was filed after the filing for reorganization. When Penn Central emerged from the reorganization in 1978 with a new name, Penn Central Company, and without a railroad, the four civil actions were still pending.  By that time, the parties had agreed that the litigation could continue, and the reorganization court had entered an order permitting their continued litigation.  *See In re Penn Central Transportation Company*, No. 70-347, Order No. 5383 (E.D. Pa. March 21, 1973) (approving the continued litigation of the *Knapik* case and stating that "no judgment which may hereafter be entered in said civil action shall be enforced except as hereinafter authorized by this Court"); *In re Penn Central Transportation Company*, No. 70-347, Order No. 8600 (E.D. Pa. March 21, 1975) (approving the continued litigation of the *Sophner* case and stating that "no judgment which may hereafter be entered in the Action shall be enforced except as authorized by this Court").[99]

---

[98]  Although we have concluded that the delay in this case, even absent fault, supports our decision to award prejudgment interest, we do not believe that the delay, standing alone, even if primarily the fault of Penn Central is an adequate basis for an award of attorney fees or costs in light of § 1(e) of the MPA absent a showing of egregious conduct.

[99]  We have not located in the record before us any similar stipulations or orders permitting the continued litigation of the *Watjen* or *Bundy* actions, but we assume that the reorganization court also permitted these actions to continue to conclusion.

The claimants had made it clear throughout the proceedings that they were seeking relief, including prejudgment interest, against the reorganized company, but on the eve of the hearings, Penn Central sought a delay of these proceedings, which we denied, and then filed a petition with the reorganization court to enjoin the proceedings.

In refusing to enjoin these proceedings, the reorganization court made clear that it would ultimately determine the enforceabiltiy of any award of merger protection benefits, including prejudgment interest.

There are two principal issues in these proceedings as a result of the reorganization of the Penn Central. First, there is the issue of what entity, if any, will be responsible for any relief that we order on behalf of the claimants. Second, there is a question of whether our award of prejudgment interest is proper in light of the reorganization.

As to the enforceability of our award against American Premier Underwriters, Inc., the reorganized company, we have already addressed why we believe that APU is an appropriate party to these proceedings. *See supra* at IV.B. We note that this issue is not unique and that the reorganized company has been held amenable to suit for other pre-consummation activities of the debtor company,[100] but we recognize that the reorganization court will ultimately determine whether its consummation order insulated the reorganized company from liability in these proceedings.

In awarding prejudgment interest to the claimants, we recognize, as do the parties, that issues involving the enforcement of any award of prejudgment interest are not before this

---

[100]    *See, e.g., In re Penn Central Transportation Co.*, 91 F.3d 1113 (3d Cir. 1995) (permitting claims for contribution or indemnity for antitrust damages to be brought against the reorganized company for pre-consummation activities of the debtor); *In re Penn Central Transportation Co.*, 944 F.2d 164 (3d Cir. 1991) (permitting claims under the Comprehensive Environmental Response, Compensation, and Liability Act of 1990 to be brought against the reorganized company for pre-consummation activities of the debtor).

panel.[101]  Moreover, we are aware that the judge who has long presided over the Penn Central bankruptcy proceeding (in the course of refusing to stay these proceedings) expressed his "present view . . . that it is unlikely that any award for interest, punitive damages or counsel fees would be enforceable." *In re Penn Central Transportation Company*, No. 70-bk-00347-JF, Order, para. 3 (January 9, 2008).  We note, however, that the court also made clear that the claimants were free to make a record on their claims for these items, and it is appropriate (and indeed our obligation) to address fully the claims for prejudgment interest, punitive damages, attorney fees, and costs independent of any limitations that may flow from the reorganization. And we conclude that the claimants have established their entitlement not only to merger protection benefits but also to prejudgment interest.  We express no view on whether principles of bankruptcy law preclude or otherwise make inappropriate either the award of merger protection benefits or the award of prejudgment interest.

## XII.    Findings of Fact and Conclusions of Law

Throughout this opinion, we have addressed the factual and legal issues relevant to the thirty-two claimants as a whole and to each of the four groups of claimants.  In this section, we pull together the group findings of fact and conclusions of law that are embedded in our earlier discussions and then make individual findings for each claimant, including individual findings

---

[101] *See* e-mail of December 3, 2007, from Carla M. Tricarichi, counsel for the claimants, acknowledging that any award that we order will be subject to confirmation and review by a court of competent jurisdiction and that "issues relating to collectability are not before this panel."  *See also* Claimants' Trial Brief, at 39 ("The law and practice is that an arbitration panel determines the amount of the claim, including interest, and then, if appropriate, the bankruptcy court determines whether the interest is collectible.").  We note that in its order of January 9, 2008, the reorganization court made clear that it was the appropriate court of competent jurisdiction.  *See In re Penn Central Transportation Company*, No. 70-347, Order No. 4350 (E.D. Pa. January 9, 2008) (stating that "[a]ny judgment which may result from that litigation may be enforced only if specifically hereafter authorized by this Court and no other Court").

on compensation loss. [102]  We will not, however, restate our discussion of the events leading up to this dispute or our interpretation of the applicable law.  Nor will we repeat our discussions of or our findings on the enhancements being sought or on the issues of delay, spoliation, burdens of proof, evidence, and the reorganization proceedings.

A       *Knapik* **Claimants**

1.       *Knapik* **Claimants--Causation & Work Requirements**

1.       The *Knapik* claimants are the following ten former Penn Central employees: Jack Acree, Edward Benko, Ken Day, Harvey Doran, Joseph Gastony, George Gentile, George Norris, Christ Steimle, Clarence Tomczak, and Frank Uher. *See* Claimants' Exs 9, 15, 29 & 46; Penn Central Exs.18-27.

2.       At the time of the merger, the *Knapik* claimants were passenger service workers employed as brakemen by the Cleveland Union Terminal, a subsidiary of the New York Central Railroad.  Claimants' Exs. 9, 15 & 46; Penn Central Exs. 18-27.

3.       The merger became effective on February 1, 1968, and on February 21, 1968, Penn Central notified the *Knapik* claimants *en masse* that they were being furloughed, effective February 25, 1968, as part of a reduction in force.  Claimants' Ex. 15; Penn Central Exs. 18-27.

4.       The close proximity of the merger and the furloughs strongly supports a finding that the merger was the cause of the subsequent furloughs. *See also* STB Decision, Claimants' Ex. 7, at *5.

---

[102] Because so many of our findings are mixed findings of fact and conclusions of law, we have elected not to separate these categories.  Instead, we have separated our findings on eligibility (*i.e.*, causation and work-related issues) and on compensation loss for each group of claimants and made individual findings of compensation loss for each claimant.

128

5.      The furlough notice advised the *Knapik* claimants that they "had rights in the Cleveland Freight Yard" and that they may "stand for employment in the Freight Yard territory." The notice also advised them that they "should immediately contact" the New York Central general yardmaster. Claimants' Ex. 15.

6.      The *Knapik* claimants did not contact the New York Central general yardmaster within fifteen days of their furlough notice, but they subsequently reported for work at the New York Central Freight Yard at various times in response to recall notices.  Claimants' Ex. 7, at *5 (STB Decision treating the *Knapik* claimants as having reported for work); Claimants' Ex. 8 (Railroad Retirement Board records); Penn Central Exs. 18-27; *see also Augustus v. Surface Transportation Board*, 238 F.3d 419, *2, 2000 U.S. App. Lexis 33966, *2 (6th Cir. Dec. 12, 2000) (noting that "[t]en of these claimants had reported to work at the N.Y. Central freight yard), *cert. denied*, 533 U.S. 949 (2001) (Penn Central Ex. 93).

7.      Penn Central records confirm that the Penn Central considered the *Knapik* claimants to have been on furlough from February 25, 1968, until they were recalled.  Penn Central Exs. 18-27; 46. *see also* Claimants' Ex. 30.

8.      Before the merger, the *Knapik* "claimants were fully employed at the CUT passenger yard with many years of seniority."  Claimants' Ex. 7, at *5 (STB Decision); *see also* Claimants' Ex. 16 (CUT seniority roster).

9.      Immediately after the merger, the *Knapik* claimants were asked to "stand for" work at the New York Central freight yard even though no work was available for them because of their placement at the bottom of the new seniority list that had been created as a result of the merger. Claimants' Ex. 7, at *5 (STB Decision); *see also* Claimants' Ex. 15 & 16 (joint seniority

roster).

10.     The jobs for which the *Knapik* claimants were expected to "stand" were not actual jobs, and immediately after they reported for work at the freight yard, the *Knapik* claimants experienced a drop in income that was not due to sickness, discipline, or failure to exercise seniority rights.  Claimants' Ex. 7, at *5 (STB Decision).

11.     In May 1969, all the *Knapik* claimants responded to a Penn Central recall notice by advising Penn Central in writing that they would be reporting for work (albeit under protest). Claimants' Ex. 18.

12.     In response to post-furlough recall notices, the *Knapik* claimants reported for work, and Penn Central records confirm that all the *Knapik* claimants were employed by Penn Central subsequent to their furloughs.  Penn Central Exs. 18-27; *see also* Claimants' Ex. 8 (Railroad Retirement Board records).

13.     To report or stand for work did not mean that an employee was required to physically show up at the work site.  Rather the employee was required to advise the appropriate supervisor of his willingness to work in the event he was recalled.

14.     In response to a recall, an employee was expected to report physically to the work site.

15.     There is no evidence in the record that the *Knapik* claimants were subjected to discipline for having failed to report to the NY freight yard within fifteen days of the furlough notices or for having failed to report to work after receipt of recall notices.

16.     There is no evidence in the record that the *Knapik* claimants failed to exercise their seniority rights for all available jobs.

17.     At the time of their furloughs, the *Knapik* claimants were denied displacement allowances and other merger protection benefits because Penn Central was taking the position that the MPA did not apply to employees of subsidiaries of the merging railroads such as the CUT.

18.     There is no strict or proximate cause requirement that limits eligibility for merger protection benefits sought under §1(b) of the MPA to Penn Central employees who could prove that their losses were solely due to the merger or to merger-related activities.

19.     If there is a strict or proximate cause requirement either for merger protection benefits sought under §1(b) of the MPA or for benefits sought under §1(a) of the MPA and the WJPA, the *Knapik* claimants met that requirement as well as any burden that they may have had to establish a nexus between the merger and their subsequent losses of employment.

20.     There is no requirement in the MPA or any other agreement governing eligibility for merger protection benefits that furloughed employees, such as the *Knapik* claimants, physically or otherwise report or stand for work at the N.Y. Central freight yard (or other similar job sites) within fifteen days of their furlough notice.

21.     Neither Judge Lambros in his 1976 and 1979 opinions, *see* Claimants' Exs. 5 & 6, nor the Sixth Circuit in *Augustus* interpreted the MPA or any other governing agreement as requiring furloughed employees, such as the *Knapik* claimants, to physically or otherwise report or stand for work at the N.Y. Central freight yard (or other similar job sites) within fifteen days of their furlough notice.

22.     The *Knapik* claimants were not made ineligible for merger protection benefits because they did not report to the freight yard within fifteen days of their furlough notice.

23. Even if the *Knapik* claimants failed to contact the New York Central freight yard within fifteen days of their furlough notice, such failures did not render these claimants forever ineligible for merger protection benefits.

24. As a result of the merger, the *Knapik* claimants suffered losses that were not due to causes that would excuse Penn Central from paying merger protection benefits. STB Decision, Claimants' Ex. 7, at *5.

25. Under the law of the case doctrine, the decision of the STB established the eligibility of the *Knapik* claimants for merger protection benefits (with only the amount of merger protection benefits to be determined) barring proof of some supervening causes that could justify the denial of benefits.

26. Independently of the law of the case doctrine, the *Knapik* claimants met all causation and work-related eligibility requirements for merger protection benefits.

27. The *Knapik* claimants met any burdens of proof that they had on the causation issues.

28. The furloughs of the *Knapik* claimants and their loss of employment were the result of the merger.

29. Penn Central did not meet its burden of proof on the various work-related eligibility requirements issue, including any duty to report to work and any duty to exercise seniority rights.

### 2.    Knapik Claimants—Compensation Loss

30. Pursuant to §1(b) and Appendix E of the MPA, the *Knapik* claimants were entitled to merger protection benefits if they were "present employes" who received less

compensation from Penn Central in any month than during the 1963-64 base period, after adjustments for general wage increases.

31.     The *Knapik* claimants were "present employes" within the meaning of the MPA. Tr. 619-20 (stipulation by Penn Central).

32.     Appendix E of the MPA and not § 6(c) of the WJPA governs the calculation of merger protection benefits available under §1(b) of the MPA.

33.     To determine whether an employee "has been placed in a worse position with respect to his compensation" within the meaning of Appendix E, Para. [3], the MPA and Appendix E require claimants to establish their annual earnings for the twelve-month base period preceding May 16, 1964.

34.     To prove compensation loss for each *Knapik* claimant, claimants' expert properly relied on wage guarantee information contained in the O'Neill letter, *see* Claimants' Ex. 29, and other Penn Central exhibits.  *See* Claimants' Expert Report, at 3 (Claimants' Ex. 9); *see also* Tr. 396-97.  *See also* Penn Central Exs. 18-27.

35.     The monthly wage guarantees in Claimants' Ex. 29 and Penn Central Exs. 18-27 are identical.

36.     Claimants' expert properly used these wage guarantees as the starting point for the adjustments for "subsequent general wage increases" that were required by Appendix E, Para. [3], of the MPA.

37.     To calculate the "subsequent general wage increases" (or the "forecasted wage guarantees"), claimants' expert properly relied on wage rate data for brakemen provided by the UTU to calculate daily wage growth rates.  Tr. 382; 397-99; *see also* Claimants' Ex. 9, at 9

133

(daily rates for *Knapik* brakemen); Claimants Ex. 42, p. 5 (daily rates of pay for yard brakemen helpers).

38.     Given the lack of specific guidance in either the MPA or the WJPA and considering the overall circumstances of these proceedings, the use of daily wage rate data for adjusting the wage guarantees for the *Knapik* claimants was a reasonable interpretation of the MPA.

39.     Using the wage guarantees and the daily wage growth rates, claimants' expert properly calculated the forecasted wage guarantees for each *Knapik* claimant.

40.     Relying on the information maintained by the Railroad Retirement Board, claimants' expert properly determined the annual railroad earnings of each *Knapik* claimant, *See* Tr. 393; *see also* Claimants' Ex. 8 (certified annual earnings records from the Railroad Retirement Board); Ex. 9 (individual reports).

41.     Before comparing annual earnings and the forecasted wage guarantees, claimants' expert excluded all years in which a *Knapik* claimant's earnings exceeded the maximum taxable earnings that railroads were required to report to the Railroad Retirement Board.  (Tr. 399-401). This calculation understated the *Knapik* claimants' actual compensation losses by ignoring high wage years that might have contained some low-wage months.

42.     Because Penn Central did not make monthly earnings information available to the claimants, the claimants' expert properly used annual, not monthly, earnings information to calculate displacement allowances.  Tr. 404, 406-08.  This use of annual data understated the actual losses calculated on a monthly basis.  Tr. 406-408.

43.    To determine the displacement allowance for each year for which an otherwise eligible *Knapik* claimant was eligible for benefits, claimants' expert properly compared the annual forecasted wage guarantees to the individual claimant's annual railroad earnings, as reported to the Railroad Retirement Board, and he properly made these calculation for the period lasting until the records indicated that the employee had become ineligible for benefits because of death, resignation, or retirement.  (Tr. 401-02).

44.    Claimants' expert properly increased the displacement allowances by the lost pension benefits to arrive at the annual (unenhanced) compensation loss for each *Knapik* claimant.  *See* Expert Report and Individual Claimants' Reports (Claimants' Exs. 9 & 45); *see also* Claimants—Individual Findings, *infra*.

45.    Under Appendix E of the MPA, displacement allowances under §1(b) of the MPA are available to otherwise eligible employees in months in which they have no earned income from Penn Central.

46.    Even if §6(c) of the WJPA applied to displacement allowances sought under §1(b) of the MPA, §6(c) does not require the denial of merger protection benefits for months in which otherwise eligible employees had no Penn Central earnings.

47.    *Knapik* claimants with no Penn Central earnings were eligible to receive merger protection benefits.

48.    The burden of presenting evidence of offsets for compensation lost on account of voluntary absences was on Penn Central, and Penn Central did not present any such evidence.

49.    The *Knapik* claimants were placed in a worse position with respect to compensation and related benefits by Penn Central after the merger, and their earnings from

135

Penn Central were, on an annualized basis, less than their annual wage guarantees, as adjusted for wage increases, at various times during the balance of their employment with Penn Central. Claimants' Ex. 9, at 5 (individual reports).

50. The *Knapik* claimants were eligible for merger protection benefits in the form of displacement allowances (including lost pension benefits).

51. The amount of the *Knapik* claimants' compensation loss from the denial of displacement allowances and pension benefits is reflected in the Claimants' Individual Reports (Claimants' Exs. 9 & 45), in the Revised Master Summary Sheet (Claimants' Ex. 44), and in the Attached Schedule of Awards.

### 3. *Knapik* Claimants—Individual Findings

52. **Jack Acree** was born on February 23, 1922, and began his employment with New York Central in 1946. At the time of the merger, he was working as a brakeman at the CUT. He was furloughed by Penn Central, effective February 25, 1968, and he briefly resumed work for Penn Central after being recalled. His date of separation from Penn Central was March 31, 1969, and his wage guarantee for 1969 was $717.30 per month or $8,608 annualized. *See* Claimants' Ex. 29 & Penn Central Ex. 18. He seeks displacement allowances for 1968 and for part of 1969. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5). Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including

pension benefits) is $10,556. *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $314,810. *See* Claimants' Ex. 45 (updated individual reports).

| | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 517 | 8,190 | 7,672 | 683 | 8,355 |
| 1969 | 141 | 8,608 | 2,009* | 192 | 2,201 |
| Total | | | 9,681 | 875 | 10,556 |

*Based on three months of Penn Central employment in 1969. *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

53.     **Edward Benk**o was born on June 2, 1918, and began his employment with New York Central in 1946. At the time of the merger, he was working as a brakeman at the CUT. He was furloughed by Penn Central, effective February 25, 1968, and he resumed work for Penn Central in June 1969, after being recalled. His date of separation from Penn Central was February 28, 1978, and his wage guarantee for 1969 was $758.56 per month or $9,103 annualized. *See* Claimants' Ex. 29 & Penn Central Ex. 19. He seeks displacement allowances for 1968 through 1977 and for part of 1978. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5). Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including

137

pension benefits) is $123,110.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $2,526,009.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 8,112 | 8,661 | 8,112 | 722 | 8,834 |
| 1969 | 5,719 | 9,103 | 5,719 | 546 | 6,265 |
| 1970 | 5,114 | 9,832 | 5114 | 488 | 5,602 |
| 1971 | 6,466 | 10,957 | 6,466 | 643 | 7,109 |
| 1972 | 9,194 | 12,054 | 9,194 | 915 | 10,109 |
| 1973 | 11,928 | 13,533 | 11,928 | 1,406 | 13,334 |
| 1974 | 11,970 | 14,138 | 11,970 | 1,837 | 13,807 |
| 1975 | 14,507 | 15,748 | 14,507 | 2,227 | 16,734 |
| 1976 | 15,673 | 17,152 | 15,673 | 2,406 | 18,079 |
| 1977 | 17,052 | 18,333 | 17,052 | 2,617 | 19,670 |
| 1978 | 3,087 | 20,140 | 3,087* | 480 | 3,567 |
| Total |  |  | 108,822 | 14,288 | 123,110 |

*Based on two months of Penn Central employment in 1978.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

54.    **Ken Day** was born on December 28, 1911, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he resumed work for Penn Central in 1968 after being recalled.  His date of separation from Penn Central was August 31, 1974, and his wage guarantee for 1969 was $780.75 per month or $9,369 annualized.  *See* Claimants' Ex. 29 & Penn Central Ex. 20. He seeks displacement allowances for 1968 through 1973 and for part of 1974. *See* Claimants' Exs. 9 &45 (individual reports).

138

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5). Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $48,267. *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $1,168,628. *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 2,650 | 8,914 | 6,264 | 557 | 6,821 |
| 1969 | 4,259 | 9,369 | 5,110 | 488 | 5,598 |
| 1970 | 7,401 | 10,119 | 2,718 | 250 | 2,977 |
| 1971 | 5,124 | 11,278 | 6,153 | 612 | 6,766 |
| 1972 | 6,436 | 12,406 | 5,970 | 594 | 6,564 |
| 1973 | 3,808 | 13,928 | 10,120 | 1,193 | 11,313 |
| 1974 | 2,565 | 14,551 | 7,134* | 1,095 | 8,228 |
| Total |  |  | 4,3468 | 4,799 | 48,267 |

*Based on eight months of Penn Central employment in 1974. *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

55. **Harvey Doran** was born on November 29, 1922, and began his employment with New York Central in 1946. At the time of the merger, he was working as a brakeman at the CUT. He was furloughed by Penn Central, effective February 25, 1968, and he resumed work for Penn Central in 1970 after being recalled. His date of separation from Penn Central was August 31. 1972, and his wage guarantee for 1969 was $381.89 per month or $4583 annualized.

139

*See* Claimants' Ex. 29 & Penn Central Ex. 21.  He seeks displacement allowances for 1968, 1969, and 1971. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $12,210.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $341,696.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 517 | 4,360 | 3,843 | 342 | 4,185 |
| 1969 | -0- | 4,583 | 4,583 | 438 | 5,020 |
| 1971 | 2,783 | 5,156 | 2,733 | 272 | 3,005 |
| Total |  |  | 11,158 | 1,052 | 12,210 |

56.  **Joseph Gastony** was born on March 15, 1911, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he  resumed work for Penn Central in 1968 after being recalled.  His date of separation from Penn Central was October 31, 1973, and his wage guarantee for 1969 was $604.10 per month or $7249 annualized.

140

*See* Claimants' Ex. 29 & Penn Central Ex. 22.  He seeks displacement allowances for 1968 through 1972 and for part of 1973. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $16,632.  *See id.* With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $413,721.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 4,020 | 6,897 | 2,878 | 256 | 3134 |
| 1969 | 6,455 | 7,249 | 794 | 76 | 870 |
| 1970 | 6,692 | 7,830 | 1,137 | 109 | 1,246 |
| 1971 | 5,344 | 8,726 | 3,382 | 336 | 3,718 |
| 1972 | 5,773 | 9,599 | 3,826 | 381 | 4,207 |
| 1973 | 5,885 | 10,772 | 3,093* | 365 | 2,457 |
| Total |  |  | 15,110 | 1,522 | 16,632 |

*Based on ten months of Penn Central employment in 1973.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

57.  **George Gentile** was born on November 17, 1913, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he resumed work

141

for Penn Central in 1969 after being recalled.  His date of separation from Penn Central was August 31, 1976, and his wage guarantee for 1969 was $377.17 per month or $4526 annualized. *See* Claimants' Ex. 29 & Penn Central Ex. 23.  He seeks displacement allowances for 1968, 1969, 1971, and 1972.  *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $7,562.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $219,239.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 517 | 4,306 | 3,789 | 337 | 4,126 |
| 1969 | 2,009 | 4,526 | 2517 | 240 | 2,758 |
| 1971 | 4,875 | 5,448 | 573 | 57 | 630 |
| 1972 | 5,950 | 5,993 | 43 | 4 | 48 |
| Total |  |  | 6,923 | 6,39 | 7,562 |

58.    **George Norris** was born on April 29, 1910, and began his employment with New York Central in 1929.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he resumed work for Penn

142

Central in 1968 after being recalled.  His date of separation from Penn Central was April 30, 1975, and his wage guarantee for 1969 was $742.70 per month or $8,912 annualized.  *See* Claimants' Ex. 29 & Penn Central Ex. 24.  He seeks displacement allowances for 1968 through 1974 and for part of 1975. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $50,156.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $1,223,886.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 1,164 | 8,480 | 7,316 | 651 | 7,967 |
| 1969 | 1,582 | 8,912 | 7,331 | 700 | 8,031 |
| 1970 | 5,976 | 9,626 | 3,650 | 349 | 3,999 |
| 1971 | 6,206 | 10,728 | 4,522 | 450 | 4,972 |
| 1972 | 4,840 | 11,801 | 7,062 | 703 | 7,764 |
| 1973 | 6,310 | 13,250 | 6,939 | 818 | 7,757 |
| 1974 | 10,049 | 13,842 | 3,793 | 582 | 4,357 |
| 1975 | 3,561 | 15,418 | 4587* | 704 | 5,291 |
| Total |  |  | 45,200 | 4,957 | 50,156 |

*Based on four months of Penn Central employment in 1975. *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

143

59.  **Christ Steimle** was born on October 22, 1927, and began his employment with New York Central in 1951.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he briefly resumed work for Penn Central in 1968 after being recalled.  His date of separation from Penn Central was December 31, 1989, and his wage guarantee for 1969 was $280.22per month or $3,363 annualized.  *See* Claimants' Ex. 29 & Penn Central Ex. 25. He seeks displacement allowances for 1968, 1969, and 1971. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $3,540.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $97,792.  *See* Claimants' Ex. 45 (updated individual reports).

| | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 1,515 | 3,199 | 1,684 | 150 | 1,834 |
| 1969 | 2,350 | 3,363 | 1,013 | 97 | 1,109 |
| 1971 | 3,506 | 4,048 | 5,41 | 54 | 596 |
| Total | | | 3,239 | 301 | 3,540 |

144

60.     **Clarence Tomczak** was born on April 21, 1916, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he resumed work for Penn Central in 1968 after being recalled.  His date of separation from Penn Central was January 31, 1979, and his wage guarantee for 1969 was $835.74 per month or $10,029 annualized.  *See* Claimants' Ex. 29 & Penn Central Ex. 26. He seeks displacement allowances for 1968 to 1972, 1974, 1977, 1978, and part of 1979. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $52,667.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $1,240,102.  *See* Claimants' Ex. 45 (updated individual reports).

|      | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|------|-------------|------------------------------------|---------------------------------|---------|--------------------------------------------------------|
| 1968 | 1,091       | 9542                               | 8,451                           | 752     | 9,203                                                  |
| 1969 | 924         | 10,028                             | 9,104                           | 869     | 9,974                                                  |
| 1970 | 6,860       | 10,931                             | 3,972                           | 379     | 4,352                                                  |
| 1971 | 7,150       | 12,071                             | 4,966                           | 494     | 5,461                                                  |
| 1972 | 8,611       | 13,280                             | 4,668                           | 464     | 5,133                                                  |
| 1974 | 9,368       | 15,576                             | 6,208                           | 953     | 7,161                                                  |
| 1977 | 15,646      | 20,198                             | 4,552                           | 699     | 5,250                                                  |

| 1978 | 17,045 | 22,190 | 5,144 | 800 | 5,944 |
|---|---|---|---|---|---|
| 1979 | 1,908 | 24,439 | 163* | 26 | 189 |
| Total | | | 47,230 | 5,437 | 52,567 |

*Based on one month of Penn Central employment in 1979.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

61.     **Frank Uher** was born on August 28, 1916, and began his employment with New York Central in 1945.  At the time of the merger, he was working as a brakeman at the CUT.  He was furloughed by Penn Central, effective February 25, 1968, and he resumed work for Penn Central in 1969 after being recalled.  His date of separation from Penn Central was January 31, 1972, and his wage guarantee for 1969 was $703.32 per month or $8,440 annualized.  *See* Claimants' Ex. 29 & Penn Central Ex. 27. He seeks displacement allowances for 1968 through 1971 and for part of 1972.  *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances to which he is entitled (including pension benefits) is $23,560.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $658,061.  *See* Claimants' Ex. 45 (updated individual reports).

| | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|

146

| 1968 | 641 | 8,030 | 7,389 | 658 | 8,046 |
| 1969 | 1,349 | 8,440 | 7,091 | 677 | 7,769 |
| 1970 | 5,381 | 9,116 | 3,734 | 357 | 4,091 |
| 1971 | 7,695 | 10,159 | 2,464 | 245 | 2,710 |
| 1972 | 71 | 11,175 | 859* | 85 | 945 |
| Total | | | 21,538 | 2,022 | 23,560 |

*Based on one month of Penn Central employment in 1972.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

B.     *Sophner* **Claimants**

1.     **Causation & Work Requirements**

62.     The *Sophner* claimants are the following sixteen former Penn Central employees: William Bilinsky, Joseph Crtalic, Paul Foecking, John F. Gallagher, Gus Janke, Joseph Jarabeck, E.W. Kochenderfer, Patrick McLaughlin, Robert McNeeley, Andrew Novotny, Martin Opalk, L.S. Pentz, Robert Schreiner, Paul Scuba, George Sophner, and Peter Sowinski.  *See* Claimants' Exs 9 (Individual Reports).

63.     At the time of the merger, the *Sophner* claimants were passenger service workers employed as carmen at the Cleveland Union Terminal, a subsidiary of the New York Central Railroad.

64.     At the time of the merger, the *Sophner* claimants were denied displacement allowances and other merger protection benefits because Penn Central was taking the position that the MPA did not apply to employees of subsidiaries of the merging railroads such as the CUT.

65.     After the merger, the *Sophner* claimants worked continuously for Penn Central; but their earnings from Penn Central in a majority of their post-merger working years were less

147

than their wage guarantees, as adjusted for general wage increases.  *See* Claimants' Individual Reports, Claimants' Ex. 9, at 4.

66.    The *Sophner* claimants are seeking displacement allowances that represent the difference between their earnings and their wage guarantees, as adjusted to account for general wage increases, for those years in which their earnings were less than their adjusted wage guarantees.

67.    There is no strict or proximate cause requirement that limits eligibility for merger protection benefits sought under §1(b) of the MPA to Penn Central employees who could prove that their losses were solely due to the merger or to merger-related activities.

68.    The *Sophner* claimants met any burden that they had to establish a nexus between the merger and their subsequent losses of employment, but if there is a strict or proximate cause requirement either for merger protection benefits sought under §1(b) of the MPA or for benefits sought under §1(a) of the MPA and the WJPA, the *Sophner* claimants did not meet such requirement.

69    If the *Sophner* claimants' losses of employment were caused by some other supervening event other than the merger, Penn Central had the burden of coming forward and identifying that event, but they failed to do so.

70.    To the extend the seniority-related work requirements are a disqualifying factor for the *Sophner* claimants, Penn Central has the burden of persuasion on this issue.

71.    There is no evidence in the record that the *Sophner* claimants exercised seniority rights to all available positions after the merger.

148

72.     There is no evidence in the record that the *Sophner* claimants failed to exercise seniority rights to all available positions after the merger.

73.     In light of Penn Central's failure to present evidence that the *Sophner* claimants failed to exercise seniority rights to obtain all available work in months for which they are claiming displacement allowances, the *Sophner* claimants met the work-related/seniority eligibility requirement of the MPA.

2.     ***Sophner* Claimants—Compensation Loss**

74.     Pursuant to §1(b) and Appendix E of the MPA, the *Sophner* claimants were entitled to merger protection benefits if they were "present employes" who received less compensation from Penn Central in any month than during the 1963-64 base period, after adjustments for general wage increases.

75.     The *Sophner* claimants were "present employes" within the meaning of the MPA. Tr. 619-20 (stipulation by Penn Central).

76.     Appendix E of the MPA and not § 6(c) of the WJPA governs the calculation of merger protection benefits available under §1(b) of the MPA.

77.     To determine whether an employee "has been placed in a worse position with respect to his compensation" within the meaning of Appendix E, Para. [3], the MPA and Appendix E require claimants to establish their annual earnings for the twelve-month base period preceding May 16, 1964.

78.     Given the absence of wage guarantee information for the *Sophner* claimants, claimants' expert properly estimated the wage guarantees for each relevant year by assuming full-time employment (*i.e.*, 2080 hours per year) at the prevailing carmen wage rate in effect for

149

each year.  *See* Claimants' Expert Report (Claimants' Ex. 9, at 3); Claimants' Individual Reports (Claimants' Ex. 9, at 4); *see also* Tr. 412-14; 422-23).

79. To calculate the "subsequent general wage increases" (or the "forecasted wage guarantees") for the *Sophner* claimants, claimants' expert properly relied on annual wage rate data provided by the Brotherhood of Railway Carmen.  *See* Tr. 380-82; *see also* Claimants' Ex. 42; Tr.382; 397-99; *see also* Claimants' Ex. 9, at 9, Table 6 (Schedule Showing Hourly Rates for Carmen); Claimants Ex. 42, at 5 (daily rates of pay for yard brakemen helpers).

80. Given the lack of specific guidance in either the MPA or the WJPA and considering the overall circumstances of these proceedings, the use of daily wage rate data for adjusting the wage guarantees for the *Sophner* claimants was a reasonable interpretation of the MPA.

81. Relying on information maintained by the Railroad Retirement Board, claimants' expert properly determined the annual post-merger earnings of each *Sophner* claimant.  *See* Tr. 393; *see also* Claimants' Ex. 8 (certified annual earnings records from the Railroad Retirement Board); Ex. 9 (individual reports).

82. Before comparing annual earnings and the forecasted wage guarantees, claimants' expert excluded all years in which a *Sophner* claimant's earnings exceeded the maximum taxable earnings that railroads were required to report to the Railroad Retirement Board.  (Tr. 399-401; 424).  This calculation understated the *Sophner* claimants' actual compensation losses by ignoring high wage years that might have contained some low-wage months.

83. To determine the displacement allowance for each year for which an otherwise eligible *Sophner* claimant was eligible for benefits, claimants' expert properly compared the

annual forecasted wage guarantees to the individual claimant's annual railroad earnings, as reported to the Railroad Retirement Board, and properly made these calculation for the period lasting until the records indicated that the employee had become ineligible for benefits because of death, resignation, or retirement.  (Tr. 401-02).

84.    Claimants' expert properly increased the displacement allowances by the lost pension benefits to arrive at the annual (unenhanced) compensation loss for each *Sophner* claimant.  *See* Expert Report and Individual Claimants' Reports (Claimants' Exs. 9 & 45); *see also* Claimants—Individual Findings, *infra*.

85.    Because Penn Central did not make monthly earnings information available to the claimants, the claimants' expert, properly used annual, not monthly, earnings information to calculate displacement allowances for the *Sophner* claimants.  Tr. 404, 406-08, 424.  This use of annual data understated their actual compensation losses calculated on a monthly basis.  Tr. 406-408.

86.    In the absence of actual earning information for the base period, the use of estimated wage guarantees is a reasonable and acceptable way to determine the *Sophner* claimants' compensation losses.

87.    The burden of presenting evidence of offsets for compensation lost on account of voluntary absences was on Penn Central, and Penn Central did not present any such evidence for the *Sophner* claimants.

88.    The *Sophner* claimants were placed in a worse position with respect to compensation and related benefits by Penn Central after the merger, and their earnings from Penn Central were, on an annualized basis, less than their annual wage guarantees, as adjusted

151

for wage increases, at various times during the balance of their employment with Penn Central. Claimants' Ex. 9, at 5 (individual reports).

89.    The *Sophner* claimants met their burden of proof on the loss compensation issue and were eligible for merger protection benefits in the form of displacement allowances (including lost pension benefits).

90.    The amount of the *Sophner* claimants' compensation loss from the denial of displacement allowances and pension benefits is reflected in the Claimants' Individual Reports (Claimants' Exs. 9 & 45), in the Revised Master Summary Sheet (Claimants' Ex. 44), and in the Attached Schedule of Awards.

### 3.    Sophner Claimants—Individual Findings

91.    **William Bilinsky** was born on February 13, 1928, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1977.  His date of separation from Penn Central was July 24, 1977.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1971 and for part of 1977. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).   Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $2,293.  *See id*. With an enhancement for prejudgment interest at the prime

152

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $52,568. *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1971 | 7,543 | 9,340 | 1797 | 179 | 1,975 |
| 1977 | 8,311 | 15,271 | 275* | 42 | 318 |
| Total |  |  |  |  | 2,293 |

*Based on seven months of Penn Central employment in 1977. *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

92. **Joseph Crtalic** was born on October 28, 1919, and began his employment with New York Central in 1946. At the time of the merger, he was working as a carman at the CUT. After the merger, he worked continuously for Penn Central until 1977. His date of separation from Penn Central was November 30, 1973. His forecast annual wages for 1969 were $7,766. He seeks displacement allowances for 1972 and for part of 1973. *See* Claimants' Exs. 9 & 45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5). Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $2,959. *See id.* With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $66,471. *See* Claimants' Ex. 45 (updated individual reports).

153

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1972 | 8,626 | 10,282 | 1,656 | 165 | 1,820 |
| 1973 | 9,220 | 11,187 | 1,019* | 120 | 1,139 |
| Total |  |  | 2,675 | 285 | 2,959 |

*Based on eleven months of Penn Central employment in 1973.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

93.     Paul Foecking was born on March 8, 1930, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1983.  His date of separation from Penn Central was June 30, 1983.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1969 to 1971, 1973, 1977, 1978, 1981, 1982, and for part of 1983. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).   Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $13,767.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $201,866.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC | Wage | Displacement | Pension | Total |
|---|---|---|---|---|---|

154

| | earnings | guarantee (annual & forecast) | allowance (annual) | | Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1969 | 7,358 | 7,766 | 408 | 39 | 447 |
| 1970 | 7,734 | 8,663 | 929 | 89 | 1,018 |
| 1971 | 7,778 | 8,340 | 1561 | 155 | 1,717 |
| 1973 | 10,274 | 11,187 | 913 | 108 | 1,021 |
| 1977 | 13,112 | 15,271 | 2,159 | 331 | 2,491 |
| 1978 | 16,300 | 16,846 | 545 | 85 | 630 |
| 1981 | 22,573 | 22,754 | 180 | 30 | 211 |
| 1982 | 22,742 | 24,695 | 2,223 | 410 | 2,633 |
| 1983 | 10,164 | 26,575 | 3,040* | 561 | 3,601 |
| Total | | | 11,595 | 1,808 | 13,767 |

*Based on six months of Penn Central employment in 1983.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

94.    **John F. Gallagher** was born on September 21, 1928, and began his employment with New York Central in 1945.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1990.  His date of separation from Penn Central was September 30, 1990.  His forecast annual wages for 1969 were $7,766.  He seeks a displacement allowance for 1969. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $3,053.  *See id.* With an enhancement for prejudgment interest at the prime

155

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $86,631.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1969 | 4,979 | 7,766 | 2,787 | 266 | 3,053 |
| Total |  |  | 2,787 | 266 | 3,053 |

95.  **Gus Janke** was born on May 17, 1909, and began his employment with New York Central in 1929.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1972.  His date of separation from Penn Central was September 30, 1972.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1969-1971 and for part of 1972. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $4,146.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $103,437.  *See* Claimants' Ex. 45 (updated individual reports).

156

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1969 | 7,331 | 7,766 | 436 | 42 | 477 |
| 1970 | 7,696 | 8,663 | 967 | 92 | 1,059 |
| 1971 | 7,750 | 9,340 | 1,590 | 158 | 1,748 |
| 1972 | 6,518 | 10,282 | 783* | 78 | 861 |
| Total |  |  | 3,776 | 370 | 4,146 |

*Based on nine months of Penn Central employment in 1972.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

96.    **Joseph Jarabeck** was born on October 25, 1907, and began his employment with New York Central in 1926.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1972.  His date of separation from Penn Central was January 31, 1972.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1970 and for part of 1972. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).   Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $1,502.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $39,946.  *See* Claimants' Ex. 45 (updated individual reports).

157

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1970 | 7,705 | 8,864 | 959 | 92 | 1,050 |
| 1971** | 7,470 | 9,340 | 1870 | 186 | 2,676 |
| 1972 | 440 | 10,282 | 411* | 41 | 452 |
| Total |  |  | 3,239 | 318 | 3,557 |

*Based on one month of Penn Central employment in 1972.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

** Table 2 of Claimants' Ex. 9 (individual report for Joseph Jarabeck does not include data for 1971, but the $3,557 total displacement allowance in Claimants' Ex. 44 (Revised Master Summary Sheet) includes 1971.  It appears, however, that prejudgment interest was calculated without regard to the 1971 data.  In ordering the claimants to update their prejudgment interest calculations to the date of this award, we are also ordering them to recalculate the prejudgment interest for Mr. Jarabeck.  *See infra* at XIII. Para. 7 (Relief).

97.  **E.W. Kochenderfer** was born on July 14, 1909, and began his employment with New York Central in 1936.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1974.  His date of separation from Penn Central was July 31, 1974.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1971 through 1973 and for part of 1974.  *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $6,784.  *See id*. With an enhancement for prejudgment interest at the prime

158

rate compounded quarterly through December 31, 2007, the award to which he is entitled is

$156,150.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1971 | 6,894 | 9,340 | 2,446 | 243 | 2,689 |
| 1972 | 8,624 | 10,282 | 1,657 | 165 | 1,822 |
| 1973 | 9,272 | 11,187 | 1,915 | 226 | 2,141 |
| 1974 | 6,724 | 11,773 | 114* | 17 | 131 |
| Total |  |  | 6,132 | 652 | 6,784 |

*Based on seven months of Penn Central employment in 1974.  *See* Claimants' Ex. 9, at p. 4 n.
(e) & (f) (individual reports).

98.    **Patrick McLaughlin** was born on June 23, 1928, and began his employment with

New York Central in 1946.  At the time of the merger, he was working as a carman at the CUT.

After the merger, he had limited work for Penn Central in 1968 and 1969 but then worked almost

continuously for Penn Central until 1979.  His date of separation from Penn Central was October

31, 1979.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances

for 1968 through 1973 and for part of 1978. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and

forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3),

his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking

(with pension benefits but without prejudgment interest)(col. 5).   Unadjusted by prejudgment

interest, the cumulative value of the displacement allowances that he is claiming (including

pension benefits) is $34,433.  *See id*. With an enhancement for prejudgment interest at the prime

159

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $828,073.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 538 | 7,026 | 6,488 | 577 | 70652 |
| 1969 | 618 | 7,766 | 7,148 | 683 | 7830 |
| 1970 | 7,710 | 8,663 | 953 | 91 | 1044 |
| 1971 | 7,254 | 9,340 | 2,086 | 208 | 2294 |
| 1972 | 6,718 | 10,282 | 3,563 | 355 | 3918 |
| 1973 | 6,114 | 11,187 | 5,073 | 598 | 5671 |
| 1978 | 11,125 | 16,846 | 5,721 | 890 | 6611 |
| Total |  |  | 31,032 | 3401 | 34433 |

99.  **Robert McNeely** was born on September 3, 1925, and began his employment with New York Central in 1943.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1987.  His date of separation from Penn Central was September 30, 1987.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1968 through 1970, for 1975, and for 1982 and 1983. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $5,146.  *See id*. With an enhancement for prejudgment interest at the prime

160

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $108,243.  *See* Claimants' Ex. 45 (updated individual reports).

| | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 5,995 | 7,026 | 1,031 | 92 | 1,123 |
| 1969 | 6,916 | 7,766 | 851 | 81 | 932 |
| 1970 | 7,543 | 8,663 | 1,120 | 107 | 1,227 |
| 1975 | 13,099 | 13,121 | 22 | 3 | 26 |
| 1982 | 23,602 | 24,965 | 1,363 | 251 | 1,614 |
| 1983 | 26,385 | 26,754 | 189 | 35 | 224 |
| Total | | | 4,576 | 570 | 5,146 |

100.  **Andrew Novotny** was born on August 8, 1917, and began his employment with New York Central in 1939.  At the time of the merger, he was working as a carman at the CUT. After the merger, he worked continuously for Penn Central until 1980.  His date of separation from Penn Central was December 31, 1980.  His forecast annual wages for 1969 were $7,766. He seeks displacement allowances for 1968, 1970, 1973, and for part of 1978.  *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $2,195.  *See id*. With an enhancement for prejudgment interest at the prime

161

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $51,295.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 6,784 | 7,026 | 242 | 22 | 264 |
| 1970 | 7,755 | 7,766 | 909 | 87 | 995 |
| 1973 | 10,739 | 11,187 | 448 | 53 | 500 |
| 1978 | 16,469 | 16,846 | 377 | 59 | 435 |
| Total |  |  | 1,975 | 220 | 2,195 |

101.  **Martin Opalk** was born on May 10, 1916, and began his employment with New York Central in 1946.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1976.  His date of separation from Penn Central was June 30, 1976.  His forecast annual wages for 1969 ere $7,766.  He seeks displacement allowances for 1968, 1969, 1971, 1972, 1973, and 1975. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $9,469.  *See id*. With an enhancement for prejudgment interest at the prime

162

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $229,070.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 6,157 | 7,026 | 869 | 77 | 946 |
| 1969 | 6,537 | 7,766 | 1,229 | 117 | 1,347 |
| 1971 | 7,374 | 9,340 | 1,986 | 196 | 2,162 |
| 1972 | 7,537 | 10,282 | 2,745 | 273 | 3,018 |
| 1973 | 10,053 | 11,187 | 1,134 | 134 | 1,268 |
| 1975 | 12,489 | 13,121 | 632 | 97 | 729 |
| Total |  |  | 8,575 | 894 | 9,469 |

102.  **L.S. Pentz** was born on August 31, 1916, and began his employment with New York Central in 1941.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1975.  His date of separation from Penn Central was in 1975.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1969, 1970, 1972, 1973, and 1975. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $5,397.  *See id*. With an enhancement for prejudgment interest at the prime

163

rate compounded quarterly through December 31, 2007, the award to which he is entitled is $119,155.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1969 | 7,298 | 7,766 | 468 | 45 | 513 |
| 1970 | 7,796 | 8,663 | 867 | 83 | 950 |
| 1972 | 8,988 | 10,282 | 1294 | 124 | 1,417 |
| 1973 | 10,756 | 11,187 | 431 | 51 | 482 |
| 1975 | 5,754 | 13,121 | 1,765* | 271 | 2,035 |
| Total |  |  | 4,824 | 573 | 5,397 |

*Based on seven months of Penn Central employment in 1975.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

103.  **Robert Schreiner** was born on April 29, 1918, and began his employment with New York Central in 1942.  At the time of the merger, he was working as a carman at the CUT. After the merger, he worked continuously for Penn Central until 1979 with the exception of a few months in 1968 and 1969.  His date of separation from Penn Central was March 31, 1979. His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1968 through 1973 and for 1975, 1978, and part of 1979. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking (with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including

164

pension benefits) is $20,815.  *See id*. With an enhancement for prejudgment interest at the prime

rate compounded quarterly through December 31, 2007, the award to which he is entitled is

$517,768.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 2,230 | 7,026 | 4,796 | 427 | 5,223 |
| 1969 | 4,339 | 7,766 | 3,428 | 327 | 3,755 |
| 1970 | 7,777 | 8,663 | 887 | 85 | 971 |
| 1971 | 7,167 | 9,340 | 2,171 | 216 | 2,387 |
| 1972 | 7,121 | 10,282 | 3,161 | 315 | 3,476 |
| 1973 | 9,389 | 11,186 | 1,798 | 212 | 2,010 |
| 1975 | 13,061 | 13,121 | 60 | 9 | 69 |
| 1978 | 15,781 | 16,846 | 1,065 | 166 | 1,231 |
| 1979 | 3,130 | 18,548 | 1,464* | 229 | 1,693 |
| Total |  |  | 18,830 | 1,985 | 20,815 |

*Based on three months of Penn Central employment in 1979.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

104.  **Paul Scuba** was born on November 26, 1910, and began his employment with

New York Central in 1941.  At the time of the merger, he was working as a carman at the CUT.

After the merger, he worked continuously for Penn Central (with the exception of part of 1972)

until 1975.  His date of separation from Penn Central was November 30, 1975.  His forecast

annual wages for 1969 were $7,766.  He seeks displacement allowances for 1968, 1971 through

1973, and for part of 1975. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and

forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3),

his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking

(with pension benefits but without prejudgment interest)(col. 5).   Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $12,892.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $306,819.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 5,406 | 7,026 | 1,620 | 144 | 1,764 |
| 1971 | 7,572 | 9,340 | 1,768 | 176 | 1,944 |
| 1972 | 3,013 | 10,282 | 7,629 | 723 | 7,992 |
| 1973 | 10,752 | 11,187 | 435 | 51 | 486 |
| 1975 | 11,397 | 13,121 | 611* | 94 | 715 |
| Total |  |  | 11,703 | 1,188 | 12,892 |

*Based on eleven months of Penn Central employment in 1975.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

105.   **George Sophner** was born on January 29, 1915, and began his employment with New York Central in 1941.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1972 (with the exception of part of 1971).  His date of separation from Penn Central was June 30, 1972.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1968 through 1971 and for part of 1972. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking

(with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $16,738.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $427,105.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1968 | 5,653 | 7,026 | 1,373 | 122 | 1,495 |
| 1969 | 4,534 | 7,766 | 3,233 | 309 | 3,541 |
| 1970 | 7,478 | 8,663 | 1,186 | 113 | 1,299 |
| 1971 | 3,159 | 9,340 | 6,181 | 615 | 6,796 |
| 1972 | 1,846 | 10,282 | 3,279* | 326 | 3,606 |
| Total |  |  | 15,252 | 1,486 | 16,378 |

*Based on six months of Penn Central employment in 1972.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

106.  **Peter Sowinski** was born on June 29, 1912, and began his employment with New York Central in 1941.  At the time of the merger, he was working as a carman at the CUT.  After the merger, he worked continuously for Penn Central until 1975.  His date of separation from Penn Central was June 30, 1975.  His forecast annual wages for 1969 were $7,766.  He seeks displacement allowances for 1971 to 1973 and for part of 1975. *See* Claimants' Exs. 9 &45 (individual reports).

The chart below includes his actual Penn Central earnings (col. 1), his annualized and forecast wage guarantees (col. 2), the annual displacement allowances that he is seeking (col. 3), his claimed pension benefits (col. 4), and the annual displacement allowances that he is seeking

167

(with pension benefits but without prejudgment interest)(col. 5).  Unadjusted by prejudgment interest, the cumulative value of the displacement allowances that he is claiming (including pension benefits) is $9,100.  *See id*. With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $208,634.  *See* Claimants' Ex. 45 (updated individual reports).

|  | PC earnings | Wage guarantee (annual & forecast) | Displacement allowance (annual) | Pension | Total Displacement Allowance (w/pension; w/o interest) |
|---|---|---|---|---|---|
| 1971 | 6,181 | 9,340 | 3,159 | 314 | 3,474 |
| 1972 | 7,459 | 10,282 | 2,823 | 281 | 3,104 |
| 1973 | 9,305 | 11,187 | 1,882 | 222 | 2,103 |
| 1975 | 6,147 | 13,121 | 363* | 56 | 419 |
| Total |  |  | 8,227 | 873 | 9,100 |

*Based on six months of Penn Central employment in 1975.  *See* Claimants' Ex. 9, at p. 4 n. (e) & (f) (individual reports).

C.      ***Watjen*** and ***Bundy*** **Claimants**

1.      **Causation & Work Requirements**

107.    The *Watjen* claimants are the following four freight rate clerks: Phillip Franz, Thomas O'Neil, Robert Watjen, and Ana Mae Wilger; the *Bundy* claimants are the following two freight rate clerks: David Bundy and James Feldscher.

108.    The *Watjen* and *Bundy* claimants are former Penn Central employees who were employed by New York Central, not by the CUT subsidiary, and who worked on freight, not passenger, service.

168

109.    Pursuant to §1(b) and Appendix E of the MPA, the *Watjen* and *Bundy* claimants were entitled to merger protection benefits if they were "present employes" who received less compensation from Penn Central in any month than during the 1963-64 base period, after adjustments for general wage increases.

110.    The *Watjen* and *Bundy* claimants were "present employes" within the meaning of the MPA.  Tr. 619-20 (stipulation by Penn Central).

111.    The *Watjen* and *Bundy* claimants had their seniority on the Detroit seniority list despite their not working in Detroit, and they reported to E.T. Scheper, Manager-Freight Accounting in Detroit. *See* Tr. 225-227; 236 (Franz).

112.    Claimants, Franz, Watjen, and Feldscher worked in Cleveland. (Tr.218) (Franz)..

113.    Claimant O'Neil worked in Syracuse; claimant Wilger worked in Cincinnati; and claimant Bundy worked in Selkirk, New York.  *See* Claimants' Exs. 20 & 22; Tr.230-31 (Franz).

114.    The merger took place in February 1968, and the *Watjen* and *Bundy* claimants remained on their jobs until early 1969.

115.    In January 1969, the *Watjen* and *Bundy* claimants were notified by Penn Central that their positions were being abolished and that the work that they had been performing was being transferred to other offices.  *See* Claimants' Ex. 20. *See also* Penn Central Exs. 79, 84 & 88.

116.    Penn Central also advised the *Watjen* and *Bundy* claimants that they had ten (10) days "to obtain a regularly assigned position available to you in the exercise of your seniority" and that, "[i]f you fail to obtain a regularly assigned position with ten (10) calendar days you will become a utility employe subject to use by the Company in accordance with the terms of the

169

Merger Implementation Agreement."  *See* Claimants' Ex. 20; Penn Central Exs. 79, 84 & 88. *See also* Penn Central, Proposed Finding, Para. 62.

117.    The *Watjen* and *Bundy* claimants' loss of employment resulted from one of the anticipated post-merger activities—the further consolidation of accounting-related freight work.

118.    The *Watjen and Bundy* claimants met not only the putative strict causation requirement (if one existed) but also any burden that they may have had to establish a nexus between the merger and their subsequent losses of employment.

119.    Within ten days of the abolition of their positions, the *Watjen* and *Bundy* claimants attempted to find another position on their home road or a position in the coordinated operation through the exercise of their seniority.

120.    The *Watjen* and *Bundy* claimants attempted to exercise their seniority to obtain another position, but their efforts to obtain information about available positions and to obtain such positions were rebuffed by Penn Central.

121.    The *Watjen* and *Bundy* claimants were not able to obtain another position with Penn Central through the exercise of their seniority.

122.    Under § 1(a) of the MPA, "present employes" are entitled to the benefits of the WJPA, and "any employe eligible to receive a coordination allowance . . . may, at his option, at the time of coordination, resign and (in lieu of all other benefits and protections provided in this agreement accept a lump sum separation allowance."  WJPA §9.

123.    The *Watjen* and *Bundy* claimants attempted to resign from Penn Central in order to receive lump-sum separation allowances under §9 of the WJPA, but their requests for such allowances were denied.

170

124.     Section 7(a) of the WJPA provides that "[a]ny employe of any of the carriers participating in a particular coordination who is deprived of employment as a result of said coordination shall be accorded an allowance (hereinafter termed a coordination allowance), based on length of service."

125.     Under § 7(c) of the WJPA, employees otherwise eligible to receive coordination allowances (and thus receive separation allowances) are only eligible for such allowances when their position on their home road is abolished as a result of a coordination, and they are "unable to obtain by the exercise of his seniority rights another position on his home road or a position in the coordinated operation."

126.     The positions of the *Watjen* and *Bundy* claimants were abolished as a result of a coordination.

127.     The *Watjen* and *Bundy* claimants attempted "to obtain by the exercise of . . . [their] seniority rights another position on . . . [their] home road or a position in the coordinated operation."

128.     The position as a utility employee referred to the job abolition notices sent to the *Watjen* and *Bundy* claimants, *see* Claimants' Ex. 20, was not a position that they were required to take in the "exercise of their seniority" within the meaning of § 7(c) of the WJPA.

### 2.     *Watjen* and *Bundy* Claimants--Compensation loss

129.     Because Penn Central had not provided "the daily rate of pay received by the employee in the position last occupied prior to time of coordination," as required by WJPA, §9(b), claimants' expert properly relied on alternative sources for the required earnings information.

171

130.   For the Watjen, Feldscher, and Franz claimants, claimants' expert properly relied on monthly wage information that was contained in the letters advising these claimants that their jobs had been abolished.  *See* Claimants' Ex. 20 (Scheper Letter); *see also* Claimants' Ex. 9, p. 4 n. (b) (individual reports for Watjen, Feldscher, and Franz).

131.   For the O'Neil, Wilger, and Bundy claimants, claimants' expert properly relied on annual earnings as reported to the Railroad Retirement Board.  *See* Expert Reports, Claimants' Ex. 9, p. 4; *see also* Claimants' Individual Reports. *id*. at 4 n. (b) (individual *Watjen* and *Bundy* reports for O'Neil, Wilger, and Bundy).

132.   For all the *Watjen* and *Bundy* claimants, claimants' expert properly looked to the earnings for the last full year of employment, which for these claimants was 1968.  (Tr. 410-11).

133.   To determine the individual separation allowances, claimants' expert properly applied the formula contained in §9 of the WJPA, which took into consideration wages earned and length of employment.

134.   Claimants' expert properly determined that the *Watjen* and *Bundy* claimants, all of whom had more than five years of service, were entitled to a separation allowance that represented twelve months of pay.

135.   Specifically, claimants' expert properly calculated the separation allowances by dividing their annual earnings by 260 days worked to find a daily rate, by then multiplying the daily rate by 30 to find the monthly rate, and by then multiplying the monthly rate by twelve to reflect their entitlement to twelve months of separation allowances.  *See* Claimants' Ex. 9, p. 4 n. (c) (individual *Watjen* and *Bundy* reports); see also Tr. 411-12).  *See* Tr. 410-11; *see also*

172

Claimants' Expert Report (Claimants' Ex. 9, at 3); Claimants' Individual Reports (Claimants' Ex. 9, at 4) (*Watjen* and *Bundy* claimants).

136.    The expert then transferred this data on the lost separation allowances to the individual report for each *Watjen* and *Bundy* claimant.  *See* Claimants' Ex. 9 & 45, at 4.

137    Based on our review of the record as a whole, we conclude that the *Watjen* and *Bundy* claimants met their burden of having proven the amount of the separation allowances to which they were entitled.

138.    The amount of the *Watjen* and *Bundy* claimants' compensation loss from the denial of separation allowances is reflected in the Claimants' Individual Reports (Claimants' Exs. 9 & 45), in the Revised Master Summary Sheet (Claimants' Ex. 44), and in the Attached Schedule of Awards.

### 3.    Watjen and Bundy Claimants—Individual Findings

139.    **Phillip Franz** was born on June 20, 1936, and began his employment with New York Central in 1955.  At the time of the merger, he was working for the New York Central in the Cleveland office as a freight rate clerk with his seniority in Detroit.  He was advised that his position was being abolished by Penn Central on January 10, 1969, and he performed work for Penn Central during five months of 1969.  His date of separation from Penn Central was May 31, 1969.  He sought a separation allowance, not a displacement allowance, based on twelve times his monthly wage rate of $630.30 (or an annual wage rate of $7,564).  Applying the formula for separation allowances, *see* WJPA §9 (determining the daily wage rate and then multiplying it by 360), the separation allowance that he is seeking is $10,473. *See also* Claimants' Exs. 9 &45 (individual reports). With an enhancement for prejudgment interest at the prime rate

173

compounded quarterly through December 31, 2007, the award to which he is entitled is $287,750.  *See* Claimants' Ex. 45 (updated individual reports).

140.  **Thomas O'Neil** was born on July 23, 1941, and began his employment with New York Central in 1965.  At the time of the merger, he was working for the New York Central in the Syracuse office as a freight rate clerk with his seniority in Detroit.  He was advised that his position was being abolished by Penn Central on January 10, 1969, and he performed worked for Penn Central during six months of 1969.  His date of separation from Penn Central was June 30, 1969.  He sought a separation allowance, not a displacement allowance, based on his annual earnings as reported to the Railroad Retirement Board for 1968, which were $7,516.  Applying the formula for separation allowances, *see* WJPA §9 (determining the daily wage rate and then multiplying it by 360), the separation allowance that he is seeking is $10,406.  *See also* Claimants' Exs. 9 &45 (individual reports). With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $284,608.  *See* Claimants' Ex. 45 (updated individual reports).

141.  **Robert Watjen** was born on May 13, 1925, and began his employment with New York Central in 1944.  At the time of the merger, he was working for the New York Central in the Cleveland office as a freight rate clerk with his seniority in Detroit.  He was advised that his position was being abolished by Penn Central on January 10, 1969, and he performed work for Penn Central during six months of 1969.  His date of separation from Penn Central was June 30, 1969.  He sought a separation allowance, not a displacement allowance, based on twelve times his monthly wage rate of $659.03 (or an annual wage rate of $7,908).  Applying the formula for separation allowances, *see* WJPA §9 (determining the daily wage rate and then multiplying it by

174

360), the separation allowance that he is seeking is $10,950. *See also* Claimants' Exs. 9 &45 (individual reports). With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $298,207. *See* Claimants' Ex. 45 (updated individual reports).

142.  **Ana Mae Wilger** was born on March 16, 1911, and began her employment with New York Central in 1954.  At the time of the merger, she was working for the New York Central in the Cincinnati; office as a freight rate clerk with her seniority in Detroit.  She was advised that her position was being abolished by Penn Central on January 10, 1969, and she performed work for Penn Central during two months of 1969.  Her date of separation from Penn Central was February 28, 1969. She sought a separation allowance, not a displacement allowance, based on her annual earnings as reported to the Railroad Retirement Board for 1968, which was $7,536.  Applying the formula for separation allowances, *see* WJPA §9 (determining the daily wage rate and then multiplying it by 360), the separation allowance that she is seeking is $10,435. *See also* Claimants' Exs. 9 &45 (individual reports). With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which she is entitled is $292, 306.  *See* Claimants' Ex. 45 (updated individual reports).

143.  **David Bundy** was born on June 27, 1930, and began his employment with New York Central in 1950.  At the time of the merger, he was working for the New York Central in the Selkirk, New York office as a freight rate clerk with his seniority in Detroit.  He was advised that his position was being abolished by Penn Central in January 1969, and he performed work for Penn Central during six months of 1969.  His date of separation from Penn Central was June 30, 1969.  He sought a separation allowance, not a displacement allowance, based on his annual

earnings as reported to the Railroad Retirement Board for 1968, which was $7,795.  Applying the formula for separation allowances, *see* WJPA §9 (determining the daily wage rate and then multiplying it by 360), the separation allowance that he is seeking is $10,793. *See also* Claimants' Exs. 9 &45 (individual reports). With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $294,615.  *See* Claimants' Ex. 45 (updated individual reports).

144.    **James Feldscher** was born on March 1, 1934, and began his employment with New York Central in 1953.  At the time of the merger, he was working for the New York Central in the Cleveland office as a freight rate clerk with his seniority in Detroit.  He was advised that his position was being abolished by Penn Central on January 10, 1969, and he worked for Penn Central for six months in 1969 after the abolition of his job.  His date of separation from Penn Central was August 31, 1969.  He sought a separation allowance, not a displacement allowance, based on twelve times his monthly wage rate of $647.55 (or an annual wage rate of $7,701). Applying the formula for separation allowances, *see* WJPA §9 (determining the daily wage rate and then multiplying it by 360), the separation allowance that he is seeking is $10,759. *See also* Claimants' Exs. 9 &45 (individual reports). With an enhancement for prejudgment interest at the prime rate compounded quarterly through December 31, 2007, the award to which he is entitled is $289,849.  *See* Claimants' Ex. 45 (updated individual reports).


XIII.    **Relief**

1.    Based on the record as a whole, we find that a preponderance of the evidence supports the validity of the thirty-two claims for merger protection benefits, and we award the

176

claimants the displacement and separation allowances that they are seeking as reflected in column (b) of the Schedule of Awards.

2.      Based on the record as a whole, we find that a preponderance of the evidence also supports the validity of the claims for prejudgment interest to enhance the claims for merger protection benefits, and we award the claimants the prejudgment interest that they are seeking at the prime rate, compounded quarterly through December 31, 2007, as reflected in column (c) of the Schedule of Awards.

3.      Based on the record as a whole, we find that a preponderance of the evidence does not support enhancements for punitive damages or for attorney fees or costs.

4.      Pursuant to Para. 4 of the Arbitration Agreement, Penn Central is ordered to comply with this award within sixty days of the date of the award.  Consequently, unless the reorganization court or some other court of competent jurisdiction stays enforcement of this award, we order Penn Central to comply with this award by providing the claimants (or their survivors or other personal representatives) with displacement or separation allowances, as enhanced by prejudgment interest compounded quarterly, through December 31, 2007, as required by Paras. 1 & 2, *supra,* and as reflected in column (d) of the Schedule of Awards..

5.      We further order the claimants to update the calculations that they used to determine the amount of prejudgment interest to which the claimants are entitled from December 31, 2007, to the date of this award.  Using the same methodology approved in this opinion (*i.e.*, prime rate compounded quarterly), the claimants shall provide Penn Central with an updated Schedule within twenty days of this award.

6.      We further order that Penn Central will have ten days from the date of submission of the updated Schedule provided under para. 5, *supra*, to submit to the claimants, in writing or electronically, any objections it may have on the updating.  We urge the parties to agree on the proper figures for the updating, but we will retain limited jurisdiction for the purpose of resolving any disagreements on the amount of the revised prejudgment interest.

7.      The updated Schedule referred to in Paras. 5 & 6, *supra*, shall also include corrected claims information for claimant Joseph Jarabeck for the reasons described in this opinion.  *See supra* XII.B.3. Para. 96.

8.      In the event the parties are unable to agree on the amount of post-December 31, 2007. prejudgment interest, for whatever reason, this disagreement shall not be a basis for delaying implementation of the payments required by Paras. 1 & 2, *supra,* within the time limit set forth in Para. 4, *supra.*

9.      We further order the claimants to advise Penn Central within ten days of this award as to whether the claimants will be making any changes in the personal representatives, and we further order the claimants to make any such changes within thirty days of this award.

10.      The awards that Penn Central are being ordered to make shall run against all of the entities that have appeared in these proceedings to represent the interests of what has been described as Penn Central, including the Penn Central Transportation Company, the Penn Central Company, and American Premier Underwriters, Inc.

11.      We do not address the topic of post-judgment (or post-award) interest, and we leave all determinations on that matter to the parties or to the courts that may be called upon to enforce or review this award.

12. If the parties are not able to agree on the amount of post-award prejudgment interest that we are ordering under Paras. 5-7, *supra*, we will resolve this dispute and issue a supplemental order.

Dated: July 30, 2009

| /s/ Steven H. Steinglass | /s/ Dennis R. Lansdowne | ** |
| Steven H. Steinglass | Dennis R. Lansdowne | Joseph P. Tomain |
| Neutral Arbitrator | Party-Appointed Arbitrator | Party-Appointed Arbitrator |

** Arbitrator Tomain has not joined this opinion but has written the attached dissent.

Distribution of Award Decision

A copy of this award decision and the attached dissent was sent electronically on July 30, 2009, to counsel who have appeared in this matter and who are listed on the cover page (with the exception of Mr. Goldfarb) and to the party-appointed arbitrators.

/s/ Steven H. Steinglass
Neutral Arbitrator

179

**Schedule of Awards of Merger Protection Benefits with Prejudgment Interest (thru 12/31/2007)**

| Knapik Claimants 69-722 | Personal Representatives (a) | Displacement Allowance (with pensions) (b) | Prejudgment Interest; prime rate (thru 12/31/2007) (c) | Displacement allowance & prejudgment interest (d) |
|---|---|---|---|---|
| Acree, Jack | Acree, Michael Berk, Gerald | 10,556 | 304.254 | 314,810 |
| Benko, Edward | Benko, Edward J. Berk, Gerald | 123,110 | 2,402,898 | 2,526,009 |
| Day, Ken | Day, Ken Jr. | 48,267 | 1,120,361 | 1,168,628 |
| Doran, Harvey | Doran, Robert E Berk, Gerald. | 12,210 | 329,486 | 341,696 |
| Gastony, Joseph | Gastony, D.J. Berk, Gerald | 16,632 | 397,089 | 413,721 |
| Gentile, George | Slusarski, Georgine Berk, Gerald | 7,562 | 211,677 | 219,239 |
| Norris, George | Neuberger, Catherine Polson, Catherine | 50,156 | 1,173,730 | 1,223,886 |
| Steimle, Christ | Steimle, Christ III | 3,540 | 97,792 | 101,332 |
| Tomczak, Clarence | Heim, Stephen Berk, Gerald | 52,667 | 1,187,435 | 1,240,102 |
| Uher, Frank | Uher, Thomas Gath, Judith | 23,560 | 634,501 | 658,061 |

| Sophner Claimants 74-914 | Personal Representatives | Displacement Allowance (with pensions) | Prejudgment Interest; prime rate (thru 12/31/2007) | With interest at prime rate thru 12/31/2007 |
|---|---|---|---|---|
| Bilinsky, William | Bilinsky, Theresa | 2,293 | 50,568 | 52,861 |
| Crtalic, Joseph | Crtalic, Judy | 2,959 | 63,512 | 66,471 |
| Foecking, Paul | Foecking, John Berk, Gerald | 13,767 | 188,099 | 201,866 |
| Gallagher, John F. | n/a | 3,053 | 83,577 | 86,631 |
| Janke, Gus | Janke, William F | 4,146 | 99,291 | 103,437 |

180

| | Berk, Gerald | | | |
|---|---|---|---|---|
| Jarabeck, Joseph | Tomsik, Donald | 3,557 | 36,389 | 39,946 |
| Kochenderfer, E.W. | Rossman, Susan | 6,784 | 149,366 | 156,150 |
| McLaughlin, Patrick | Violini, John Jr. | 34,433 | 793,640 | 828,073 |
| McNeely, Robert | n/a | 5,146 | 103,097 | 108,243 |
| Novotny, Andrew | n/a | 2,195 | 49,101 | 51,295 |
| Opalk, Martin | Campbell, Donna | 9,469 | 219,601 | 229,070 |
| Pentz, L.S. | Pentz-Kirchener, Ann Marie | 5,397 | 113,758 | 119,155 |
| Schreiner, Robert | Rich, Linda | 20,815 | 491,953 | 512,768 |
| Scuba, Paul | Scuba, Paul | 12,892 | 293,927 | 306,819 |
| Sophner, George | Berk, Gerald | 16,738 | 410,367 | 427,105 |
| Sowinski, Peter | Oleksiak, Donna | 9,100 | 199,534 | 208,634 |

| **Watjen Claimants 69-675** | **Personal Representatives** | **Separation Allowance** | **Prejudgment Interest; prime rate (thru 12/31/2007)** | **With interest at prime rate thru 12/31/2007** |
|---|---|---|---|---|
| Franz, Phillip | n/a | 10,473 | 277,278 | 287,750 |
| O'Neil, Thomas | n/a | 10,406 | 273,662 | 284,068 |
| Watjen, Robert | Watjen, Judith | 10,950 | 287,957 | 298,907 |
| Wilger, Ana Mae | Stone, Joyce W. | 10,435 | 281,872 | 292,306 |

| **Bundy Claimants 69-947:** | **Personal Representatives** | **Separation Allowance** | **Prejudgment Interest; prime rate (thru 12/31/2007)** | **With interest at prime rate thru 12/31/2007** |
|---|---|---|---|---|
| Bundy, David | Bundy, Anna Jo Berk, Gerald | 10,793 | 283,823 | 294,615 |
| Feldscher, James | Feldscher, James Jr. Berk, Gerald | 10,759 | 279,089 | 289,849 |

181

## DISSENTING OPINION

## BEFORE THE ARBITRATION COMMITTEE ESTABLISHED UNDER SECTION 1 (e) OF THE MERGER PROTECTION AGREEMENT OF NOVEMBER 16, 1964

MICHAEL J. KNAPIK, et al.,                  Case No. 69-722
     Claimants
        v.
PENN CENTRAL,
     Carrier


ROBERT WATJEN, et al.,                       Case No. 69-675
     Claimants
        v.
PENN CENTRAL,
     Carrier

DAVID C. BUNDY, et al.,                      Case No. 69-947
     Claimants
        v.

PENN CENTRAL,

     Carrier

G.V. SOPHNER, et al.,                        Case No. 74-914
     Claimants
        v.
PENN CENTRAL,                                **DISSENTING OPINION**
Carrier
                                             **Joseph P. Tomain**


### Introduction

     The Claimants, the Carrier, and the Panel all agree that this is a contract action. Agreement ends after that.  The Majority has awarded the Claimants compensatory damages in excess of $13 million largely based on compounded prejudgment interest.  I dissent from the

1

Majority Opinion because the award is not supported by the facts, the evidence, or the law.

More specifically, the award is not legally supportable because:

> **I.**      **The Express Language and Clear Intent of the Contract Requires that the Claimants Prove Eligibility Which They Have Not Proven**

> **II**      **The Claimants' Testimony and Carrier's Unrebutted Expert Testimony Demonstrates that the Job Loss was Not Caused by the Merger Which is Required by the Contract Before Recovery** and,

> **III.**      **The Confession of Error by Claimants' Expert Admits That He Did Not Use the Required Contract Computation for Determining Damages**.

> I further dissent from the award of prejudgment interest because:

> **IV.**      **The Award is Not Based on the Record and is Designed to Penalize the Carrier**.

Consequently, the Majority Award must be overturned.

**I.**      **The Explicit Language and Clear Intent of the Contract Requires that the Claimants Prove Eligibility Which They Have Not Proven**

This litigation revolves around the 1964 *Agreement for Protection in Event of Merger of Pennsylvania and New York Central Railroads,* known as either the Merger Protection Agreement or the MPA, signed between the Carriers and the Claimant's representatives.  The MPA expressly incorporates by reference the earlier *Washington Job Protection Agreement of 1936* (WJPA).  The Claimants base their arguments and the Majority bases it award on the MPA. Nevertheless, to fully understand the scope of the protection afforded by the MPA, we must first understand the scope of the protection afforded under the WJPA.  Both agreements consistently require that the Claimants prove that they were adversely affected *by the merger* before they are entitled to recover contract benefits.  The Claimants not only failed to prove that they were eligible to recover job protection benefits under the contracts due to the merge, they expressly

demonstrated that they suffered job losses due to the dramatic decline in passenger service at their place of employment – the Cleveland Union Terminal (CUT).

### A. The Washington Job Protection Agreement of 1936

In May 1936, carriers and unions entered into what is known as the Washington Job Protection Agreement (WJPA).  At that time, the parties understood that the rail industry was changing and they negotiated certain protections for railroad employees.  The WJPA was specific as to the protections it afforded.  Section 1 of the WJPA reads "That the fundamental scope and purpose of this agreement is to provide for allowances to defined employes **affected by coordination** as hereinafter defined, and it is the intent that the provisions of this Agreement are to be restricted to those changes in employment in the Railroad Industry **solely due to and resulting from such coordination**."  The clear and express language of the WJPA is directed to *mergers* as explicitly defined in §2(a) of the WJPA.  If the just quoted language in Section 1 is not sufficiently clear, the paragraph continues "Therefore, the parties hereto understand and agree that fluctuations, rises and falls and changes in volume or character of employment **brought about solely by other causes** are **not within the contemplation of the parties** hereto, or covered by **or intended to be covered by this agreement**."

The WJPA is a merger protection agreement.  It was intended to protect railroad employees from job loss due to mergers and it expressly excluded job protection from other causes such as fluctuations in business including the decline in passenger traffic.

Section 2 of the Agreement defines terms and defines "coordination" as a merger (§2(a)).  Section 3 of the Agreement defines the scope of coordination and the parties affected.  Sections 4 and 5 identify benefits for affected employees and both sections significantly impact this

3

litigation.  Repeatedly, the Majority argues that the subsequent 1964 Merger Protection Agreement (MPA), to be discussed in more detail below, granted "benefits greater than . . .heretofore required . . . ." (p. 9) and contained "unprecedented protective provision and security for Penn Central employees." (p. 10, note 11).[1]  The MPA does expand benefits but neither to the extent sought by the Claimants nor to the extent awarded by the Majority.

The Claimants and the Majority argue that the MPA guarantees them jobs and compensation, apparently for life, in the event of job loss regardless of causation.  The MPA does no such thing.  Instead, according to its express language, the MPA expands the scope of workers covered and the length of coverage but it does not eliminate the requirement that job loss occur as a result of the merger. Instead, the MPA, and every decision maker throughout this litigation, continues to require that the Claimants demonstrate job loss as a result of the merger before they can claim benefits. However, to understand the scope of the expanded benefits, I must discuss the WJPA in some detail.

Pursuant to §4, in the event a carrier contemplates coordination, they must publicize the intended coordination and they must notify employee representatives.  The notification "shall contain **a full and adequate statement of the proposed changes to be effected by such coordination**, **including an estimate of the number of employees of each class affected** by the intended changes."  Following the notice, a conference among the representatives of the parties interested in the intended changes is to be held for the purpose of reaching an agreement on the application of the WJPA.

---

[1] This quotation comes from a letter from Penn Central management to its then employees on the date of the merger assuring them that their jobs were protected from the merger.  I accord this letter, in effect a press release about the merger, no legal effect.  Further it is highly doubtful that the letter was even addressed to the New York Central employees who are the subject of this litigation and were being newly merged into Penn Central.

Under § 5: "**Each plan of coordination which results in the displacement of employes or rearrangement of forces shall provide for the selection of forces from the employes of all carriers involved on bases accepted as appropriate for application in the particular case . . . ."** Those "bases" are to be determined by subsequent agreement of the parties and if no agreement is reached then "the dispute may be submitted . . . for adjustment in accordance of Section 13 [of the WJPA]."  Job losses due to a merger are to be addressed pursuant to agreement as specified in §5.  Further "any assignment of employes made necessary by a coordination shall be made on the basis of an agreement between the carriers and the organizations of the employes effected . . . ."

The WJPA explicitly contemplates job losses as a result of a merger and some, but not necessarily all, affected employees might receive merger protection by subsequent agreement among the parties or though the contract's dispute resolution mechanism.  Most importantly for the purposes of this decision, the WJPA expressly ***did not*** protect all employees against job loss due to a merger.  As we will see, the MPA ***does*** provide for merger protection for all employees displaced by the merger.  By protecting all employees against job loss due to a merger, the MPA thus extends "greater" perhaps even "unprecedented" benefits to railroad employees.  The MPA, however, contrary to the Majority opinion, does not guarantee all employees against job loss regardless of cause for an indefinite period of time.

Section 6(a), as well as §7 (a),[2] of the WJPA confirms the intent of §5 to protect only some of the employees affected by the merger.  In other words, job losses due to mergers were anticipated and some employees could be protected either through a subsequent agreement or through dispute resolution while others risked job loss with no protection or benefits.

---

[2] Quoting §7(a): "Any employee of any of the carriers participating in a particular coordination who is deprived of employment ***as a result of said coordination*** . . ." shall be accorded a coordination allowance.

5

Section 6(a) begins "No employee of any of the carriers involved in a particular coordination who is **continued in service** shall, for a period not exceeding five years following the effective date of such coordination, be placed, **as a result of such coordination**, in a worse position . . . ."  If after agreement or resolution of a dispute, then the employees who are **continued in service** have a job guarantee with seniority rights, compensation, and other benefits for five years and these employees are financially protected by a "displacement allowance." (§6 (b)).[3]

The WJPA, then, recognizes the following:

(1)     mergers and consolidations are anticipated (§ 1);

(2)     job losses as a result of a merger were contemplated (§ 5);

(3)     some employees affected by the merger may be protected by a subsequent agreement or through a dispute resolution mechanism; and,

(4)     workers who continued in service after the agreement or the resolution of the dispute had a guarantee of five years employment (§ 6(a)).

Claimants and the Majority argue that the coordination benefits provided in the WJPA were expanded in the subsequent 1964 Merger Protection Agreement.  Claimants and the Majority are correct that benefits were extended.  They are incorrect about the extent of those "extended" benefits which are set out in the clear and express language of the 1964 Agreement.  Briefly, the WJPA offered two protections: (1) **some employees** were protected against job loss *due to a merger* (2) for a **period of  5 years**.  The MPA extended those benefits and protected (1) **all employees** (2) **for an indeterminate period** against job loss *due to a merger*.  Thus,

---

[3] The significance of the "displacement allowance" under WJPA §6 and the "coordination allowance" under WJPA §7 will be discussed *infra*.  Briefly, the Majority incorrectly uses the calculations for the displacement allowance and the coordination allowance in the 1936 WJPA to compute its award.  This reliance is misplaced for two reasons.  First, both the displacement and the coordination allowances apply only to those employees "continued in service" under the WJPA who were not afforded the protection as outlined in that agreement.  Second, those benefits are only afforded employees displaced due to a merger.

employees under the MPA have significantly extended benefits if they can demonstrate that they have suffered job loss due to the merger as expressly provided for in the agreement.

### B. The Merger Protection Agreement of 1964

The WJPA was a global agreement among multiple carriers and unions.  The more specific 1964 Merger Protection Agreement is between the Pennsylvania and New York Central Railroads and it provides specific worker protection as identified in the express language of the agreement.

The following explicit textual language demonstrates that the benefits under the MPA were to be afforded to employees in the express event of a merger or coordination:

(1)    The title of the MPA itself,  *Agreement for Protection in Event of Merger of Pennsylvania and New York Central Railroads*, states that it is for job protection in the event of a merger.

(2)    The first Whereas Clause identifies the merger between the two railroads as the subject of the agreement.

(3)    The third Whereas Clause identifies the fact that the merger "will or may have adverse effect upon employees represented by their labor organization[s]."

(4)    The fifth Whereas Clause quotes § 5 (2) (f) of the Interstate Commerce Act noting that as a condition of approval of the merger, the ICC will require job protection for "**railroad employes affected**" by the merger  for a period of four years.  The Statute also recognizes that "an Agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."  The Interstate Commerce Act thus provides for a minimum of four years of job protection and recognizes that parties can enter into a more beneficial agreement.

The parties, through the MPA as noted above, did enter into a more beneficial agreement than provided for either by the four year protection of the ICC Act or by  the five year protection afforded some employees under the WJPA.

(5)    The sixth Whereas Clause recognizes that the parties have "reached agreement respecting the protection to be afforded employees of the railway carriers involved or who may become involved in the aforesaid application and transactions" of the merger between the New York and Pennsylvania Central Railroads.

(6)    While the Whereas Clauses of the MPA all address merger protection benefits, the intended scope of the protection is expressed in the body of the MPA itself. Section 1(a) of the MPA expressly incorporates by reference the Washington Job Protection Act of 1936 which, again as noted above, provided limited employee benefits "solely due to and resulting from such coordination." (WJPA § 1).

(7)    MPA § 1(a) continues to emphasize the point that the WJPA shall be applied for the protection of the New York Central and Pennsylvania Central employees "**who may be adversely affected** with respect to their compensation, rules, working conditions, fringe benefits or rights and privileges pertaining thereto **incident to approval and effectuation of said merger. . . .**"

Section 1 (a) clearly and unequivocally states that benefits accrue as a result of the merger.  Section 1 (b) identifies which employees are covered and their benefits in more detail.  Section 1(b) neither eliminates the causation requirement nor creates a new class benefits as the Majority argues.

Thus, the express language and structure of the MPA is clear.  The MPA incorporates and expands the benefits of the WJPA and the ICC Act for employees adversely affected by the merger between the New York Central the Penn Central railroads.  Claimants and the Majority argue that Section 1(b) expands benefits.  It does not.  Instead, §1 (b) defines the class of workers who are eligible to receive protection.  Under §1 (b) all New York Central employees are now on the Pennsylvania Central roster and all employees are protected against job loss due to coordination or merger.

The Majority further, and erroneously, argues that while §1 (a) contains a causation requirement that job loss must be due to the merger, that §1 (b) eliminates that requirement (p. 64).  On the face of it, this argument make no sense.  Nor is the argument supported by the clear and express contract language.   Again, to emphasize the point that the express language of the

MPA applies to job loss caused by the merger MPA §1 (a) says that benefits accrue to those employees "**adversely affected . . . incident to approval and effectuation of said merger**. . . "

Thus, the MPA §1 (a) refers to merger protection benefits as set out in the MPA itself and in the WJPA and then §1 (b) sets out in detail which employees are covered by the agreement i.e. employees who suffered job loss as a result of the merger.  Section 1 (b) paragraph 1 states that on the date of the merger both New York and Pennsylvania Central employees merge into the new entity. Paragraph 2 defines "present employees." Paragraph 3 requires the submission of a roster of all employees. Paragraph 4 describes disqualifications for benefits e.g., death, resignation or further business decline among other reasons.  Paragraph 5 describes emergency situations. Paragraph 6 addresses transfers and paragraph 7 addresses temporary employees.  In other words, §1 (b) does not eliminate the causation requirement, it does not expand benefits by turning the Merger Protection Agreement into a full-fledged, life time employment guarantee. Rather, it more fully identifies the class of employees eligible for protection.

The Majority argues that the MPA extends the job loss protections of the WJPA by (1) eliminating any eligibility requirement and (2) extending protection beyond the WJPA's five year requirement.  The MPA, however, extends job loss protection in another direction.  First, all employees are protected against job loss due to the merger and second they are protected beyond the five year limit of the WJPA.  Thus, under the MPA all employees were protected from job loss due to merger yet they could loose their jobs for "other causes," such as job loss due to a decline in passenger service, as explicitly recognized throughout this litigation.

### C. Judge Lambros' Rulings

The history of this litigation will be recounted below.    Suffice it to say, that litigation began in the US District Court for the Northern District of Ohio.    The presiding judge, Judge Thomas Lambros, had two occasions to issue rulings in this case and on both occasions he recognized that the claimant had to prove that job loss was a result of the merger.  In 1976 he ruled that an open question in the litigation was: "Were the plaintiffs placed in a worse position with respect to their employment **by reason of the merger**?" He further ruled that that question remained to be litigated.  *Knopik v. Penn Central*, Case No. C 69-722 Transcript of Oral Rulings at p. 19-20 (July 14, 1976).  Again in 1979, Judge Lambros  ordered arbitration to resolve the open question as to the entitlement to compensation under the MPA.  *Knopik v. Penn Central*, Case No. C 69-722 Memorandum Opinion and Order (November 11, 1979).

### D. **Blackwell Arbitration Decision**

The Blackwell  arbitration panel  issued  its  decision  on  June  22,  1992  denying compensation to all Claimants because of their failure to prove that the merger caused their job losses.  Although this arbitration decision was ultimately overturned by a reviewing court it is consistent   in requiring that the Claimants demonstrate that their injury was caused by the merger.  "The phrase 'adversely affected' means that in order to establish his right to payment of benefits under the MPA,  an Employee must establish that he lost his employment or that he earned less than his MPA guarantee as a result of the merger . . . . For example, an Employee who is furloughed due to a decline in the freight business does not constitute being 'adversely affected.'"  *See Augustus v. Surface Transportation Board*, Petition for Writ of Certiorari, 2001 WL 34125460 (U.S. Dkt. No. 00-1499) at 40a.

10

E. **Surface Transportation Board Decision**

The Majority cites with approval the 1998 decision by the Surface Transportation Board (STB) (Dkt. No. 21989 (December 2, 1998)) regarding appeals by the *Knapik* Claimants.  The Majority misreads the decision to hold that the plaintiffs proved eligibility and that Penn Central is foreclosed from offering evidence of "other causes" for the job loss other than the merger. (P. 28-32).  The STB opinion expressly allows evidence of "other causes" and invites the Carrier to proffer such evidence.  The Majority distorts the express language and reasoning of this opinion, as it has distorted the express language and reasoning of the contracts at issue.

In its opening paragraph, the Board says that it is reviewing an appeal of the denial of benefits  "under an agreement entered into in January 1, 1964, ***for the protection of railroad employees who would be affected by the 1968 merger*** of the Pennsylvania Railroad Company and the New York Central Railroad Company to form the Penn Central Transportation Company." (P. 1).  While the central issue in this appeal involves "standing for" or "reporting to" work, the decision explains the scope of the MPA.  "This proceeding involves the efforts of claimants to obtain labor protection benefits pursuant to the 1964 merger protection agreement." (P. 3).

The Board found that the arbitration panel erred by summarily denying benefits to claimants who reported for work and therefore reversed.  (P. 4).  That finding, however, did not end the case because the Broad was addressing the arbitration panel's *summary* dismissal.  In fact, the decision went on to note that the issues before it involved first the question of eligibility and second, if eligible, the amount of compensation.  Because of the Blackwell panel's summary

11

dismissal neither eligibility nor compensation were fully and properly considered according to the Board.

The Board fully recognized that the Claimants had to satisfy a causation requirement.  In its opinion, the Board writes: "It is not clear, what else could claimants could have submitted to satisfy the panel that they suffered losses as a result of the merger."  And, emphasizing the summary nature of the Blackwell panel's decision,  the Board writes: "***Our examination of the hearing record***, however, shows that *the carrier made no effort whatsoever to identify the specific periods of general business decline, emergency conditions, or other supervening events* that would justify non-payment of benefits under section 1 (b) of the agreement."  (P. 8).  The Board also noted that it would "be unlikely that supervening causes could explain claimants' losses." (P. 9).  And, "Unless an arbitral panel can point to evidence supporting total denial that we have overlooked and that it is considerably more compelling than the evidence in its 1992 decision, *summary denial of all benefits is completely unjustified*." (P.9).  In short, on the record before it the Board reversed the Blackwell panel and recognized that the litigation would continue on matters of causation and eligibility.

Four things stand out about the STB decision:

(1) The MPA §1 (a) contains a causation requirement and claimant's must demonstrate eligibility.

(2) Section 1(b) of the MPA addresses which group of employees is eligible.  This section does not, as the Majority would have it, either eliminate causation or provide life-time job guarantees.

(3) The record was silent as to other causes for the job losses.

(4) The Carrier can put forth evidence of other causes to defeat claims for benefits.

In conclusion, the Board expressly left open the issues of causation for future determination.  "[W]e will not affirmatively find that claimants <u>are</u> entitled to compensation, but

will remand the issue of the entitlement to compensation to the parties, who may attempt to resolve the issue among themselves or seek additional arbitration on this issue consistent with that [1992 arbitral] decision."  (P. 9).  The seven *Knapik* claimants who failed to report to work and, therefore were denied benefits, appealed the Board's decision to the Sixth Circuit which upheld the board.  *Augustus v. Surface Transportation Board*, 238 F. 3d 419 (2000) *cert. denied* 533 U.S. 949 (2001).

It must also be noted that the Sixth Circuit also read the MPA as affording "protection [for] employees ***affected by the proposed merger***."  Slip. Op. at 1.

### E. Eligibility

Whether we call it causation or eligibility, the Claimants must prove an entitlement to job loss protection benefits under the contract.  If there is any law of the case to be applied to the current arbitration it is that eligibility must be established and that before benefits accrue to any of the Claimants they must show that they were adversely affected because of the merger.  The clear, express, consistent language of both the *Washington Job Protection Agreement* and the *Merger Protection Agreement*, as well as all rulings by arbitrators, administrative law judges, district court judges, and appellate court judges throughout this litigation as well as basic contract law, demonstrate conclusively that job benefits will extend to those affected by the merger and do not extend to other causes such as the elimination of passenger service.  All of the evidence demonstrates, in the Majority's words, that "there was a precipitous decline in intercity railroad passenger service."  (P. 6).  Consequently and conclusively, the decline of passenger service into and out of the CUT was the cause of the Claimants' job losses.  The merger did not cause the losses.

The faulty logic of the Majority is revealed in a footnote discussing the testimony of the Carrier's expert witness Michael R. Weinman. (P. 7, n. 5). The Majority argues that the decline in business led to the merger and, therefore, the merger led to job loss. This argument is logically fallacious. The fallacy of the Majority is that they have proven causation. While it is logically possible that the merger could cause job loss, it is also logically possible (and in fact more probable) that the decline in passenger service at the CUT, and not the merger, caused the job loss.

This issue of causation remains to be discussed and the testimony from the Claimants as well as the argument from the Majority proves exactly that the job loss was due to the decline and virtual elimination of passenger service at the CUT and not by the merger. The easiest example of a job loss caused by the merger is to recognize that the Claimants were all New York Central employees who did not want to be displaced by Penn Central employees as a result of the merger. If such displacement did occur, then, the MPA job protections apply.

Thus, the burden is on the Claimants to show that they are entitled to job loss benefits due to the merger. Further, even if we assume that the Claimants offered sufficient evidence going forward to show that job loss was due to the merger, that evidence was soundly rebutted by evidence that the decline in passenger service caused the job loss and while that evidence comes primarily from the Claimants themselves, it is supported by the expert testimony offered by the Carrier. Further, this reasoning is also accepted by the Majority: "There is little doubt that the fundamental cause of the loss of employment for railroad employees working on passenger service at the CUT and elsewhere was the decline in intercity railroad passenger service in the quarter century following World War II." (P. 62).

**II.     The Claimants' Testimony and Carrier's Unrebutted Expert Testimony Demonstrates that the Job Loss was Not Caused by the Merger Which is Required by the Contract Before Recovery**

**A. Claimants' Testimony**

The Carrier argues, consistently with the express language and clear intent of the WJPA and the MPA, that those agreements covered benefits in the event of merger.  In fact, over the years, the Carrier has paid over $100 million in merger protection benefits to railroad employees. In other words, Penn Central recognized its obligation to protect employees in the event of a merger but did not treat the MPA, as the Claimants and as the Majority would have it, as a lifelong work guarantee.

There are four groups of Claimants in this litigation and in the case of each group, it is uncontradicted by the Claimants' own testimony that they were furloughed due to a result in the decline of passenger service at the Cleveland Union Terminal.  The *Knapik* group of claimants was represented at the hearing by James J. Knapik, the son of Michael J. Knapik.  Mr. Knapik, Sr. was a named claimant in an earlier part of the litigation and he was dismissed from the case by the Sixth Circuit in *Augustus*.[4]  Nevertheless, Mr. Knapik's direct testimony is that his father had lost his job because of passenger service:

> Q:  Do you know what happened to the jobs?  Was there a furlough at that time?  Do you know?
>
> A:  There was a decrease in the passenger service, I believe. Transcript at 109 (Dec. 10, 2007).

Mr. John Gallagher, a representative of the *Sophner* group of claimants, also testified that the furloughs were a result of a decline in passenger service.

> Q.   Isn't it true that there was a dramatic decline in railroad traffic, passenger traffic into and out of the CUT?

---

[4] *Augustus* v. *Surface Transportation Board*, 238 F.3d 419, 200 W.L. 188805 (6th Cir.) (Dec. 22, 2000).

> A.  There was a contrived flow of traffic into and out of the CUT. Compared to the—if you want to say declined, compared it to the '40s when there was thousands of troops, thousands of passengers, thousands of prisoners of war, thousands of immigrants going through the CUT. From that area, yes, there was a decline. Transcript at 184 (Dec. 10, 2007).

Similarly, in his videotaped deposition, Claimant Robert McNeely testified that he lost his job as a passenger car inspector because there were "no more passenger trains" at CUT. *Videotaped Deposition of Robert McNeeley* 9 (September 26, 2007).

And finally, Mr. Phillip Franz was a representative of the *Watjen/Bundy* group of claimants, testified on direct as follows:

> Q.  And can you tell us what the benefits were under the Merger Protective Agreement (MPA)? . . .
>
> A.  It offered employees protection in the event that their job was eliminated or affected by the merger. Transcript at 216-17 (Dec. 10, 2007).

The testimony from the representatives or claimants for each of the four groups confirms the express language and clear intent of the contract that job loss benefits were to be afforded to employees in the event of a merger but that they were furloughed as a result of the decline in passenger service and not the merger.

### B. Carrier's Unrebutted Expert Testimony

The Carrier offered expert testimony by Mr. Michael Weinman.  Mr. Weinman's expert report and testimony at the hearing went unrebutted.  His report and his testimony indicates that the decline of passenger service at the CUT was the cause of business decline and caused the layoffs at the terminal.  The Majority also accepts this proposition (P. 6-8).

Mr. Weinman testified that the decline in passenger service resulted in the job losses experienced by the Claimants.  Among the reasons for that decline, Mr. Weinman listed: (1) New York Central restructured its business in 1967 which had repercussions in Cleveland; (2) decline in mail service in favor of truck and air transportation; (3) the expansion of the interstate highway system; (4) increased suburbanization which moved jobs away from central city; (5) the national passenger network experienced gaps; (6) air travel increased; and, (7) manufacturing jobs were lost in the Cleveland rust belt among other factors. Transcript at 513- 517 (Dec. 12, 2007).

After listing the factors contributing to the decline in passenger service, Mr. Weinman then documented the amount of urban transit traffic that was lost nationally and then lost specifically in Cleveland.  "It [passenger ridership] declined from 375 million riders in 1950 to 101 million in 1971.  Effectively, it [the Cleveland transit system] lost three quarters of its ridership." (Transcript at 526). In other words, the main feeders to the CUT were greatly diminished and so too was the passenger traffic at the Terminal.  More specifically to passenger trains, Mr. Weinman testified that the number of passenger trains in 1961 was three times that of the number of trains in 1971. (Transcript at 528-29).

Given the decline in passenger service since the end of World War II and continuing through the 1960s, Mr. Weinman testified that the merger was not the cause of the job losses; instead, the job losses were caused by the decline in passenger service:

> Q. [by Carrier's attorney Mr. Jason Groppe] what was the result of that decline in passenger service to the CUT after the merger?
>
> A. It continued to reduce the needs of the railways to maintain a facility at CUT and all that was incident to it.
>
> Q.  So the merger did not really affect the CUT?

17

> A. The merger had almost no effect on the CUT . . . . The Pennsylvania Railroad's passenger service to Cleveland ended approximately 1965 . . . .
>
> Q. Was there a consolidation of passenger terminals between New York Central and the Pennsylvania Railroad at the CUT after the merger?
>
> A. No.  There would have been no reason to consolidate because the Pennsylvania had no presence whatsoever of any passenger trains in Cleveland. (Transcript at 537-30).

This line of questioning dramatically indicates that the merger did not affect the job losses suffered by the claimants.  Indeed, Mr. Weinman expressly testified that the merger had no effect on passenger traffic at the CUT because Penn Central had no passenger traffic at the CUT. No former New York Central workers were displaced by Penn Central workers as a result of the merger and, overall, according the Weinman, "The merger had almost no effect on the CUT. . . there would have been no effect of the merger itself on the Cleveland Union Terminal." (Transcript at 538).  The Claimants, former New Your Central passenger service employees, could show job loss due to the merger if Penn Central passenger service employees replaced them after the merger.  This testimony, however, shows that Penn Central had stopped passenger service and that its passenger service employees did not displace the Claimants.

Mr. Weinman further testified that it was the decline in passenger service which adversely affected these Claimants:

> Q. Did the decline in passenger rail service that you have been testifying about through the CUT in the late 1960s, what effect did that have on the labor force for CUT?
>
> A. The labor force at CUT reacted to the decline in passenger service because the management reacted to it by discontinuing jobs, discontinuing assignments and reducing the resources applied to that commensurate with the decline in passengers and the revenue they are from.  It was a case that affected virtually every crafted Cleveland Union Terminal.  Every craft lost job

18

> opportunities as a result of the diminution of passenger service through CUT. (Transcript at 540).

This testimony went unrebutted. Neither the Claimants' cross-examination nor Claimants' factual or expert testimony controverted the assertion that the Claimants lost their passenger service jobs for any reason but the loss of passenger service at the CUT. The merger did not cause the job loss, the loss of passenger service did.

In his 1976 ruling, Judge Lambros also found that the decline in passenger service was the cause of the job losses:

> The evidence demonstrated that there was a decline in passenger service. The Cleveland Union Terminal employees, by reason of the changes in the mode of travel and the economy of this nation; that their status as an employee of the Cleveland Union Terminal, because of changes in habits of the American traveling public; that their conditions of employment were imperiled by virtue of interstate highway system and air transportation, and there is no question of the fact that the Court can take judicial notice of the fact that passenger service was on the decline. Transcript of the Oral Rulings of the Hon. Thomas D. Lambros, Dkt. No. C 69-722 at p. 5-6 (July 14, 1976).

As Judge Lambros ruled, the Claimants must prove eligibility before they are entitled to receive benefits. *Id*. at 24. According to the express contract language, Claimants must prove that they suffered job losses due to the merger.

The Claimants own testimony and the unrebutted expert testimony of the Carrier demonstrates the Claimants job losses were caused by the decline in passenger service and not by the merger. Assuming, *arguendo*, that the Claimants did prove eligibility, which they did not, then they were required to prove a measure of damages and that measure was set out in the Merger Protection Agreement. The Claimants' expert testimony admittedly failed to use the proper contract measurement and, therefore, failed to prove damages.

### III.    The Confession of Error by Claimants' Expert Admits That He Did Not Use the Required Contract Computation for Damages

In support of their damages claim, the Claimants offered the testimony of an economist, Dr. Harvey Rosen.  Dr. Rosen makes three fatal mistakes and he admits each of them. First, before damages can be calculated, it is necessary to use the correct formula as provided in the Merger Protection Agreement.  Second, the required formula must be properly applied.  Third, before damages can be calculated, the proper wage information, as required in the contract, must be used.   Dr. Rosen failed to follow the required contract formula, failed to apply it properly, and he failed to use the required contract documentation.

#### A. Dr. Rosen Failed to Use the Proper Formula

Before a measurement can be made regarding damages, the Claimants must use the formula specified in the Merger Protection Agreement to calculate benefits.  Specifically, the Claimants must use the formula provided in §6 (c)of the Washington Job Protection Agreement as incorporated by reference by the MPA.  Instead, Dr. Rosen relied upon Appendix E which is also incorporated by reference in the MPA.  However, a reading of Appendix E clearly indicates that its language is limited to determining the Claimant's *status* not the amount of their benefits. "***For purposes of determining whether, or to what extent, such an employe has been placed in a worse position with respect to his compensation***, his total compensation and total time paid for during the base period will be separately divided by twelve." In other words, the language of Appendix E enables a decision maker to determine whether any given employee satisfies the requirement that he was "placed in a worse position."   It does not provide a method for measuring compensation.  Instead, Appendix E could not be more clear that the WJPA was to be used to make the necessary calculations: "Employes . . . entitled to the benefits of the Washington Job Protection Agreement . . . ***shall be entitled to compensation computed in***

*accordance with the provisions of* **[the WJPA]**."  The WJPA, in turn, then, in §6 (c)sets out the formula for determining the amount of benefits due to eligible employees.

Dr. Rosen admitted §6 (c)of the WJPA was the applicable formula and that he relied instead on Appendix E:  "Q. Now, I think we all agree, and you agreed a little bit earlier, that Section C tells us how to calculate the displacement allowance; isn't that right? A. Section C outlines a formula on page 10.  That's correct." (Transcript at 440-41).  Then,  " . . . I looked at the merger agreement, I looked at Appendix at A through E.  A was the Washington Jobs Agreement, E is this modification to the Washington Jobs Agreement."  "Q. But you didn't rely on attachment – Appendix E in making your calculations, did you? A. I relied on the entire agreement . . . I cited that I think I also cited E. . . ." (Transcript at 474-76).  Assuming that Dr. Rosen is consistent, and this testimony fails to demonstrate that he was consistent, at best he used both § 6(c)and Appendix E to compute compensation when only §6(c)was applicable.  As shown below, these different formula result in different damages calculations.

### B. Dr. Rosen Failed to Properly Apply the Required Formula

More damaging, Dr. Rosen also admitted that he did not apply the formula properly.  The underlying reason given by Dr. Rosen for not applying the correct formula is that the Carrier failed to provide him with the necessary monthly wage cards.  This argument about failing to provide this information will be dealt with below.  Suffice it to say here, however, (1) that the monthly wage cards were necessary for the proper calculation of compensation; (2) that Dr. Rosen never used these monthly statements; and, (3) that it was the Claimants' obligation to obtain these cards and that they failed to do so.  There is a compelling reason why the Claimants did not provide the monthly wage information to Dr. Rosen.  As Dr. Rosen's testimony makes clear, if he had used the monthly wage statements his compensation calculations would have been significantly lower.

Section 6 (c)of the WJPA sets out the formula for determining compensation.  As the transcript makes clear, §6(c) provides a six-step calculation and Dr. Rosen admitted to not following at least steps 2 through 6.

> Q. So the calculation in the agreement under 6(c) and you did not do.
>
> A. I didn't have the monthly so I had to use the annual to do that but not the monthly.
>
> * * * * *
>
> Q. So you didn't do this calculation.  We are only on step two, there're [sic] five steps.
>
> A. For the 10 people on the O'Neill list, I did not.
>
> * * * * *
>
> Q. Well, for any of the Claimants. You didn't have their actual hours worked, did you?
>
> A. I did not.
>
> Q. You estimated it correct?
>
> A. Correct. (Transcript at 454-55).

The transcript continues in this vein through the rest of the formula. "Q. Did you do that [apply the next step of the formula]? A. I couldn't do it.. . . . .Q. You didn't do that comparison, did you? A. I couldn't. You are right.. . . . Q. All right. So you didn't do that. Step five, you did not do?  A. No, I was only asked to look at guarantee difference" (Transcript at 455-75).

With the excuse that he did not have the easily obtainable and required monthly wage cards, Dr. Rosen in effect arbitrarily made up a calculation to compute compensation damages.

### C. Dr. Rosen Failed to Use the Required Contract Documents

In order to apply the contract formula, Dr. Rosen would have needed to use monthly wage cards which he repeatedly said were not made available to him by the Carrier.  (I will address the availability of this data below).  Instead, Dr. Rosen relied on questionable evidence, including railroad retirement data (Transcript at 379); the so-called O'Neill letter from Conrail, that is not authenticated, nor verified in any way (Transcript at 380); and other general assumptions (Transcript at 440).  The Carrier argues, and the Claimants' expert agrees that monthly wage data is central to the proper computations:

> Q.  And the displacement allowance is paid on a disparity each month?
>
> A.  Yes.
>
> Q.  You didn't do that comparison month-to-month, did you"
>
> A.  I couldn't. You are right.
>
> Q.  You just annualized it, your damage calculation, didn't you?
>
> A.  I looked at the annual difference  . . . . (Transcript at 458).

Throughout Dr. Rosen's testimony, he repeatedly acknowledged that he did not use the monthly data and that he did not use the correct formula required by §6 (c)of the contact:  "A. But I didn't have the monthly information I wish I did." (Transcript at. 453).  Dr. Rosen further agrees with the Carrier that the WJPA did not refer to the information that he used to do his calculations:

> [Does the MPA or the WJPA direct you to consult the Railroad Retirement Board information in calculating the compensation?]
>
> A. It doesn't. It says you should consult the monthly records from the railroad for each person's compensation wage rate and time worked. (Transcript at 477-78).
>
> * * * * * *

[Does the contract tell you to consult tax schedules under the Railroad Retirement Act 1966 through 2007?]

A. No. (Transcript at 478).

\* \* \* \* \* \*

[Does the contract tell you to consult the O'Neill letter?]

A. . . . it does not say that. (*Id.*)

\* \* \* \* \* \*

[Does it direct you to consult UTU research?]

A.  No. (Transcript at 478-79).

In short, all of the documentation that Dr. Rosen consulted for his computations were not authorized by the contract and he did not use the monthly wage data that was contractually required.

What is most disturbing about the failure to use the formula as required by the contract is the fact that the Majority fully acknowledges that the Claimants "did not follow the specific requirement of the MPA and, where applicable, the WJPA" and that it did not require its application. (P.106). The Majority without citation to any authority, then, simply allows for "deviations" in the contract. (*Id.*)**.**

By dispensing with the contractually required compensation formula, the Majority is not simply allowing "deviations" from the contract; instead, it is completely abrogating the terms of the contract.  The Majority justifies the so-called "deviations" by arguing, against the evidence in the record, that the Carrier is responsible for the length of this litigation and is also responsible for failing to give to the Claimants records which they did not own, which the Carrier told the Claimants where to obtain them, and which the Claimants refused or failed to obtain because those records lowered the compensation calculations substantially.  By not requiring the

Claimants to follow the contract formula, the Majority unjustifiably throws out the contracts which are at issue in this case.

### D. Dr. Rosen's Excuse for Not Using the Monthly Wage Cards

Dr. Rosen and the Claimants argue that the Carrier is guilty of spoliation of evidence and because of this spoliation Dr. Rosen was prevented from using the monthly wage cards.  In fact, the fault lies with the Claimants and the problem with the accusation about spoliation is threefold.  First, the evidence was neither hidden nor destroyed by the Carrier or anyone else; it still exists. Second, through the discovery process the Claimant's were told where the monthly wage data was located.  Third, the Claimants neglected or refused to obtain the data.  An add-on argument is that the monthly wage cards have not been under the control of the Carrier since 1976 when possession of those cards was transferred to Conrail by act of Congress.

The Claimants repeated argue that the Carrier had a legal duty to maintain and provide wage and compensation information upon request.  This is incorrect. They base that claim on the third paragraph of Section 1(b) of the MPA.  That paragraph reads that Penn Central will furnish rosters and other records "upon request."  The operative language of that paragraph, however, reads as follows: "the Carrier will furnish, upon request, information specified in appendix E to this Agreement."  Appendix E is entitled "Memorandum of Understanding, Re Employment Information to be Furnished Upon Request and Computations Respecting Compensation Due Operating Employees Under agreement."  Appendix E specifies as follows: "Upon request, the merged company will furnish the **operating signatory organizations**" specified information. Appendix E and the MPA were documents signed by unions and carriers.  The right to request and receive the information runs to the union, not to the employees.

Thus, both the WJPA and Appendix E say that the duty to provide such information runs to the signatory unions to the agreement.  The duty to provide this information does not run to

25

the individual employees.  The entire economic rationale for collective bargaining is a quid pro quo between carriers and employees.  The employees have the power of the union to bargain for them and the carriers have to bargain only with the unions not with individual employees.

Regardless, the mystery as to why the Claimants failed to request easily obtainable monthly wage information in their own backyard is solved – the monthly wage data results in a lower compensation computation.

By way of illustration, Dr. Rosen computed the displacement allowance for Claimant Acree as $7,672 using Rosen's documentation and formula and not that required by the contract. If however, §6(c) and the monthly time cards were used, then the displacement allowance is computed as $193.92. (Transcript at 467-72).  Claimant's expert admits: (1) that the monthly wage data should have been used; (2) instead, he used annual data and assumptions; and (3) the monthly data would have yielded substantially lower calculations for displacement allowances.

Another illustration demonstrates how the Majority grossly miscalculated the damages awards.  *Sophner* Claimant John Gallagher was awarded $86,631 by the majority which includes a displacement allowance for 1969 of $3,053 with interest compounded quarterly until December 31, 2007.  The problem with this award, as well with the others, is that there is no evidence that Mr. Gallagher, as well as the other Claimants, qualified for any benefits.  In Mr. Gallagher's case, he testified that he was injured apparently in 1969 for six months (Transcript at 194-96). Nevertheless, the Claimants' Expert's calculation (See *Preliminary Report Concerning the Displacement Allowance of John Gallagher* p. 3-4 (July 30, 2007)) and the Majority's award, which simply adopts Rosen's figures, were both based on the wage differential for the entire year when, in fact, he was not eligible for benefits due to his injury.  The calculations are completely wrong.  Clearly, the Majority uncritically adopted Rosen's calculations regardless of the fact that he (1) relied on the wrong formula; (2) improperly applied the formula that he admitted was the

26

proper formula; and (3) relied on the wrong annualized documentation and other unsubstantiated assumptions.

### E. Watjen/Bundy Claimants

All of the *Knapik/Sophner* Claimants were passenger service employees and, as discussed above, failed to prove that the merger caused their job losses. The six *Watjen/Bundy* claimants were rate clerks and this group, as well, did not prove that the merger caused their job losses. In fact, after the merger, these employees were offered and they accepted other Penn Central jobs and they took them. All of these Claimants quit their positions and then sought a separation allowance despite having accepted new jobs. Neither the MPA nor the WJPA provides for an election. In fact, in order to seek a separation allowance, the claimant must prove eligibility for the coordination allowance which these Claimant's could not and did not do. In other words, as the WJPA §§7 (a) and (c)require, the claimants must show that they lost their jobs due to the coordination. The Claimants did not show that they lost their jobs due to the merger. In fact, they demonstrated just the opposite – they took new jobs. The Claimants could not take new jobs then quit then seek separation and even if they did seek the separation allowance they would have had to prove that they lost their jobs due to the merger.

### IV. The Award is Not Based on the Record and is Designed to Penalize the Carrier

The award in this case is in excess of $13 million the great bulk of which is comprised of prejudgment interest. We are now approaching the 40th anniversary of this litigation that was commenced in 1969. The Majority's award is the first time that the Claimants have been given monetary relief. In fact, all prior rulings necessitated that the Claimants appeal from either District Court orders or from the decisions of other arbitration panels. Curiously, then, the Majority justifies imposing the burden of prejudgment interest on the Carrier by, in effect,

27

penalizing them for delaying this litigation.  The Majority further justifies its award by effectively blaming the Carrier for allegedly spoiling the necessary evidence to compute the calculations.  Neither of these arguments is true and neither one survives scrutiny.  In addition, as all the parties recognize, Judge Fullam has already indicated that prejudgment interest is unlikely to be imposed in this case.

### A.  The Carrier Cannot Be Charged with Delay

A brief review of the history of this litigation would demonstrate at least, that all parties, as well as the federal judges the arbitrators involved in it have been responsible for the length of this litigation.  This review conclusively demonstrates that the Carrier is not chiefly responsible. The Majority finds that "Indeed, everyone in these proceedings bears some responsibility for the delay." (P. 44).  And yet, it uses the length of the litigation to argue that the delay, which it attributes chiefly to the Penn Central, is the justification for imposing prejudgment interest, which it  characterizes as an enhancement when in fact, it serves as a penalty.

**Chronology**

| | |
|---|---|
| Merger Protection Agreement | May 20, 1964 |
| Merger Effective | February 1, 1968 |
| Claimants Furloughed | Various times beginning February 21, 1968 |
| Claimants file in US District Court | September 15, 1969 |
| US District Court Dismisses Complaint | July 14, 1976 |
| US District Court Orders Arbitration | November 29, 1979 |
| First Arbitration Agreement | June 18, 1980 |
| First Arbitration Panel Disbanded | 1983 |
| Second Arbitration Panel | 1988 |

| | |
|---|---|
| Arbitration Decision | June 22, 1992 |
| Supplemental Arbitral Decision | July 16, 1994 |
| Claimant's Appeal to ICC | November 16, 1994 |
| ICC STB Board Denies Appeal | August 1, 1996 |
| Claimants' Appeal to 6th Circuit Dismissed | |
| Claimants Refile with ICC STB | April 17, 1997 |
| Surface Transportation Bd. Decision | December 2, 1998 |
| US 6th Circuit Decides Claimants' Appeal | December 22, 2000 |
| Claimant's Move to Reopen in USDC | 1998 & 2004 |
| USDC Rules | February 18, 2005 |
| Carrier Moves to Clarify Order | |
| USDC Rules | April 28, 2005 |
| USDC Orders Arbitration | June 28, 2006 |
| Third Arbitration Panel Holds Hearing | December 10-13, 2007 |

This review indicates that the majority of appeals, literally from the initial suit in 1969 until the present arbitration, have been on motion or appeal of the Claimants not Penn Central. Ten years passed (1969-1979) from the initial filing of the district court lawsuit until the district court ordered the first arbitration.  Twelve to14 years passed (1980-1994) from the time of the first arbitration agreement until the supplemental arbitration decision.  Another 6 years elapsed (1994-2000) due to the Claimants' appeals of that decision.  (The Carrier's appeal to the 6th Circuit was voluntarily dismissed.)  And nearly ten years, (2000 to the present) involve the present arbitration.  It appears that none of these delays can reasonably be attributable to the Carrier.  Instead the weight of the delays rests on the Claimants and on the judges and arbitrators

29

hearing this case. There is, then, no basis to impose an effective penalty on the Carrier for the length of this litigation.

To be sure, Judge Oliver ruled that Carrier's defense of laches could not stand. *Order* in Case No.: 69-675; 69-722; 69-974; and, 74-914 (February 18, 2005). It does not follow, as the Majority finds, that because there is no ruling against the Claimants for delay that the Carrier bears that responsibility. The Majority correctly does not argue that the delay should be attributable to the Claimants for pursuing their rights in this litigation. Just as the Claimants cannot be faulted for vigorously seeking their day in court, the Carrier should not be penalized for its vigorous defense. Yet, this is exactly what the Majority does, by enhancing the award: "[T]he age of these proceedings as well as the delay provide support for our decision to award the claimant's prejudgment interest . . . ." (P. 40). In other words, the Majority uses the length of the proceedings to justify imposing a multimillion dollar award against the Carrier while ignoring any of the delays caused by the Claimants' pursuit of litigation or by the delay caused by the arbitrators and judges involved.

The Majority reasons, incorrectly, that because Judge Oliver denied Carrier's defense of laches that it "left open the possibility of our finding that Penn Central is more culpable than the claimants for the delay." The Majority writes that "Penn Central bears the greater share of the responsibility for the delay in these proceedings" (p. 42) even though the majority also found that "Indeed, everyone involved in these proceedings bear some responsibility for the delay." (At p. 44). The argument that the Carrier is responsible for the delays makes no logical, factual, nor legal sense. The record is clear that over the last 40 years there is more than enough blame to go around for the length of these proceedings. Additionally, the record also decidedly demonstrates that the Claimants and the litigation processes involved were the primary culprits and that any award cannot be "enhanced" against the Carrier on this basis.

**B. The Carrier Cannot be Charged with Spoliation of Evidence**

Just as the Majority reasoned that the delay was the basis for imposing the prejudgment interest "enhancement," it also argues that the Carrier's spoliation of evidence, while not in itself sanctionable, justifies the enhanced award.   The issue of spoliation of evidence, i.e. the failure of the Claimants to obtain the monthly wage data, was addressed above, but to reiterate: (1) the monthly wage cards continue to exist; (2) they were neither hidden nor destroyed by the Carrier; (3) they are in the Claimants' backyard in the CUT; (4) they are in the possession of Conrail and not the Carrier and Conrail had has legal possession by act of Congress since 1976; (5) the Claimants, through discovery were told were the cards were located; and, (6) the Claimants either refused or neglected to obtain them.

The Claimants argue that their neglect or refusal to obtain the monthly wage data is justified by the Carrier's duty to maintain the cards and their purported duty to produce them on request.   Again, the duty to maintain is acknowledged and monthly wage data was maintained. The duty to produce, however, ran not to these claimants but to their representative unions pursuant to a collective bargaining agreement.   The mystery as to why the claimants refused or neglected to obtain this information is simply solved: the wage data produce much lower displacement allowances than did the incorrect and often unsubstantiated data used by their expert.

The Majority argues that even though the Claimants had other options for obtaining the record, the Carrier was still  "responsible for producing them"(p. 49) even though they ceased having ownership over the monthly wage data 30 years ago when it was transferred to Conrail. What the Majority gives with one hand, it takes away with the other.   The Majority writes that "these proceedings do not involve the type of egregious conduct that supports spoliation sanctions"(p. 49) but then it imposes the prejudgment interest sanction or enhancement for precisely this reason.   In addition, the Majority says that even though the evidence is available

31

and easily obtainable, the Carrier's failure to supply the monthly wage data supported its decision to impose a certain burdens of proof on the Carrier, relax evidentiary rules in favor of the Claimants, and permit the use of a flexible (read a non-evidentiary) approach to the proof of compensation against the Carrier.

### C. Prejudgment Interest is Not Legally Justified in this Case

Before prejudgment interest can be legally assessed, compensation must be liquidated. Assuming for the purpose of this argument  that this panel has discretion to award prejudgment interest, it may only be awarded if the underlying damages are liquidated.  In other words, we must know with reasonable certainty what the underlying damages are so that an interest calculation can be made accurately.  In this case, again, the Claimant's expert admitted that he did not use the required calculation in the contract because he did not have the wage cards that were available.  Consequently, accurate calculations cannot be made.

Above it was demonstrated that the computations used the incorrect formula and resulted in higher damages amounts and in at least in the case of John Gallagher awarded him $3,053 in compensation with an overall award of $86, 631 which includes prejudgment interest when in fact he could not qualify for benefits under the MPA because he was out of work due to injury not due to any displacement by the Carrier.   Another problem arises with the award of prejudgment interest through December 2007 – most of the Claimants were deceased. Nevertheless, the Majority awards prejudgment interest after their deaths.   Thus the Majority unrealistically assumes that the displacement allowance should include all work years throughout an employee's life expectancy and that upon death all of that income would have passed to the estate without any having been deducted for consumption.  Even if we assume that a displaced worker should receive all the compensation due to him and never paid, it does not follow that the

estates should be treated as if at the time of death the estate should have received every penny earned plus interest without taking into account the worker's consumption.

**Conclusion**

The Majority award cannot stand because it is based neither on the facts nor the law of this case.  Further, the award cannot stand because the Majority  penalizes the Carrier by ignoring the clear and express language of the contract especially regarding the formula for compensation; eliminating the contractual causation or eligibility requirement; ignoring the Claimants' own testimony as to the reason for their job losses; ignoring the Claimants' expert's confession of error regarding his calculation of damages; shifting burdens of proof; excusing evidence; sanctioning the Carrier for delays beyond its control; and, sanctioning the Carrier for not providing easily obtainable evidence which it did not possess and which the Claimants refused or neglected to obtain because it did not help their case.   All of these errors constitute *post hoc* justifications by the Majority for its $13 million award.


 For these reasons, I dissent from the Majority's award of damages in this arbitration.


Dated: July 30, 2009                                    */s/ Joseph P. Tomain*
                                                        Joseph P. Tomain
                                                        Party-Appointed Arbitrator

33